**UNITED STATES COURT OF APPEALS**
**FOR THE THIRD CIRCUIT**

| | |
|---|---|
| LIMA JEVREMOVIĆ, an individual; and AUTONOMOUS USER REHABILITATION AGENT, LLC, a Delaware Limited Liability Company,<br><br>*Plaintiffs-Appellants*,<br><br>-*against*-<br><br>BRITTANY JEREAM COURVILLE, an individual; and THAT SURPRISE WITNESS TV LLC, a New Jersey Limited Liability Company,<br><br>*Defendants-Appellees*. | Case No. 25-2553<br><br>**DECLARATION OF**<br>**ELLIOT D. OSTROVE**<br><br>On Appeal from the United States District Court for the District of New Jersey, before the Honorable Zahid N. Quraishi, U.S.D.J. No. 3:22-cv-04969-ZNQ-RLS |

I, **ELLIOT D. OSTROVE**, of full age, hereby state and declare as follows:

1.      I am an attorney at law admitted to practice in the State of New Jersey, including the District of New Jersey, and the United States Court of Appeals for the Third Circuit. I am a member of Epstein Ostrove, LLC, attorneys for Plaintiffs-Appellants, Lima Jevremovic and Autonomous User Rehabilitation Agent, LLC (collectively, "Plaintiffs").

2.      Pursuant to Federal Rule of Appellate Procedure 32.1(b), I submit this Declaration containing copies of unpublished and/or non-precedential court opinions cited in the Plaintiff's appellate brief.

3.      Attached hereto as **EXHIBIT 1** is a true copy of *LY Berditchev Corp. v. ESupplements, LLC*, 2024 U.S.Dist. LEXIS 165092 (D.N.J. September 12, 2024).

4.      Attached hereto as **EXHIBIT 2** is a true copy of *Sciore v. Phung*, 2022 U.S. Dist. LEXIS 58163, (D.N.J. March 30, 2022).

1

5.      Attached hereto as **EXHIBIT 3** is a true copy of *Wang v. N.J. State Police*, 2019 U.S. Dist. LEXIS 139809 (D.N.J. August 19, 2019).

6.      Attached hereto as **EXHIBIT 4** is a true copy of *Herman v. Ibtihaj Muhammad*, Docket No. A-1328-23, 2024 N.J. Super. Unpub. LEXIS 2416 (App. Div. October 15, 2024).

7.      Attached hereto as **EXHIBIT 5** is a true copy of *Schachtel v. Hughes*, Docket Nos. A-3510-21, A-3728-21. 2024 N.J. Super. Unpub. LEXIS 2609 (App. Div. October 25, 2024).

I declare under penalty of perjury that the foregoing is true and correct.

Dated: October 21, 2025                          _/s/Elliot D. Ostrove_____
                                                          **ELLIOT D. OSTROVE**

2

# EXHIBIT 1

No *Shepard's* Signal™
As of: October 21, 2025 7:09 PM Z

# *LY Berditchev Corp. v. ESupplements, LLC*

United States District Court for the District of New Jersey

September 12, 2024, Decided; September 12, 2024, Filed

Civ. No. 2:24-cv-00625 (WJM)

**Reporter**
2024 U.S. Dist. LEXIS 165092 *; 2024 WL 4182585

LY BERDITCHEV CORP., Plaintiff, v. ESUPPLEMENTS, LLC and MICHAEL PEERS, Defendants.ESUPPLEMENTS, LLC and MICHAEL PEERS, Counterclaimants, v. LY BERDITCHEV CORP., Counterclaim Defendant.

## Core Terms

Counterclaim, products, wholesalers, tortious interference, motion to dismiss, allegations, selling, distribution agreement, trademark, online, resell

**Counsel:  [*1]** For LY BERDITCHEV CORP., Plaintiff: MARK BERKOWITZ, TARTER KRINSKY & DROGIN LLP, NEW YORK, NY.

For ESUPPLEMENTS, LLC, MICHAEL PEERS, Defendants: ARTHUR JOSEPH MONACO, LEAD ATTORNEY, O'BRIEN LLP, NEW YORK, NY.

For MICHAEL PEERS, ESUPPLEMENTS, LLC, Counter Claimants: ARTHUR JOSEPH MONACO, LEAD ATTORNEY, O'BRIEN LLP, NEW YORK, NY.

For LY BERDITCHEV CORP., Counter Defendant: MARK BERKOWITZ, TARTER KRINSKY & DROGIN LLP, NEW YORK, NY.

**Judges:** WILLIAM J. MARTINI, UNITED STATES DISTRICT JUDGE.

**Opinion by:** WILLIAM J. MARTINI

## Opinion

In this action, Defendant/Counterclaimant ESupplements, LLC d/b/a Nutricost ("Nutricost")[1] has asserted a counterclaim against Plaintiff/Counterclaim Defendant LY Berditchev Corporation ("LYB") for tortious interference with contract, which LYB now moves to dismiss pursuant to *Fed. R. Civ. P. 12(b)(6)*. ECF No. 15. The Court decides the matter without oral argument. *Fed. R. Civ. P. 78(b)*. For the reasons stated below, LYB's motion to dismiss is **granted**. Nutricost's counterclaim is **dismissed without prejudice**.

### I. BACKGROUND

Nutricost manufactures dietary supplemental products under the Nutricost trademark that it owns. Compl. ¶¶ 6, 14, 15, ECF No. 1. It sells its products on its own storefronts on third-party online sales platforms such as

---

[1] Although the caption in the docket includes Michael Peers as a counterclaimant, the Counterclaim identifies Nutricost as the only counterclaimant. *See* ECF no. 11.

Amazon.com **[\*2]** ("Amazon"), as well as directly to consumers through its internet website and authorized wholesalers that in turn provide Nutricost products to brick-and-mortar retailers. Counterclaim ¶¶ 2-3, ECF No. 11. LYB acquires and re-sells various consumer products, including Nutricost products, on online platforms such as Amazon. Compl. ¶¶ 17-18, 39. Nutricost filed complaints with Amazon alleging that LYB's sale of Nutricost products infringed its trademark. *Id.* at ¶ 45. As a result, certain of LYB's listings were removed by Amazon purportedly causing LYB harm. *Id.* at ¶ 50.

LYB instituted this action claiming that because it only sells genuine products through its Amazon storefront, Nutricost has no legitimate intellectual property claim against it, *id.* at ¶ 38, and that Nutricost knew or should have known that its trademark allegations were false, *id.* at ¶ 59, but nonetheless made false complaints to eliminate fair competition and control pricing, *id.* at ¶¶ 69-70. LYB seeks declaratory judgment and damages for defamation, trade libel, and tortious interference with contract.

In its counterclaim, Nutricost maintains that it has "distribution" agreements with all of its wholesalers prohibiting **[\*3]** the sale or distribution of "Nutricost products to any person or entity Distributor knows, should know, or has any reason to believe will resell the Products, directly or indirectly, online." Counterclaim, ¶ 8. The distribution agreement requires wholesalers to sell *only* to Nutricost's authorized brick-and-mortar retailers or authorized online sales platforms, which do not include Amazon. Def. Br. at 2.[2] According to Nutricost, LYB knew of this contractual prohibition yet purchased Nutricost products from one or more of Nutricost's wholesalers, tortiously interfering and causing breach of the distribution agreement. *Id.* at ¶¶ 10-13. Nutricost sues for damages as well as injunctive relief to have LYB cease all sales of Nutricost products.

LYB presently moves to dismiss Nutricost's counterclaim for tortious interference of contract.

## II. DISCUSSION

A motion to dismiss a counterclaim is governed by the same standard applicable to a motion to dismiss a complaint under *Fed. R. Civ. P. 12(b)(6)*, which provides for the dismissal of a complaint, in whole or in part, if the plaintiff fails to state a claim upon which relief can be granted. *See Hotaling & Co., LLC v. Berry Solutions Inc., 2022 U.S. Dist. LEXIS 178066, 2022 WL 4550145, at \*2 (D.N J. Sept. 29, 2022)*. The moving party bears the burden of showing that no claim has been stated. **[\*4]** *Hedges v. United States, 404 F.3d 744, 750 (3d Cir.2005)*. Dismissal is appropriate only if, accepting all the facts alleged in the complaint as true, the plaintiff has failed to plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*; *see also Umland v. PLANCO Fin. Serv., Inc., 542 F.3d 59, 64 (3d Cir. 2008)*. This assumption of truth is inapplicable, however, to legal conclusions couched as factual allegations or to "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)*. While a complaint need not contain detailed factual allegations, "a formulaic recitation of the elements of a cause of action will not do." *Twombly, 550 U.S. at 555*. The factual allegations must be sufficient to raise a plaintiff's right to relief above a speculative level, *see id. at 570*, such that the court may "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal, 556 U.S. at 678* (citing *Twombly, 550 U.S. at 556*). While "[t]he plausibility standard is not akin to a probability requirement' ... it asks for more than a sheer possibility that a defendant has acted unlawfully."*Iqbal, 556 U.S. at 678*.

A claim for tortious interference requires a plaintiff to allege facts showing: (1) the existence of a contract; (2) defendant interfered intentionally and maliciously with that contract; (3) loss of the prospective gain or breach **[\*5]** of contract as a result of the interference; and 4) damages resulting from that interference. *Printing Mart-Morristown v. Sharp Elec. Corp., 116 N.J. 739, 751-52, 563 A.2d 31 (1989)*; *Fid. Eatontown, LLC v. Excellency Enter., LLC, No.*

---

[2] However, ¶ 8 of Nutricost's counterclaim states that "...wholesalers agree to *not* directly or indirectly market sell or distribute Nutricost products to expressly authorized brick-and-mortar retailers or expressly authorized online sales platforms, which do not include Amazon.com." (emphasis added).

*16-3899, 2017 U.S. Dist. LEXIS 96368, 2017 WL 2691417, at \*6 (D.N.J. June 22, 2017)*. LYB contends that the counterclaim for tortious interference with contract should be dismissed because Nutricost does not plausibly plead any of the requisite elements. The Court finds that Nutricost fails to adequately plead the second element.

As to the first element, Nutricost sufficiently alleges the existence of a contract. Specifically, Nutricost claims to have "distribution" agreements with its wholesalers prohibiting the wholesalers from selling or distributing "Nutricost products to any person or entity Distributor knows, should know, or has any reason to believe will resell the Products, directly or indirectly, online." Counterclaim, ¶ 8. "Courts in this district have held that a 'claim for tortious interference with contract [may] survive a motion to dismiss where a plaintiff alleges the existence of a contract but does not plead specific facts identifying it,'" *Plumbers & Pipefitters Loc. 572 Health & Welfare Fund v. Merck & Co., No. 12-1379, 2014 U.S. Dist. LEXIS 90313, 2014 WL 12621229, at \*5 (D.N.J. June 30, 2014)* (internal citation omitted)); *see e.g. Leva Pharm. Indus., Ltd. v. Apotex, Inc., No. 07-5514, 2008 U.S. Dist. LEXIS 60418, 2008 WL 3413862, at \*9 (D.N.J. Aug. 8, 2008)* (concluding notice pleading under "*Rule 8(a)* does not require a party to identify a specific prospective customer or contract.").

The third and fourth elements of tortious interference are **[\*6]** also adequately plead. Nutricost alleges LYB induced wholesalers to breach their distribution agreements by selling the products to any entity that might resell the products. *See* Counterclaim ¶ 13. The Court is also satisfied that the Nutricost's assertion of loss of the "economic benefit of [LYB's] sale of Nutricost products on Amazon" adequately states a claim for damages as a result of LYB's "interference with Nutricost's distribution agreements with its wholesalers." Counterclaim ¶ 16.

However, the Counterclaim fails to sufficiently plead that any interference with contract was intentional and malicious. "'Interference is intentional when the actor desires to bring it about or if he knows that the interference is certain or substantially certain to occur as a result of his action.'" *Fid. Eatontown, 2017 U.S. Dist. LEXIS 96368, 2017 WL 2691417, at \*7* (citing *Cargill Global Trading v. Applied Dev. Co., 706 F. Supp. 2d 563, 575-76 (D.N.J. 2010)*). "Malice" does not "mean 'ill will;' rather, it means that harm was inflicted intentionally and without justification or excuse." *Lamorte Burns & Co., Inc. v. Walters, 167 NJ. 285, 306, 770 A.2d 1158 (NJ. 2001)*. There is no compensable tort injury if conduct does not transgress the "rules of the game" such that "a plaintiff's loss of business is merely the incident of healthy competition." *Id.* "The conduct must be both injurious and transgressive of generally accepted **[\*7]** standards of common morality or of law," *Id.* (internal quotations and citation omitted). "The line clearly is drawn at conduct that is fraudulent, dishonest, or illegal." *Id. at 307*.

Here, the only allegation of intent in the Counterclaim is conclusory. Nutricost claims that LYB "intentionally, knowingly, and willfully interfered with Nutricost's distribution agreements by inducing one or more of its wholesalers to "sell Nutricost products to [LYB] for resale on Amazon.com" and either conspired "with Nutricost wholesalers to conceal the sale of Nutricost products to [LYB] or [LYB] concealed its true identity or intent to resell the Nutricost products on Amazon." Counterclaim, ¶¶ 13-14. Even accepting as true that LYB knew Nutricost wholesalers were contractually prohibited from selling Nutricost products to LYB, *see* Counterclaim ¶ 12, these are bald allegations of intentional harm that lack any factual support, Moreover, LYB's sale of Nutricost products does not transgress the "rules of the game." *See Iberia Foods Corp. v. Romeo, 150 F.3d 298, 301, n.4 (3d Cir. 1998)* ("According to the 'first sale' or 'exhaustion' doctrine, a trademark owner's authorized initial sale of its product into the stream of commerce extinguishes the trademark owner's rights to maintain **[\*8]** control over who buys, sells, and uses the product in its authorized form,"); *see e.g., Matrix Essentials, Inc. v. Cosm. Gallery, Inc., 870 F. Supp. 1237, 1248 (D.N.J, 1994)* (finding no tortious interference where "defendants simply interfered with Matrix's interest in maintaining its distribution and marketing scheme" and were "simply attempting to make a profit through the sale of Matrix goods, just as a competitor would attempt to make a profit by competing with Matrix for consumers"), *aff'd*, *85 F.3d 612 (3d Cir. 1996)*.

## III. CONCLUSION

For the reasons noted above, LYB's motion to dismiss the counterclaim is **granted**. Nutricost's counterclaim for tortious interference is **dismissed without prejudice**. Defendant may file an amended counterclaim, consistent with the rulings in this Opinion, within thirty days.

/s/ William J. Martini

**WILLIAM J. MARTINI, U.S.D.J.**

Date: September 12, 2024

**ORDER**

**WILLIAM J. MARTINI, U.S.D.J.:**

This matter comes before the Court on the motion of Counterclaim Defendant LY Berditchev Corporation ("LYB") to dismiss Defendant/Counterclaimant ESupplements, LLC d/b/a Nutricost's ("Nutricost") counterclaim pursuant to *Fed. R. Civ. P. 12(b)(6)*. ECF No. 15. For the reasons set forth in the accompanying opinion, and for good cause shown,

**IT IS** on this 12th day of September 2024, **ORDERED** that Counterclaim Defendant **[*9]** LYB's motion to dismiss is **granted;** and

**IT IS FURTHER ORDERED** that Nutricost's counterclaim for tortious interference with contract is **dismissed without prejudice**. Nutricost may file an amended counterclaim, consistent with the rulings in the accompanying Opinion within thirty days.

/s/ William J. Martini

**WILLIAM J. MARTINI, U.S.D.J.**

---

**End of Document**

# EXHIBIT 2

 Caution

As of: October 21, 2025 7:05 PM Z

# *Sciore v. Phung*

United States District Court for the District of New Jersey

March 30, 2022, Decided; March 30, 2022, Filed

Civil Action No. 19-13775

**Reporter**

2022 U.S. Dist. LEXIS 58163 *; 2022 WL 950261

MICHAEL SCIORE, et al., Plaintiffs, v. KELLY PHUNG, et al., Defendants.

## Core Terms

sentence, restaurant, food, defamation, motion to dismiss, trade libel, personal jurisdiction, tortious interference, meats, amended complaint, nondefamatory, verifiability, unlimited, statement of facts, allegations, defamatory, carb, expressing, hyperbolic, customers, ran, contractual relationship, contacts, dishes, ribs, allegedly defamatory, assessing, parties, courts, fails

**Counsel: [*1]** For Plaintiffs: DAVID D. LIN, LEWIS & LIN LLC, BROOKLYN, NY.

For Defendants Kelly Phung, Studio KP, LLC, and Peter Ly: MATTHEW ADAM GREEN, JOSHUA BENJAMIN KAPLAN, OBERMAYER REBMANN MAXWELL & HIPPELL LLP, MOUNT LAUREL, NJ.

For Defendant Rachele Tran and Sidney Tran: ARIJ H. SYED, ORLOVSKY MOODY SCHAAF CONLON & GABRYSIAK, MONMOUTH PARK CORPORATE CENTER, WEST LONG BRANCH, NJ.

KEVIN CHING, Defendant, Pro se, PHILADELPHIA, PA.

**Judges:** NOEL L. HILLMAN, United States District Judge.

**Opinion by:** NOEL L. HILLMAN

## Opinion

**HILLMAN, District Judge**

Presently before the Court are the motions to dismiss Plaintiffs' Amended Complaint filed by *pro se* Defendant Kevin Ching ("Ching") and Defendant Peter Ly ("Ly") (collectively "Defendants"). [Dkt. Nos. 87 and 94 respectively]. Defendant Ching seek to dismiss Plaintiffs' Amended Complaint pursuant to *Rule 12(b)(2)* for lack of personal jurisdiction, or, in the alternative, pursuant to *Rule 12(b)(6)* for failure to state a claim upon which relief can be granted. Defendant Ly also seeks dismissal pursuant to *Rule 12(b)(6)*.

Plaintiffs Michael Sciore and Old City Pretzel Company, LLC (collectively "Plaintiffs") oppose the Ly motion, [Dkt. No. 106], as well as oppose the Ching motion, and cross-move to transfer the case against Defendant **[*2]** Ching to the United States District Court for the Eastern District of Pennsylvania pursuant to *28 U.S.C. § 1631*. [Dkt. No. 98].

The Court has considered the parties' submissions and decides these matters pursuant to *Federal Rule of Civil Procedure 78*. For the reasons stated below, Defendant Ching's motion to dismiss for lack of personal jurisdiction will be granted, Plaintiffs' motion to transfer will be denied, and the Court will grant Defendant Ly's motion for failure to state a claim upon which relief can be granted.

## BACKGROUND

The facts and procedural history of this case are well-known to the parties and have been fully detailed in the Court's January 18, 2021 Opinion, [Dkt. No. 53]. Accordingly, the Court adopts that background and will not restate the full history here.

This case concerns negative restaurant reviews posted on Yelp.com ("Yelp") about the now defunct restaurant Ardiente. Amended Complaint, [Dkt. No. 55], at ¶ 1. Ardiente is the registered fictious name for Plaintiff Old City Pretzel Company, LLC, a limited liability company of which Plaintiff Sciore, a New Jersey citizen, was the sole member. Ardiente was located in Philadelphia, Pennsylvania. Id. at ¶¶ 5-6.

Plaintiffs allege that on July 7, 2018, Defendant Ly posted **[*3]** the following negative restaurant review ("Ly review") about Ardiente on Yelp:

> Not highly recommended for having parties, birthdays, or any type of events here because they will run out of food even though they say it's "unlimited" (you'll be lucky if you even get enough food to begin with). A friend of ours planned a birthday dinner here a month in advance for her husband and a group of 40 people. As promised, there will be unlimited food but drinks will be charged separately by the establishment. As the night started, everyone's ordering drinks and having a good time until [sic] food started coming out. There was countless number of carbs and veggie dishes of the same 3-4 items but when we had meats come out, it was literally 4 people to 2 pieces of chicken or 4 people to 1 piece of rib. Let alone there wasn't even enough meats to be given to each person for them to say "we ran out". [sic] After confronting the owner, he goes I understand this table didn't get it, but do understand what the other tables got (LOL Tf exactly), what does that have to do with the table that didn't get jack sh*t? Mind you it was suppose [sic] to be unlimited food since it was a preset menu, but they "ran **[*4]** out." Also to mention, the meats, portioned for mice, took nearly 45 mins to come out following the countless UNLIMITED amount of carb dishes (i [sic] get it [sic] restaurants that do this is [sic] trying to get you full before the meats come out), but again, the meats that came out wasn't even enough to begin with. Finally, the bill came out close to $5000 for having mediocre drinks, unlimited carbs and grass, and 2 pieces of meat for 40 people to share. After reducing the price, it came to 100 a person, in which [sic] still can't be justified for what was given to us. At the end, following the dispute, they had the audacity to just bring two plates of ribs when everyone had already lost their appetite from waiting too long, and yes it was left there and no one ate anyone [sic] it. Following the whole "party" many of us went and got pizza because we were obviously still hungry. Def not a place to go with this type of hospitality.

Amended Complaint, [Dkt. No. 55], at ¶¶ 27-28.

Plaintiffs' Complaint avers the above allegations are false statements of fact that cannot be interpreted as opinion. Plaintiffs claim Defendant Ly posted his review to harm Plaintiffs' reputation and to cause **[*5]** them to lose revenue.

Plaintiffs further allege that on July 15, 2018, Defendant Ching posted the following negative restaurant review ("Ching review") about Ardiente on Yelp:

> Had high expectations after perusing their menu and reading prior reviews beforehand. However, not only was I disappointed but insulted by how our party was treated from the owner himself. Food itself was mediocre and too salty to be palatable. Our first 5-6 courses of the tasting menu consisted of underwhelming veggie or carb dishes. The last two courses were supposed to be the short ribs and Cornish hen but they ran out after serving only a few morsels of each. How this restaurant failed to prepare for this event with a month's notice is beyond me and will steer clear from this place indefinitely.

Id. at ¶¶ 76-77.

Plaintiffs' Complaint repeats the same allegations regarding the Ching review as it alleged towards the Ly review, namely that the review contains false statements of fact that cannot be interpreted as opinion, and that Defendant Ching sought to harm Plaintiffs' reputation and to cause them to lose revenue.

In response to the Ly and Ching reviews, as well as other reviews, Plaintiffs filed a complaint **[\*6]** in August of 2018 (this was a prior case, naming only Kelly Phung, Studio KP LLC, and John Doe fictious parties). Plaintiffs thereafter initiated this matter, filing the underlying complaint on June 14, 2019. Both cases concerned claims of defamation and, based on this underlying claim for defamation, a claim of tortious interference with contractual relations and prospective contractual relations. On February 17, 2021, Plaintiffs filed the First Amended complaint, which is presently the operative pleading and is the first pleading to name as Defendants Ching, Ly, Rachele Tran, Sidney Tran, Michelle Nguyen Tran, Irine Tran, and Thao Tran (whose identities were unknown by Plaintiffs until recently).

On April 27, 2021, Defendants Irine Tran, Sidney Tran, and Rachele Tran filed answers to the first amended complaint. On May 13, 2021, Defendant Ching filed his motion to dismiss. Ching Motion to Dismiss ("Ching MTD"), [Dkt. No. 87]. On May 25, 2021, Defendant Ly filed his motion to dismiss. Ly Motion to Dismiss ("Ly MTD"), [Dkt. No. 94]. Plaintiffs opposed Defendant Ching's motion to dismiss and cross-moved to transfer their case against him to the United States District Court for the Eastern **[\*7]** District of Pennsylvania. Plaintiffs' Brief in Opposition to Ching ("Ching Opp. Br."), [Dkt. No. 98-6].

On June 22, 2021, Plaintiffs filed opposition to Defendant Ly's motion to dismiss. Plaintiffs' Brief in Opposition to Ly ("Ly Opp. Br."), [Dkt. No. 106]. Both Defendants Ching and Ly have filed briefs in reply to Plaintiffs' opposition to the requested relief, and, with leave of the Court, Plaintiffs filed a sur-reply in support of their opposition to Defendant Ching's motion to dismiss and cross-motion to transfer. The parties' motions are therefore ripe for adjudication.

## DISCUSSION

### A. Subject Matter Jurisdiction

This Court exercises subject matter jurisdiction over this matter pursuant to *28 U.S.C. § 1332* because there is complete diversity of citizenship, and the amount in controversy exceeds $75,000. See Amended Complaint, [Dkt. No. 55], at ¶¶ 5-17 and Prayer for Relief ¶ 5.

### B. Standard of Review

#### 1. Ly's Motion to Dismiss Pursuant to *Rule 12(b)(6)*

Defendant Ly's motion to dismiss is governed by *Fed. R. Civ. P. 12(b)(6)*.

When considering a motion to dismiss a complaint for failure to state a claim upon which relief can be granted, a court must accept all well-pleaded allegations as true and view them in the light most favorable to the plaintiff. **[\*8]** *Evancho v. Fisher, 423 F.3d 347, 351 (3d Cir. 2005)*. It is well settled that a pleading is sufficient if it contains "a short and plain statement of the claim showing that the pleader is entitled to relief." *Fed. R. Civ. P. 8(a)(2)*.

"While a complaint attacked by a *Rule 12(b)(6)* motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do . . . ." *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)* (alteration in original) (citations omitted) (first citing *Conley v. Gibson, 355 U.S. 41, 47, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)*; *Sanjuan v. Am. Bd. of Psychiatry & Neurology, Inc., 40 F.3d 247, 251 (7th Cir. 1994)*; and then citing *Papasan v. Allain, 478 U.S. 265, 286, 106 S. Ct. 2932, 92 L. Ed. 2d 209 (1986)*).

To determine the sufficiency of a complaint, a court must take three steps: (1) the court must take note of the elements a plaintiff must plead to state a claim; (2) the court should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth; and (3) when there are well-pleaded factual

allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief. *Malleus v. George, 641 F.3d 560, 563 (3d Cir. 2011)* (quoting *Ashcroft v. Iqbal, 556 U.S. 662, 664, 675, 679, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)* (alterations, quotations, and other citations omitted).

"[W]hen a complaint adequately states a claim, it may not be dismissed based on a district court's assessment that **[*9]** the plaintiff will fail to find evidentiary support for his allegations or prove his claim to the satisfaction of the factfinder." *Twombly, 550 U.S. at 563 n.8* (quoting *Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974)*). Thus, a court asks "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claim." Id. (quoting *Scheuer, 416 U.S. at 236*).

"A motion to dismiss should be granted if the plaintiff is unable to plead 'enough facts to state a claim to relief that is plausible on its face.'" *Malleus, 641 F.3d at 563* (quoting *Twombly, 550 U.S. at 570*); see also *Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009)* ("*Iqbal* . . . provide[d] the final nail in the coffin for the 'no set of facts' standard that applied to federal complaints before *Twombly*."). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a [party] has acted unlawfully." *Iqbal, 556 U.S. at 678*.

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing *Twombly, 550 U.S. at 556*). It is ultimately the defendant, however, that bears the burden of showing that no claim has been presented. *Hedges v. United States, 404 F.3d 744, 750 (3d Cir. 2005)* (citing *Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1409 (3d Cir. 1991)*).

**2. Ching's Motion to Dismiss Pursuant to *Rule 12(b)(2)***

Defendant Ching's motion to dismiss is governed by *Fed. R. Civ. P. 12(b)(2)*.

After a motion to dismiss **[*10]** is filed pursuant to *Fed. R. Civ. P. 12(b)(2)*, the burden shifts to the Plaintiff to provide sufficient facts to establish jurisdiction. See *O'Connor v. Sandy Lane Hotel Co., 496 F.3d 312, 316 (3d Cir. 2007)* (citing *GE v. Deutz AG, 270 F.3d 144, 150 (3d Cir. 2001)*). The Plaintiff must "sustain its burden of proof in establishing jurisdictional facts through sworn affidavits or other competent evidence" and cannot rely "on the bare pleadings alone in order to withstand a defendant's *Rule 12(b)(2)* motion to dismiss for lack of in personam jurisdiction." *Weber v. Jolly Hotels, 977 F. Supp. 327, 331 (D.N.J. 1997)*. At the same time, however, courts must "accept all of the plaintiff's allegations as true and construe disputed facts in favor of the plaintiff." *Carteret Sav. Bank v. Shushan, 954 F.2d 141, 142 n.1 (3d Cir. 1992)*.

"When a district court is sitting in diversity, it 'may assert personal jurisdiction over a nonresident defendant to the extent allowed under the law of the forum state.'" *Koch v. Pechota, 744 F. App'x 105, 109 (3d Cir. 2018)* (quoting *Metcalfe v. Renaissance Marine, Inc., 566 F.3d 324, 330, 51 V.I. 1219 (3d Cir. 2009)*). The New Jersey long-arm statute "provides for jurisdiction coextensive with the due process requirements of the United States Constitution." *Id. at 110* (quoting *Miller Yacht Sales, Inc. v. Smith, 384 F.3d 93, 96 (3d Cir. 2004)*). "New Jersey courts [therefore] look to federal law to interpret the limits on personal jurisdiction." Id. (citing *IMO Indus. v. Kiekert AG, 155 F.3d 254, 259 (3d Cir. 1998)*).

Federal due process requires that a defendant have "certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and **[*11]** substantial justice.'" *Int'l Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S. Ct. 154, 90 L. Ed. 95 (1945)* (quoting *Milliken v. Meyer, 311 U.S. 457, 463, 61 S. Ct. 339, 85 L. Ed. 278, (1940)*). A defendant establishes minimum contacts by "purposefully avail[ing] itself of the privilege of conducting activities within the forum State," thereby invoking "the benefits and protections of [the forum State's] laws." *Asahi Metal Indus. Co. v. Superior Ct., 480 U.S. 102, 109, 107 S. Ct. 1026, 94 L. Ed. 2d 92 (1987)* (quoting *Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985)*). This "purposeful availment" requirement assures that the defendant could reasonably anticipate being haled into court in the forum and is not haled into a forum as a result of "random," "fortuitous," or "attenuated" contacts with the forum

state. *Burger King, 471 U.S. at 472, 475*; see also *World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297, 100 S. Ct. 559, 62 L. Ed. 2d 490 (1980)*.

There are two types of personal jurisdiction that satisfy the minimum contacts standard: specific and general jurisdiction. *Koch, 744 F. App'x at 110*. "A court has specific jurisdiction when the suit 'arises out of or relate[s] to the defendant's contacts with the forum.'" Id. (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915, 923-24, 131 S. Ct. 2846, 180 L. Ed. 2d 796 (2011)*). "[A] court has general jurisdiction . . . when a defendant's 'affiliations with the State are so "continuous and systematic" as to render them essentially at home in the forum State.'" Id. (quoting *Goodyear, 564 U.S. at 919*). As such, general jurisdiction does not require the cause of action to have a relationship with the defendant's forum contacts.

## C. Analysis

### 1. Ly's Motion to Dismiss Pursuant to *Rule 12(b)(6)*

### a. Plaintiffs' Defamation Claim [*12]  Against Ly

Plaintiffs assert a claim for defamation against Ly, alleging the Ly review was a knowingly and maliciously false statement published on Yelp to third parties about Plaintiffs and that said statement was intended to harm Plaintiffs' reputation and business activities. Defendant Ly responds by arguing the Amended Complaint fails to sufficiently plead a claim for defamation and must be dismissed because: (1) the Ly review is just that, a restaurant review, constituting nothing more than the author's opinions about the quality of the restaurant; (2) the hyperbolic words and phrases do not give rise to a defamation claim; and (3) even if the review contains statements of fact, said statements are not defamatory because they are objectively unverifiable. The Court agrees with all three of Ly's arguments.

To plead a *prima facie* case of defamation under New Jersey law,[1] "a plaintiff must establish (1) the assertion of a false and defamatory statement concerning the plaintiff, (2) the unprivileged publication of that statement to a third party, (3) fault amounting to at least negligence by the publisher, and (4) damages." *Robles v. U.S. Envt. Universal Serv., Inc., 469 Fed. App'x 104, 109 (3d Cir. 2012)* (citing *DeAngelis v. Hill, 180 N.J. 1, 12-13, 847 A.2d 1261 (2004)*); *Leang v. Jersey City Bd. of Educ., 198 N.J. 557, 585, 969 A.2d 1097 (2009)*. The elements of defamation in New Jersey comport **[*13]**  with the Restatement (Second) of Torts. *DeAngelis, 180 N.J. at 12*.

As to the first element, a viable defamation claim must show that the statements at issue were defamatory in nature, which is a question of law for the Court. *Reed v. Scheffler, 218 F. Supp. 3d 275, 282 (D.N.J. 2016)* (citing *Ward v. Zelikovsky, 136 N.J. 516, 643 A.2d 972 (1994)*). As determined by the Supreme Court of New Jersey, "[w]hether a statement is defamatory depends on its content, verifiability, and context." *Lynch v. New Jersey Educ. Ass'n, 161 N.J. 152, 167-68, 735 A.2d 1129 (1999)* (citing *Ward, 136 N.J. at 529*). Assessing a statement's content "involves consideration not merely of a statement's literal meaning, but also of the fair and natural meaning that reasonable people of ordinary intelligence would give to it." *Lynch, 161 N.J. at 167*. Thus, "the critical consideration is what a reasonable reader would understand the statement to mean." Id. (citing *Milkovich v. Lorain Journal Co.,*

---

[1] As the parties present their arguments under New Jersey law, they tacitly agree that New Jersey law applies, and as they fail to argue otherwise, the Court applies New Jersey law to this matter. Indeed, a court sitting in diversity must apply the substantive law of the forum. *Robeson Indus. Corp. v. Hartford Accident & Indem. Co., 178 F.3d 160, 165 (3d Cir. 1999)*. However, the Court recognizes that New Jersey conflict-of-law analysis might suggest that the Commonwealth of Pennsylvania have a greater interest in this action. Nonetheless, there is "no conflict between New Jersey and Pennsylvania law: both rely on the Restatement (Second) of Torts and require similar elements for defamation." *Kerrigan v. Otsuka Am. Pharm., Inc., 560 Fed. App'x 162, 167 (3d Cir. 2014)*. Thus, the Court is confident in its application of New Jersey law because there is no material difference between New Jersey and Pennsylvania law as it relates to Plaintiff's core claim of defamation.

_497 U.S. 1, 17, 110 S. Ct. 2695, 111 L. Ed. 2d 1 (1990)_). In addition, in assessing the content, courts will "distinguish 'between genuinely defamatory communications as opposed to obscenities, vulgarities, insults, epithets, name-calling, and other verbal abuse.'" _Ward, 136 N.J. at 530_ (citation omitted). "Loose, figurative or hyperbolic language is not likely to imply specific facts, and thus is not likely to be deemed actionable." _Lynch, 161 N.J. at 168_ (citing _Ward, 136 N.J. at 532_).

Further effecting a statement's content, is the context in which it is issued, since "[t]he context of a statement can affect significantly **[*14]** its fair and natural meaning." _Lynch, 161 N.J. at 168_ (citing _Ward, 136 N.J. at 532_). The third level of analysis, namely verifiability, goes to whether the statement is one of fact or opinion, because statements of opinion, which cannot be proved true or false, like unverifiable statements of fact, are not actionable. _Lynch, 161 N.J. at 167_.

While opinions are not necessarily afforded "a wholesale defamation exemption," _Milkovich, 497 U.S. at 18_; see also _Ward, 136 N.J. at 531_, opinions are not defamatory "unless they imply false underlying objective facts." _Lynch, 161 N.J. at 168_ (citing _Restatement (Second) of Torts § 566_ (1977)). "The higher the 'fact content' of a statement, the more likely that the statement will be actionable." _Id. at 531-32_ (citation omitted). The Supreme Court of New Jersey identifies an opinion as a statement "based on stated facts or facts that are known to the parties or assumed by them to exist," _Dairy Stores, Inc. v. Sentinel Publ'g Co., 104 N.J. 125, 147, 516 A.2d 220 (1986)_ (citations omitted); while a "mixed opinion" is a statement "not based on facts that are stated or assumed by the parties to exist," _id. at 147-48_. Importantly, defendants are not held liable if the statement can be construed as either fact or opinion. _Lynch, 161 N.J. at 168_. And, a defendant will not be held liable for an opinion that is "accompanied by its underlying nondefamatory factual basis." _Kotlikoff v. The Community News, 89 N.J. 62, 72-73, 444 A.2d 1086 (1982)_.

The Court finds that the challenged Ly statement does not constitute defamation **[*15]** under any of the standards discussed above. It is undisputed that the Ly review was published on Yelp in the form of a restaurant review regarding Ly's experience dining at Ardiente. Accordingly, after assessing the contents, context, and verifiability, the challenged review constitutes a statement of opinion rather than fact, making it not defamatory.

### i. Context of the Ly Review

Beginning with the context of the Ly review, the Court notes that the allegedly defamatory statement is first and foremost a restaurant review, and, second, the statement is a Yelp review. These two lenses help focus this Court's analysis.

As pertains to the ordinary understanding and context of reviews on Yelp, a recent opinion from the United States District Court for the Eastern District of New York is informative. See _Mirza v. Amar, 513 F. Supp. 3d 292 (E.D.N.Y. 2021)_. There, a medical practice and its operating physician brought an action for defamation, trade libel, and tortious interference with contractual relations against a patient who had written a negative review on Yelp. In addition to considering the content, Judge Cogan of that court also considered the context of the review, which he found to be a nondefamatory opinion, holding:

> Here, the context **[*16]** is a review on Yelp, an Internet forum. "New York courts have consistently protected statements made in online forums as statements of opinion rather than fact." _Ganske[ v. Mensch,] 480 F. Supp. 3d [542,] 552 [(S.D.N.Y. 2020)]_. Statements made on Internet forums are made in a unique context in that they are generally informal and unedited. See id. This context leads "readers [to] give less credence to allegedly defamatory remarks published on the Internet than to similar remarks made in other contexts." Id. (quoting _Sandals Resorts Intl. Ltd. v. Google, Inc., 86 A.D.3d 32, 44, 925 N.Y.S.2d 407 (1st Dep't 2011)_). That defendant's allegedly defamatory statements appeared on Yelp — an Internet forum specifically designed for the publication of crowd-sourced opinionated reviews about businesses — "conveys a strong signal to a reasonable reader" that the statements are defendant's opinion. Id. When a posting "viewed in its full context, reveals that defendant is a disgruntled consumer and that [her] statements reflect [her] personal opinion based

upon [her] personal dealing with plaintiff," the context strongly suggests that the statements are merely "subjective expressions of consumer dissatisfaction" and thus nonactionable opinion. *Penn Warranty Corp. v. DiGiovanni, 10 Misc. 3d 998, 1005, 810 N.Y.S.2d 807, 815 (Sup. Ct. 2005)*.

Because Yelp reviews are used by consumers to provide their positive or negative opinions of businesses, the **[*17]** context strongly signals to readers that the review merely reflects the writer's opinion. As described below, the allegedly defamatory statements here do not overcome that context and are not actionable. Defendant's language is full of opinion and hyperbole and, to the extent that any isolated statement within the review might be construed as factual, when the review is read as a whole and in context, the message conveyed is merely the negative but protected opinion of a disgruntled customer.

*Mirza, 513 F. Supp. 3d at 297-98*. The Court views Ly's review in the same light. In the context of Yelp, a reasonable reader would understand that the review at issue here was Defendant Ly's subjective opinion as a disgruntled customer.

Turning next to the context of restaurant reviews and how this field of publication may inform the Court's analysis, the Court again turns to the views of New York courts, which appear particularly well-versed in actions for defamation based on negative restaurant reviews. For example, a panel of the Supreme Court of New York, Appellate Division, First Department plainly held that "restaurant ratings and reviews almost invariably constitute expressions of opinion." *Themed Restaurants, Inc. v. Zagat Survey, LLC, 21 A.D.3d 826, 801 N.Y.S.2d 38, 39-40 (1st Dep't 2005)*.[2] Likewise, in the more seminal **[*18]** decision of Mr. Chow of New York v. Ste. Jour Azur S.A., the Second Circuit vacated judgment and remanded the case back to the district court with instructions to dismiss the complaint because the Defendant-Appellants' negative restaurant review was opinion and Plaintiff-Appellee had failed to demonstrate how even the one factual averment contained within the review was in any way defamatory. *759 F.2d 219 (2d Cir. 1985)*.

The Defendants in Mr. Chow of New York included the publisher of a restaurant guide called the Gault/Millau Guide to New York and the guide's two editors. *759 F.2d at 221*. Contained within the guide was a negative review of the New York restaurant Mr. Chow. Id. The review made several negative statements, which are more or less analogous to the instant action, for example: (1) the review noted that the owner Mr. Chow is "clever" from a culinary perspective for opening a Chinese restaurant that is not actually about eating Chinese food — let alone good Chinese food; (2) the review called the restaurant chain's London branch "clearly overrated;" (3) the review claimed the service is bad since you will "have to wait ten minutes to obtain chop-sticks" and because "it is impossible to have the basic condiments **[*19]** (soy sauce, hot sauce, etc.) on the table;" (4) the review claimed the "principal concern of the waiters (Italians) is to sell you expensive alcoholic drinks;" and (5) the review was highly critical of the food, stating the food is not only bad but has "only the slightest relationship to the essential spirit of Chinese cuisine," with descriptions like: (a) "heavy and greasy dough" that "resembled bad Italian ravioli;" (b) "disturbingly gamy taste;" (c) "contain[ing] more dough (badly cooked) than meat;" (d) "remained still frozen on the plate;" (e) "rubbery . . . soaking . . . totally insipid;" (f) Peking duck prepared in one form instead of the traditional three ways, which included "pancakes the size of a saucer and the thickness of a finger;" and (g) "egg-rolls the thickness of andouillette sausages, and the dough the thickness of large tagliatelle." *Id. at 221-22*.

Assessing this review, the Second Circuit found that five of the six allegedly defamatory statements submitted to the jury were pure opinion, and that the only non-opinion, factual statement, namely that Mr. Chow served the duck one way instead of three, was not shown to be defamatory. In reaching this conclusion, the Second Circuit **[*20]** specifically found that restaurant reviews are, as they are understood by a reasonable reader and by their very nature, largely opinion:

---

[2] *Themed Restaurants, Inc.* concerned claims of defamation and trade libel by a restaurant against the restaurant review survey Zagat for publishing a review that stated, "God knows 'you don't go there for the food,'" and "weary well-wishers suggest that they 'freshen up the menu and their makeup.'" *Themed Restaurants, Inc., 801 N.Y.S.2d at 39-40*. The appellate panel found the "allegedly libelous statements can only be construed as statements of opinion and thus are constitutionally protected . . . [particularly since] restaurant ratings and reviews almost invariably constitute expressions of opinion." Id. (citations omitted).

Restaurant reviews are also the well recognized home of opinion and comment. Indeed, "[b]y its very nature, an article commenting upon the quality of a restaurant or its food, like a review of a play or movie, constitutes the opinion of the reviewer." *Greer v. Columbus Monthly Pub. Corp., 4 Ohio App.3d 235, 238, 4 Ohio B. 426, 448 N.E.2d 157 (1982)*. The natural function of the review is to convey the critic's opinion of the restaurant reviewed: the food, the service, the décor, the atmosphere, and so forth. Such matters are to a large extent controlled by personal tastes. The average reader approaches a review with the knowledge that it contains only one person's views of the establishment.

*Mr. Chow of New York, 759 F.2d at 227-28*.

The Court agrees with the Second Circuit's reasoning and finds that the context of the Ly review, as a restaurant review, strongly supports Ly's argument that the review is a nondefamatory opinion. Further, Plaintiffs here, like the Plaintiff-Appellee in Mr. Chow of New York, fail to cite a single case that found a restaurant review libelous. Granted, Ly only cites an unpublished, out-of-district opinion.[3] Nonetheless, the Court's independent research reveals **[*21]** a significant weight of authorities holding restaurant reviews as nondefamatory opinion. In addition to the aforementioned New York cases, in Mr. Chow of New York, the Second Circuit cites to numerous other cases that reached similar decisions. *759 F.2d at 228 n.7* (citing *Golden v. Elmira Star Gazette, Inc., 9 Media L. Rep. (BNA) 1183 (N.Y.Sup.Ct. Ontario County 1983)*; *Greer v. Columbus Monthly Publishing Corp., 4 Ohio App.3d 235, 4 Ohio B. 426, 448 N.E.2d 157 (1982)*; *Kuan Sing Enterprises v. T.W. Wang, Inc., 86 A.D.2d 549, 446 N.Y.S.2d 76 (1st Dep't)*, aff'd, *58 N.Y.2d 708, 444 N.E.2d 1008, 458 N.Y.S.2d 544 (1982)*; *Pritsker v. Brudnoy, 389 Mass. 776, 452 N.E.2d 227 (1983)*; *Havalunch, Inc. v. Mazza, 170 W. Va. 268, 294 S.E.2d 70 (W.Va.1981)*; *Ihle v. Florida Pub. Co., 50 Fla. Supp. 47, 5 Media L. Rep. (BNA) 2005 (Fla.Cir.Ct.1979)*; *Mashburn v. Collin, 355 So.2d 879 (La.1977)*; *Steak Bit of Westbury, Inc. v. Newsday, Inc., 70 Misc.2d 437, 334 N.Y.S.2d 325 (Sup.Ct. Nassau County 1972)*; *Twenty-Five East 40th Street Restaurant Corp. v. Forbes, Inc., 37 A.D.2d 546, 322 N.Y.S.2d 408 (1st Dep't 1971)*, aff'd, *30 N.Y.2d 595, 331 N.Y.S.2d 29, 282 N.E.2d 118 (1972)*). While none of the cases mentioned above are binding authority in this court, the aforementioned rulings on the context of Yelp reviews and restaurant reviews is highly persuasive in assessing the case at bar.

Therefore, the Court finds the context of the Ly review strongly supports Ly's argument that the review is a nondefamatory opinion. This alone provides a sufficient and independent basis for the conclusion that the Ly review does not support a valid claim, though the content and verifiability issues also support the Court's conclusion.

### ii. Content and Verifiability of the Ly Review

Turning next to the Ly review's actual statements, the Court finds the review's content and verifiability support Ly's argument that the review is a nondefamatory opinion. As a preliminary matter, Plaintiffs fail to specify which parts of the allegedly defamatory Ly review are false or constitute defamation. Thus, **[*22]** the Court will assess the statement in its entirety.[4]

While select portions of various statements may be verifiable, the overwhelming majority of the Ly review is pure opinion. More importantly, after applying the literal meaning as well as the fair and natural meaning that a reasonable person of ordinary intelligence would give to the review's content, and considering the sentences within

---

[3] See *Clancy v. Vacationaire Estates, Inc., No. 18-cv-2249, 2019 U.S. Dist. LEXIS 31272, 2019 WL 955113, at *11 (D. Minn. Feb. 27, 2019)* (holding the Google restaurant review of "[l]ow quality food, cold fries, soggy fish and undercooked hamburgers," to be "subjective descriptions that constitute opinions, not defamation").

[4] Plaintiffs' brief in opposition to the motion to dismiss specifically objects to Ly's fifth, sixth, and eight sentences. While the Court could limit its analysis to only these sentences since Plaintiffs fail to aver the remaining sentences are defamatory, the Court will assess each sentence for the sake of completeness.

the proper context, this Court finds there are no defamatory statements. When broken down to each component sentence,[5] Ly's review reads:

1. Not highly recommended for having parties, birthdays, or any type of events here because they will run out of food even though they say it's "unlimited" (you'll be lucky if you even get enough food to begin with).
2. A friend of ours planned a birthday dinner here a month in advance for her husband and a group of 40 people.
3. As promised, there will be unlimited food but drinks will be charged separately by the establishment.
4. As the night started, everyone's ordering drinks and having a good time until [sic] food started coming out.

5. There was countless number of carbs and veggie dishes of the same 3-4 items but when we had meats come out, it was literally 4 people **[*23]** to 2 pieces of chicken or 4 people to 1 piece of rib.
6. Let alone there wasn't even enough meats to be given to each person for them to say "we ran out". [sic]
7. After confronting the owner, he goes I understand this table didn't get it, but do understand what the other tables got (LOL Tf exactly), what does that have to do with the table that didn't get jack sh*t?
8. Mind you it was suppose [sic] to be unlimited food since it was a preset menu, but they "ran out."
9. Also to mention, the meats, portioned for mice, took nearly 45 mins to come out following the countless UNLIMITED amount of carb dishes (i [sic] get it [sic] restaurants that do this is [sic] trying to get you full before the meats come out), but again, the meats that came out wasn't even enough to begin with.
10. Finally, the bill came out close to $5000 for having mediocre drinks, unlimited carbs and grass, and 2 pieces of meat for 40 people to share.
11. After reducing the price, it came to 100 a person, in which [sic] still can't be justified for what was given to us.

12. At the end, following the dispute, they had the audacity to just bring two plates of ribs when everyone had already lost their appetite from waiting **[*24]** too long, and yes it was left there and no one ate anyone [sic] it.
13. Following the whole "party" many of us went and got pizza because we were obviously still hungry.
14. Def [sic] not a place to go with this type of hospitality.

Of these fourteen sentences, numbers 6, 7, 9, 11, and 14 are plainly opinions. Sentence 6 concerns Ly's opinion that the quantity of meat served was too small.[6] Sentence 7 concerns Ly's opinion about his experience dining at Ardiente, expressing his feelings of dissatisfaction and insult. Sentence 9 again concerns Ly's opinion about the quantity of the food, employing hyperbolic language, remarking there wasn't enough meat and that the meat was "portioned for mice." Sentence 11 asserts Ly's opinion that the meal was overpriced — an entirely subjective view. Sentence 14 expresses Ly's opinion that he does not recommend the restaurant.

---

[5] Plaintiffs' brief in opposition to Ly's motion to dismiss takes issue with Ly's "pars[ing] out each of the 'discrete 14 sentences,'" arguing the statements when read as a whole constitute defamation. Ly Opp. Br., [Dkt. No. 106], at 4-5. The Court disagrees with Plaintiffs' view and their reading of *Taj Mahal Travel, Inc. v. Delta Airlines, Inc., 164 F.3d 186 (3d Cir. 1998)*. To the extent Plaintiffs argue the Court's defamation assessment cannot include analysis of each challenged phrase or statement separate and apart from the entire statement, they are incorrect. The Court is called to assess each statement's content both at the individual level and holistically. The Court considers the statements as a whole, but this assessment is used to assess the statement's context — as Defendant Ly correctly points out.

The Court thus agrees with Defendant Ly's reading of *Taj Mahal*, as it stands for the proposition that courts do not consider allegedly defamatory phrases in isolation, but rather must also consider the context in which the statement is made. However, this consideration does not result in the conclusion that Plaintiffs suggest, namely that a collection of otherwise non-defamatory statements can somehow become defamatory when read as a whole — the total cannot be greater than the sum of its parts.

[6] Plaintiffs take issue with sentence 6, arguing the sentence stands as a statement of fact, namely that Plaintiffs did not provide meat as promised. However, Ly's review plainly states, "there wasn't even enough meats," making this is a subjective complaint about the quantity of food served. What is enough meat for one person may not be enough meat for another person. This is not an objectively verifiable statement of fact, making it pure opinion.

These are all opinions expressing Ly's subjective belief that the food, service, and the restaurant overall were bad quality and overpriced. These are not factual statements. The average reader would understand Ly's review as a simple attempt to voice his disappointment, albeit with some hyperbolic or figurative language such as **[*25]** "meats[] portioned for mice."

As for sentences 2, 3, 4, and 13, the Court agrees with Ly's assessment that they are not defamatory, since they are mostly factual statements about the background leading up to the dinner and the party's post-dinner actions. As none of the statements contain specific references to Plaintiffs, let alone false or defamatory statements about Plaintiffs, these sentences are not defamatory. *Robles, 469 Fed. App'x at 109*. This point is further buttressed by the fact that Plaintiffs' opposition brief takes no issue with Ly's characterization of these statements as nondefamatory.

However, the Court notes that sentences 4 and 13 do contain opinions, noting: (1) Ly believed the party was having a good time until the food service, and (2) Ly believed the party was still hungry after the dinner because they went out for pizza. As sentences 4 and 13 may be interpreted as either fact or opinion, this supports the conclusion they are not actionable under a claim of defamation. *Lynch, 161 N.J. at 168*. Furthermore, as sentences 4 and 13 present opinions and the sentences do not contain specific references to Plaintiffs, this issue is a merely academic question.

The remaining sentences of 1, 5, 8, 10, and 12 are mixed opinions **[*26]** containing both statements of fact and opinion. Sentence 5 claims "[t]here was [sic] [a] countless number of carbs and veggie dishes . . . but . . . [the] meats [were] . . . literally 4 people to 2 pieces of chicken or 4 people to 1 piece of rib." Although sentence 5 contains factual allegations, the statement is plainly "[l]oose, figurative or hyperbolic language," and the facts alleged are likely unverifiable (the Court deems it virtually impossible that Plaintiffs possess even a scintilla of evidence capable of verifying the ratio of diners to chicken and ribs), thus making it unactionable. *Lynch, 161 N.J. at 168* (citing *Ward, 136 N.J. at 532*).

Likewise, sentence 10, which includes the factual averment that the bill was close to $5,000 as well as several opinions,[7] also fails to rise to the level of an actionable defamatory statement as Ly merely employed "[l]oose, figurative or hyperbolic language" that is otherwise unverifiable. Id. Given the context as a Yelp restaurant review, a reasonable reader would clearly understand sentences 5 and 10 from the context that Ly was expressing his opinion that the restaurant served too many carb and veggie dishes and not enough meat, and charged too much money, making sentences 5 and **[*27]** 10 more or less statements that can fairly be construed as either fact or opinion making them unactionable and nondefamatory. Id.

Sentence 1 is a closer question as it is debatable whether it contains both a statement of fact and opinion. "Not highly recommended for having parties, birthdays or any type of events here," is definitively an opinion. However, this is followed by an arguably factual averment that such events "will run out of food even though they say it's 'unlimited,'" and the sentence is closed with the opinion that "you'll be lucky if you even get enough food to begin with."

Parsing this sentence and reading it in context leads the Court to reject the statements as anything more than an opinion posing a hypothetical conclusion utilizing hyperbolic language. Another way of reading this sentence is: "if one has an event at Ardiente, then they will run out of food, which makes the venue not recommended." There is no way of verifying the statement as it is a hypothetical and, more importantly, when read in context, can be interpreted as mere opinion. See *Lynch, 161 N.J. at 167-68* (statements are nondefamatory if they can be construed as either fact or opinion, which is interpreted based upon the statement's **[*28]** fair and natural meaning from a reasonable reader).

---

[7] Claiming that Ardiente served "mediocre drinks, unlimited carbs and grass, and 2 pieces of meat for 40 people to share," is clearly loose, figurative or hyperbolic opinion expressing Ly's dissatisfaction with the quality and quantity of food served by Ardiente.

Here, a reasonable reader would understand from the context of the review that Ly was merely expressing his opinion that the restaurant is not recommended as they do not serve enough food. And, as a Yelp restaurant review, the context of sentence 1 supports the conclusion that it is a nondefamatory opinion. Moreover, as the sentence is capable of being construed as fact or opinion, the Court concludes it is not actionable pursuant to the Supreme Court of New Jersey's ruling in *Lynch*.

Facially, the remaining sentences of 8 and 12 appear to consist of largely factual statements. However, a closer review of the sentences in the context of the review as a whole leads the Court to conclude that these too are unactionable, nondefamatory statements. In essence, sentence 12 claims Ardiente "had the audacity" to bring out two plates of ribs after previously claiming to run out, and as the diners lost their appetites from waiting too long, no one ate the ribs. Read against the other sentences, Sentence 12 contradicts Ly's other sentences, namely sentence 8, which claims the restaurant ran out of food, and sentence 13, which claims the diners went **[*29]** out for pizza because they were obviously still hungry. It is therefore illogical to read sentence 12 on its face as a statement of fact, given that the preceding and subsequent sentences directly contradict the averments.

Instead, sentence 12 more accurately reads as an opinion that Ly was offended and frustrated by Ardiente bringing out ribs after claiming to run out and because, in his opinion, the diners had waited too long for food to served. The sentence thus can be interpreted as Ly's opinion that the restaurant had bad service and did not serve enough food or served it too late in the meal. This reading comports with the Ly's other sentences, which all present the same opinion: not enough food and bad service. A reasonable reader, understanding the context of sentence 12 would therefore appreciate that the sentence expresses Ly's opinion.

Likewise, a reasonable reader would not take sentence 8 as a pure statement of fact, which essentially claims the restaurant was supposed to serve unlimited food but ran out. As with the analysis of sentence 12, Ly does not literally claim Ardiente ran out of food when it was supposed to serve unlimited food; after all, how could the restaurant **[*30]** run out when it served countless, unlimited carb dishes, as per sentences 9 and 10, and two subsequent plates of ribs, as per sentence 12. Sentence 8, therefore, would be interpreted by a reasonable reader as Ly's opinion, again expressing his dissatisfaction with the restaurant and claiming Ardiente did not serve enough meat. Moreover, as the Court has noted with other sentences, the verifiability of this sentence is highly unlikely under the circumstances presented in the record. Accordingly, these sentences are not actionable under *Lynch*.

In sum, in assessing the Ly review's content both as a whole and at the individual sentence level, as well as the verifiability of any arguably factual statements contained in the Ly review, the Court finds that the review lacks a sufficient basis to maintain Plaintiffs' claim of defamation against Ly.

### b. Plaintiffs' Claim for Trade Libel Against Ly

Plaintiffs argue they sufficiently plead a claim for trade libel, thus Ly's motion to dismiss should be denied. While Ly does not directly address the issue of trade libel, based on his arguments regarding defamation, the Court finds he presents a valid basis for dismissal.[8]

Ly's failure to directly address trade **[*31]** libel can be explained by Plaintiffs' failure to properly plead such a claim. Plaintiffs' Amended Complaint asserts a cause of action for defamation per se and trade libel. However, these are generally independent claims and Plaintiffs fail to demonstrate, let alone argue, that the claims can be muddled together based on the present record. See *Dairy Stores, Inc., 104 N.J. at 133-35*; see also *Gillon v. Bernstein, 218 F. Supp. 3d 285, 294 (D.N.J. 2016)*. The Court could view this action as merely one for defamation, as this view is entirely supported by the record because Plaintiffs repeatedly emphasize this is a defamation action. Putting aside

---

[8] In fact, no party articulates the elements of trade libel or, beyond Plaintiffs' conclusory averments, claims the record even presents trade libel. However, Ly's arguments on nondefamatory opinions and the verifiability of his review also applies to the claim of trade libel and presents a basis for the Court to grant dismissal.

this obvious deficiency, the Court nonetheless has assessed the Amended Complaint and finds Plaintiffs fail to plead a claim of trade libel.

In New Jersey, a claim of trade libel requires that Plaintiffs prove: "(1) publication, (2) with malice (3) of false allegations concerning plaintiff's property or product (4) causing special damages, i.e., pecuniary harm." *Intervet, Inc. v. Mileutis, Ltd., 2016 U.S. Dist. LEXIS 22165, 2016 WL 740267, at *6 (D.N.J. Feb. 24, 2016)* (quoting *Sys. Operations, Inc. v. Sci. Games Dev. Corp., 555 F.2d 1131, 1140 (3d Cir. 1977)*. In particular, "[s]pecial damages is an 'essential' element of trade libel[,]" *Wolfe v. Gooding & Co., Inc., 2017 U.S. Dist. LEXIS 146147, 2017 WL 3977920, at *4 (D.N.J. Sept. 11, 2017)* (quoting *Mayflower Transit, LLC v. Prince, 314 F. Supp. 2d 362, 379 (D.N.J. 2004)*, and "must be in the form of pecuniary harm and must be pled with particularity[.]" *Canfield Sci., Inc. v. Melanoscan, LLC, 2017 U.S. Dist. LEXIS 80896, 2017 WL 2304644, at *7 (D.N.J. May 25, 2017)*.

"To show special damages, Plaintiff must 'allege either the loss of particular customers by name, **[*32]** or a general diminution of business, and extrinsic facts showing that such special damages were the natural and direct result of the false publication.'" *Gillon, 218 F. Supp. 3d at 298* (quoting *Bocobo v. Radiology Consultants of S. Jersey, P.A., 477 Fed. App'x 890, 901 (3d Cir. 2012)*).

> When predicating a damages claim on the general diminution in business, Plaintiff must prove 'facts showing an established business, the amount of sales for a substantial period preceding publication, the amount of sales for a [period] subsequent to the publication, facts showing that such loss in sales were the natural and probable result of such publication, and facts showing the plaintiff could not allege the names of particular customers who withdrew or withheld their custom.'

*Gillon, 218 F. Supp. 3d at 299* (quoting *Mayflower Transit, LLC, 314 F. Supp. 2d at 378*). "General, implied, or presumed damages of the kind available in personal defamation actions do not satisfy the requirement of special damages needed for disparagement causes of action." *Patel v. Soriano, 369 N.J. Super. 192, 249, 848 A.2d 803 (App. Div. 2004)*.

Assessing the elements of trade libel, the Court finds that Plaintiffs' fail to plead a *prima facie* case.[9] In particular, the Court finds Plaintiffs have not pled special damages with the requisite level of particularity by merely alleging generally that Ardiente lost customers, prospective customers, and vendors. See *Gillon, 218 F. Supp. 3d at 298-99*; see also *Intervet, 2016 U.S. Dist. LEXIS 22165, 2016 WL 740267, at *6* (dismissing trade **[*33]** libel counterclaim where defendant alleged "[a]s a direct and proximate result of the trade libel of [Plaintiff], [Defendant] has incurred and will continue to suffer damages") (internal quotation marks omitted); see also *Zim v. Seruga, 2006 U.S. Dist. LEXIS 51773, 2006 WL 2135811, at *11 (D.N.J. July 28, 2006)* (dismissing trade libel claim where plaintiff stated "a general allegation that the statements published on the website 'caused Plaintiffs to sustain damages'"). Plaintiffs neither present the loss of particular customers by name, demonstrate a general diminution of their business, nor explain how the Ly review - from a clearly disgruntled customer - could cause the general and broad claims of

---

[9] Instead of supporting the elements of trade libel through factual allegations, Plaintiffs merely plead bald assertions and legal conclusions. See, e.g., Amended Complaint, [Dkt. No. 55], ¶ 104, ("These statements were made maliciously and willfully and were intended to cause harm to Plaintiffs' business and reputation"); ¶ 106 ("These statements were made maliciously and willfully and were intended to cause harm to Plaintiffs' personal and professional reputation"); ¶ 111 ("As a result of the Non-Phung Defendants' acts, Plaintiffs have suffered irreparable damage to its reputation and further damages in the form of lost sales and profits, in an amount to be determined at trial"); ¶¶ 31, 80 (the Ly and Ching reviews "harm[ed] Plaintiffs' reputation and causing them to lose revenue"); ¶ 84 (the Ly and Ching reviews posted "to interfere with Plaintiffs' contractual relationships with its customers and vendors . . . by inducing Plaintiffs' customers and vendors and prospective diners to cease doing business with Plaintiffs); ¶ 85 ("several diners have claimed to have read the reviews and have called or messaged to inquire about the truth of the false statements therein and . . . cancelled scheduled appointments with Plaintiffs"); ¶ 86 (the Ching and Ly reviews caused "a number of Plaintiffs' customers (or prospective customers) [to] refuse to patronize and/or continue to patronize Plaintiffs' business"); and ¶ 87 (the reviews caused Plaintiff Ardiente to close).

damages Plaintiffs assert. Thus, they have failed to allege sufficient facts to make out a plausible claim for special damages.[10]

More importantly, since the Court has found that the Ly review constitutes an opinion not capable of being proven false, Plaintiffs' trade libel claim must fail as a matter of law. "A plaintiff alleging trade libel 'must demonstrate that Defendant's statements were false or that they were written with reckless disregard for the truth or falsity.'" *Read v. Profeta, 397 F. Supp. 3d 597, 651 n.37 (D.N.J. 2019)* (quoting *Mayflower Transit, LLC, 314 F. Supp. 2d at 378*). In order for Plaintiffs to prevail on the trade libel claim, Ly's statements may **[*34]** not be expressions of opinion. *NXIVM Corp. v. Sutton, 2007 U.S. Dist. LEXIS 46471, 2007 WL 1876496, at *7 (D.N.J. June 27, 2007)* (citing *Cassidy v. Merin, 244 N.J. Super. 466, 479, 582 A.2d 1039 (App. Div. 1990)*; *Themed Restaurants, Inc., 801 N.Y.S.2d at 39-40*).

Moreover, as explained by this Court in *NXIVM Corp.*, the New Jersey Supreme Court has held "[i]nsofar as defenses to product disparagement are concerned, a qualified privilege should exist whenever it would exist for a defamation action . . . it follows that the right to make a statement about a product should exist whenever it is permissible to make such a statement about the reputation of another." *NXIVM Corp., 2007 U.S. Dist. LEXIS 46471, 2007 WL 1876496 at *7* (quoting *Dairy Stores, Inc., 104 N.J. at 137*; and citing *Guerrero v. Carva, 10 A.D.3d 105, 779 N.Y.S.2d 12, 17 (1st Dep't 2004)* (recognizing constitutional protection for statements of opinion); and citing *Penn Warranty Corp. v. DiGiovanni, 10 Misc. 3d 998, 810 N.Y.S.2d 807, 814 (N.Y.Sup.2005)* (noting that courts have been "loathe to stifle's one's criticism of goods or services")).

Therefore, for the reasons expressed above in the Court's defamation analysis, the Ly review does not form the basis for a valid claim of trade libel. See *Read, 397 F. Supp. 2d at 653* (dismissing the trade libel claim because the statement at issue "is more of a legal conclusion or an opinion-based characterization of the facts, rather than a statement of fact that itself could be verified or disproved") (citing *Ward, 136 N.J. at 530* (emphasizing the distinction between actionable statements that are capable of verification and "rhetorical hyperbole" and "statements that are in form statements of opinion . . . which **[*35]** cannot reasonably be understood to be meant literally and seriously and are obviously mere vituperation and abuse.") (citation omitted)); see also *Dairy Stores, Inc., 104 N.J. at 137*.

Accordingly, the Court will dismiss Plaintiffs' claim of trade libel against Ly. The Court's ruling is twofold: (1) Plaintiffs have not plead the necessary elements to establish a false allegation concerning Plaintiffs' property and (2) have failed to allege sufficient facts to establish special damages.

**c. Plaintiffs' Claim of Tortious Interference Against Ly**

Plaintiffs also bring a claim for tortious interference with contractual relations and prospective contractual relations. Ly argues the claim fails as a matter of law and the Court should grant dismissal.

Here, Plaintiffs again conflate separate and distinct claims into one, as the Amended Complaint alleges "Tortious Interference with Contractual Relations and Prospective Contractual Relations"; yet the parties' papers addressing the motions to dismiss concern only a claim for "tortious interference with prospective economic advantage." Nonetheless, like the claim for defamation, the Court, regardless of the theory upon which it premised, agrees with Ly that Plaintiffs' claim fails as **[*36]** a matter of law.

---

[10] As noted above, proving a general diminution in business requires Plaintiffs to prove the existence of an established business and present sales figures for a "substantial period preceding publication" against the sales figures for the period after the publication. As this case concerns a new restaurant that had just opened (hardly an established business) and closed within 9 months of the review, it is highly unlikely that the restaurant existed long enough for Plaintiffs to prove a general diminution. What is clear is that Plaintiff has failed to allege sufficient facts to make out a plausible claim for special damages.

Even after an amended complaint and an unsuccessful second amended complaint, Plaintiffs have failed to identify which, if any, contract or contracts were interfered with as a result of the Yelp reviews. Despite having these opportunities to present a *prima facie* case of tortious interference with contractual relations, the amended complaint fails to articulate a single existing contract, let alone attach one as an exhibit. The Court has thoroughly reviewed the pleadings and finds Plaintiffs presents only bald assertions and legal conclusions as to this theory of liability however framed. As the existence of a contract between Plaintiffs and others is a prerequisite to this claim, there is nothing before the court to support a claim for tortious interference with contractual relations. *Dello Russo v. Nagel, 358 N.J. Super. 254, 268, 817 A.2d 426 (App. Div. 2003)* (to set forth a cognizable claim for tortious interference with contractual relations, Plaintiffs must establish: "(1) actual interference with a contract; (2) that the interference was inflicted intentionally by a defendant who is not a party to the contract; (3) that the interference was without justification; and (4) that the interference caused damage"); see also *Printing Mart-Morristown v. Sharp Electronics Corp., 116 N.J. 739, 751-752, 563 A.2d 31 (1989)*.

Likewise, a claim **[*37]** for tortious interference with prospective economic advantage also fails as presented. To state a valid claim for tortious interference under New Jersey law, Plaintiffs must establish "(1) a reasonable expectation of economic advantage to plaintiff; (2) interference done intentionally and with malice; (3) causal connection between the interference and the loss of prospective gain; and (4) actual damages." *Luttmann v. Tiffany & Co., 2009 U.S. Dist. LEXIS 5026, 2009 WL 197520, at *2 (D.N.J. Jan. 26, 2009)* (quoting *Varrallo v. Hammond, Inc., 94 F.3d 842, 848 (3d Cir. 1996)*). Yet Plaintiffs allege no specific facts in support of any of these elements and instead rely on legal conclusions that cannot form the basis for stating a plausible claim. If such a claim is plausible, Plaintiffs should have presented specific examples of diners, patrons, customers, prospective diners, or vendors who Plaintiffs had actual or a reasonable expectation of economic advantage with, let alone how the Yelp restaurant review interfered and caused them to lose this opportunity. This pleading deficiency is fatal.

Moreover, the claim, regardless of the underlying theory, must be dismissed as Defendant Ly correctly points out since, as with trade libel, "when a tortious interference claim 'is based on allegedly defamatory statements and the defamation cause of action **[*38]** fails for lack of evidentiary support, the tortious interference claim necessarily fails as well.'" *Perez v. Factory Direct of Secaucus, LLC, 2013 U.S. Dist. LEXIS 152407, 2013 WL 5770734, at *7 (D.N.J. Oct. 23, 2013)* (quoting *Prof'l Recovery Servs. v. GE Capital Corp., 642 F. Supp. 2d 391, 408 (D.N.J. 2009)*). Because Plaintiffs' tortious interference claim is predicated on the Ly review, and the Court finds the Ly review to be an unactionable nondefamatory statement, the Ly review cannot form the basis for a valid claim of tortious interference. See, e.g., *LoBiondo v. Schwartz, 323 N.J. Super. 391, 415-17, 733 A.2d 516 (App. Div. 1999)* (dismissing a claim for tortious interference, after finding the challenged statement as nondefamatory, because "if the alleged defamation is not actionable, then its consequences are also not actionable because the conduct that caused those consequences was privileged"); *Bainhauer v. Manoukian, 215 N.J. Super. 9, 47-48, 520 A.2d 1154 (App. Div. 1987)* ("Proof or failure of proof of the operative facts of the defamation count would, therefore, completely comprehend the malicious interference cause. Thus, if no abuse of privilege is found, then the 'malicious' predicate of the interference count would also fail."); *Binkewitz v. Allstate Ins. Co., 222 N.J. Super. 501, 537 A.2d 723 (App. Div. 1988)* (finding qualified privilege applies to tortious interference claim based on the defamatory statements).

Therefore, the Court will dismiss Plaintiffs' claim of tortious interference. While Plaintiffs could potentially cure their pleading deficiencies by asserting the missing details (existence **[*39]** of specific contract(s) with third parties, patrons, vendors, etc. who cancelled or withheld their business and patronage after and as a result of the Ly review), the claim must fail as a matter of law because the Ly review is an unactionable nondefamatory statement of opinion.

### 2. Ching's Motion to Dismiss Pursuant to *Rule 12(b)(2)*, and Plaintiffs' Requests for Jurisdictional Discovery or Cross Motion to Transfer

Ching argues that since the Court lacks personal jurisdiction over him, Plaintiffs' claims against Ching must be dismissed pursuant to *Rule 12(b)(2)*. Ching argues he resides in Pennsylvania, works in Pennsylvania, and the

activities that gave rise to Plaintiffs' claims occurred in Pennsylvania. Ching MTD, [Dkt. No. 87], at 14-16; Declaration of Kevin Ching, [Dkt. No. 87-1], at ¶¶ 1-6. Ching further avers that he has no: (1) "continu[ous] contact with New Jersey," (2) "property or assets located in New Jersey," (3) "interaction[s] with the State of New Jersey," (4) activities "otherwise engaging with New Jersey," and (5) he "has done absolutely nothing which could be considered availing himself of New Jersey." Id. at ¶¶ 3-4; Ching MTD, [Dkt. No. 87], at 15.

Ching notes the only connection this matter has [*40] to New Jersey is the fact that Plaintiff Sciore was, until recently, a New Jersey citizen, and, until this lawsuit, Ching lacked any knowledge of how dining at Ardiente could possibly implicate New Jersey.[11] Id.; Amended Complaint, [Dkt. No. 55], at ¶ 5. Ching claims that because he lacks any contacts with New Jersey he would have no expectation of being brought before a New Jersey court "for visiting and allegedly reviewing a restaurant that was located in Pennsylvania." Id. at 16. Accordingly, Ching argues the Court lacks both specific and general jurisdiction, making dismissal appropriate because the Court lacks personal jurisdiction over him. In response, Plaintiffs argue there is specific jurisdiction but admit there is no general jurisdiction. Ching Opp. Br., [Dkt. No. 98-6], at 2.

Jurisdiction, therefore, turns on whether the Court has specific jurisdiction over Ching. In cases of intentional torts, the court may exercise personal jurisdiction when the *Calder* test is satisfied. *Calder v. Jones, 465 U.S 783, 104 S. Ct. 1482, 79 L. Ed. 2d 804 (1984)*;[12] see also *Marten v. Godwin, 499 F.3d 290, 297 (3d Cir. 2007)*. Defendants who satisfy the *Calder* test do not have to satisfy the elements of the traditional test of personal jurisdiction. See *IMO Indus., Inc. v. Kiekert AG, 155 F.3d 254, 265 (3d Cir. 1998)* (reasoning that a party that satisfied the *Calder* test may avail itself of a court's [*41] personal jurisdiction even if the party would not satisfy the traditional test); see also *Marten, 499 F.3d at 297*.

Under this test, a plaintiff may show specific personal jurisdiction if he or she demonstrates: (1) the defendant committed an intentional tort; (2) "the plaintiff felt the brunt of the harm in the forum such that the forum can be said to be the focal point of the harm suffered by the plaintiff as a result of that tort"; and (3) the defendant expressly aimed his or her tortious conduct at the forum such that the forum can be said to be the focal point of the tortious activity. *IMO Indus., Inc., 155 F.3d at 265-66*; see also *Marten, 499 F.3d at 297*.

Although Plaintiffs note the *Calder* elements are the appropriate standard to test for personal jurisdiction, they fail to articulate an argument as to how each element is satisfied. Rather, Plaintiffs only address the "express aiming" requirement, claiming Ching aimed the allegedly defamatory Ching review at Ardiente and Ardiente's owner, namely Sciore, a New Jersey resident. Plaintiffs argue the Court should discredit Ching's claims of ignorance as to Ardiente and Sciore's ties to New Jersey since, as Plaintiffs aver, Sciore is publicly well-known and there are at least two online articles available noting Sciore [*42] as the restaurant's owner.[13] Plaintiffs thus claim that because

_____

[11] Sciore has since moved to Florida and claims citizenship of that state. Proposed Second Amended Complaint, [Dkt. No. 127-2], at ¶ 5.

[12] In *Calder*, petitioners, both Florida residents, wrote a libelous article about a California resident, causing harm to her reputation in California. "The article was drawn from California sources, and the brunt of the harm, in terms both of respondent's emotional distress and the injury to her professional reputation, was suffered in California." *Calder, 465 U.S. at 788-89*. In fact, petitioners' "intentional, and allegedly tortious, actions were expressly aimed at California." *Id. at 789*. The Court thus found that petitioners wrote an article knowing its "potentially devastating impact upon respondent" in California. Id. "In sum, California [wa]s the focal point both of the story and of the harm suffered." *Id. at 789*. Accordingly, the Supreme Court in *Calder* held that jurisdiction was proper "because of the[ ] intentional conduct in Florida [was] calculated to cause injury to respondent in California." *Id. at 791*.

A proper application of *Calder* supports an entirely different outcome on this record. The so-called defamatory restaurant review was written about a Pennsylvania restaurant, which is the state where any alleged harm to the restaurant's reputation would be primarily felt. There is nothing in the record to show New Jersey was either the focal point of the review or the place where any harm was suffered within the meaning of *Calder*.

[13] Plaintiffs did not provide the Court with copies of the articles; therefore, the Court is unable to assess the articles' content and supposed publication dates (which Plaintiffs claim as occurring prior to the Ching review). Moreover, as Ching notes, Plaintiffs

information about Sciore's relation to New Jersey was publicly available, Ching should have been more diligent before defaming a New Jersey citizen and should thus face a New Jersey court.

In opposition, Ching reiterates his prior arguments that both he and the Ching review have no connection to New Jersey. In assessing the *Calder* elements, Ching argues Ardiente was a Pennsylvania restaurant and therefore Pennsylvania is the focal point of the restaurant's reputational interest. Any harm felt by Ardiente from Ching's review was thus directed at and felt in Pennsylvania, not New Jersey — a jurisdiction implicated only by virtue of Sciore's domicile (who was not mentioned by name in the review). As the activities underling Plaintiffs' claims occurred in Pennsylvania, Ching claims the Court lacks personal jurisdiction under *Calder*. The Court agrees with Ching.

Even assuming Plaintiffs meet the first *Calder* element of a plausible claim against Ching of defamation, trade libel, and tortious interference, see *Remick v. Manfredy, 238 F.3d 248, at 258 (3d Cir. 2001)* (noting that the mere allegation of defamation satisfies the first element), Plaintiffs fail to demonstrate the remaining two elements. Ardiente **[*43]** was a Philadelphia restaurant. By definition, as a restaurant review, the Ching review was directed at Ardiente. If Ardiente lost any customers as a result of the Ching review, as is thinly alleged in the complaint, said diners would have been in Philadelphia, Pennsylvania. Thus a court in Pennsylvania, not New Jersey, has personal jurisdiction over the claims against Ching. This is true because personal jurisdiction is only proper if the forum state is "the focus of the activities of the defendant out of which the suit arises." *Marten, 499 F.3d at 298*.

Beyond the obvious fact that Pennsylvania is the focal point, there are no facts that show Ching's review was specifically targeted at New Jersey. Nothing is alleged in the Amended Complaint to even suggest Ching's review targeted Sciore or that Ching knew Sciore to be a New Jersey citizen. Thus, the "express aiming" argument advanced by Plaintiffs directs the Court to dismiss for lack of jurisdiction, since the specific facts here fail to show Ching targeted New Jersey. Id.; *Christie v. Nat'l Inst. for Newman Stud., 258 F. Supp. 3d 494, 504 (D.N.J. 2017)* ("[I]n tort cases that involve 'harmful communications, courts have held that the 'express aiming' requirement of the 'effects test' remains satisfied when the defendant is alleged to **[*44]** have engaged in wrongful conduct targeted at a plaintiff whom the defendant knows to be a resident of the forum state'") (citations omitted).

At best, Plaintiffs argue that since the effect of harm was felt by Sciore in New Jersey, then this alone is enough to establish specific jurisdiction. However, this argument was already considered and expressly rejected by the Third Circuit in *IMO Indus., Inc. v. Kiekert AG, 155 F.3d 254, 261-63 (3d Cir. 1998)*. There, the Third Circuit considered *Calder* and various cases from other Circuit courts, finding they "all stand for the proposition that the mere allegation that the plaintiff feels the effect of the defendant's tortious conduct in the forum because the plaintiff is located there is insufficient to satisfy *Calder*." *Id. at 263*. The prevailing issue throughout this case, as in IMO Indus., Inc., is that "the plaintiffs failed to point to other actions that adequately demonstrated that the defendants targeted (or "expressly aimed" their conduct at) the forum, and thereby showed that the forum was the focal point of the tortious activity." Id. Therefore, Plaintiffs do not demonstrate the second and third elements of the *Calder* test, and the Court cannot exercise specific jurisdiction over Defendant Ching.

Seeming to recognize the weaknesses **[*45]** inherent in their claims of specific jurisdiction over Ching, Plaintiffs make two last-ditch requests as alternatives to dismissal of this action. First, Plaintiffs request that the Court transfer venue to the United States District Court for the Eastern District of Pennsylvania, pursuant to *28 U.S.C. § 1631*. Cross Motion to Transfer, [Dkt. No. 98], at 14-16. *Section 1631* authorizes a transfer of venue for lack of personal jurisdiction, providing that a "court shall, if it is in the interest of justice, transfer such action or appeal to

---

fail to argue the articles mention Sciore as a New Jersey citizen, and, according to Ching, the articles do not in fact contain such information.

In addition to rejecting Plaintiffs' arguments premised on the articles, and for the sake of completeness, the Court similarly rejects Plaintiffs' argument that Sciore is a well-known New Jersey citizen making the Ching review's reference to Ardiente's owner an intentional attack of a New Jersey citizen meant to harm Sciore in New Jersey. The Court rejects the argument as a bald assertion, which is buttressed by the fact Plaintiffs provide no factual or legal support to the claim. This is not surprising as Plaintiffs' also assert that "it would be completely implausible for Plaintiff Sciore . . . to be considered a public figure."

any other such court . . . in which the action or appeal could have been brought at the time it was filed." *28 U.S.C. § 1631*. However, dismissal in lieu of transfer best serves "the interests of justice" where it is clear that transfer would be "a futile waste of judicial and party resources." *United States v. Foy, 803 F.3d 128, 136 n.7 (3d Cir. 2015)*; see also *Qayyum v. Tillerson, 2018 U.S. Dist. LEXIS 76295, 2018 WL 2095603, at \*\*3-4 (D.N.J. May 7, 2018)*.

Plaintiffs contend that Ching would be subject to personal jurisdiction in Pennsylvania because he resides there and the events underlying the case occurred in Philadelphia, thus there would be no issue of personal jurisdiction. Plaintiffs also note that transfer is in the interests of justice since Plaintiffs timely initiated this action in New Jersey and anything short of transfer (namely **[\*46]** dismissal) will result in a time bar to Plaintiffs' ability to bring a timely suit in the United States District Court for Eastern District of Pennsylvania.[14] In opposition, Ching argues the Court should dismiss the case and deny the motion to transfer since "all the claims of Plaintiffs lack merit and should be dismissed on the merits." Ching emphasizes that transferring to the Eastern District of Pennsylvania will only prolong the inevitable, namely dismissal of Plaintiffs' frivolous claims.

The Court, again, agrees with Ching. Although, the Court abstains from ruling on the merits of Ching's *Rule 12(b)(6)* motion as the Court lacks jurisdiction over him, the Court may consider whether transfer would be futile. See *Qayyum, 2018 U.S. Dist. LEXIS 76295, 2018 WL 2095603, at \*\*3-4*. Here, transfer of this action would be futile because the allegedly defamatory Ching review is likely to found to be nothing more than opinion - a defense that necessitates dismissal. Id. (Ruling transfer "would clearly be futile," since the plaintiff's claim fails as a matter of law, "making any curative amendment unlikely." The Court, further held that "because the remaining defendants named in the Complaint have not been served, and it is not apparent on the face of **[\*47]** the Complaint that personal jurisdiction exists over those defendants in any forum to which transfer of the action against Defendant Price would appropriate, it is likely that the severance of the case, and the maintenance of separate proceedings with substantially overlapping issues of law and fact would give rise to judicial inefficiency.").

Much of the Court's analysis above regarding the Ly review is applicable to the Ching review, since the Ching review's contents, context, and verifiability makes the statement highly unlikely to rise to the level of defamation and thus the other claims too are likely to fail.[15] Even a cursory examination of the Ching review evinces the futility of Plaintiffs' claims.

For example, breaking the Ching review into its component sentences shows:
1. Had high expectations after perusing their menu and reading prior reviews beforehand.
2. However, not only was I disappointed but insulted by how our party was treated from the owner himself.
3. Food itself was mediocre and too salty to be palatable.
4. Our first 5-6 courses of the tasting menu consisted of underwhelming veggie or carb dishes.

5. The last two courses were supposed to be the short ribs and Cornish **[\*48]** hen but they ran out after serving only a few morsels of each.
6. How this restaurant failed to prepare for this event with a month's notice is beyond me and will steer clear from this place indefinitely.

Of these six sentences, numbers 1, 2, 3, 4, and 6 are opinion. Sentence 1 concerns Ching's opinion regarding his "expectations" about Ardiente. Sentence 2 concerns Ching's opinion about his experience dining at Ardiente, expressing his feelings of disappointment and insult. Likewise, Sentence 3 concerns Ching's opinion about the poor quality of food, remaking it was "mediocre and too salty to be palatable." Sentence 4 addresses the food's quality,

---

[14] The Court notes that Plaintiffs filed an action in the United States District Court for the Eastern District of Pennsylvania against Defendants Ching and Thao Tran, "asserting similar claims as set forth herein." That action is entitled Sciore v. Tran, Civil Case No. 2:21-cv-04403-MMB. The Court will not comment on that matter any further, as resolution of that case is left to the sound discretion of Judge Baylson. However, the mere existence of that case calls into question Plaintiffs' argument that dismissal will cause a time bar that unjustly prejudices their ability to assert a claim against Ching.

[15] As explained more fully above in the Court's analysis of the context of restaurant reviews and Yelp reviews, the context of the Ching review, as a Yelp restaurant review, is unlikely to support a finding of defamation.

remarking the courses were "underwhelming veggie or carb dishes." Sentence 6 expresses a rhetorical question, again demonstrating Ching's frustration with the dining experience.[16][1] Not one of these statements, taken on their own, expresses a factual statement that can be objectively verified. Rather, these are all subjective opinions expressing Ching's belief that the food, service, and dining experience overall were bad quality. Absent verifiable facts, a reviewing court would find Ching's review as an expression of his subjective opinion, albeit **[*49]** with some hyperbolic language, as in the phrase "too salty to be palatable."

In contrast, sentence 5 uniquely stands out as it not pure opinion like the others. There, Ching states, "The last two courses were supposed to be the short ribs and Cornish hen but they ran out after serving only a few morsels of each." Unlike the other sentences, sentence 5 is a mixed opinion as it contains both statements of fact and opinion. There are arguably two statements of fact: (1) "the last two courses were supposed to be the short ribs and Cornish hen," and (2) "but they ran out after serving" some short ribs and Cornish hen.

While such statements are capable of being proven true or false, a review of the Amended Complaint fails to demonstrate any averments of fact to undermine the validity of these facts. Plaintiffs baldly claim "[i]t is not possible that the allegations in the Kevin C. Defamatory Review are true. Plaintiff Ardiente provided the services and goods for which it was hired, namely a tasting menu for a private birthday party. The food provided was palatable." Amended Complaint, [Dkt. No. 55], at ¶ 81. Thus, there is nothing alleged to show the falsity of the statement, making **[*50]** it nondefamatory. Even putting aside the lapse in time and the fact that Ardiente closed months after the review was written, a court is still unlikely to find Plaintiffs capable of proving that the restaurant did not run out of short ribs and Cornish hen the night of the birthday dinner. Therefore, the phrase is an unverifiable statement of fact that cannot constitute an actionable basis for defamation. See _Lynch, 161 N.J. at 167_.

Further supporting this interpretation of sentence 5 as a nondefamatory statement is the fact that it contains Ching's opinion regarding the amount and portions of short ribs and Cornish hens served (namely, "only a few morsels of each"). This language is ostensibly hyperbolic, and, when read in full context as a restaurant review posted on Yelp, an ordinary reader would likely understand that the sentence means the restaurant did not serve enough food — which is a subjective opinion. See _Lynch, 161 N.J. at 167-68_ (finding a statement to be nondefamatory if it can be construed as either fact or opinion, which is interpreted based upon the statement's fair and natural meaning from a reasonable reader). Accordingly, a court is likely to find that the Ching review contains only opinion, making it an inapposite **[*51]** basis for defamation.

Since the Ching review is not defamatory, and for the reasons explained above regarding the Ly review, the Ching review cannot also support an actionable claim of trade libel or tortious interference. Transfer, therefore, is not in

---

[16] Ching's phrase, "How this restaurant failed to prepare for this event with a month's notice is beyond me" is not defamatory because it is an opinion premised upon the earlier sentence that Ardiente ran out of short ribs and Cornish hens. See _Kotlikoff, 89 N.J. at 72-73_ (holding a defendant will not be held liable for an opinion that is "accompanied by its underlying nondefamatory factual basis"). Although Plaintiffs counter that sentence 6 contains statements of fact that are objectively verifiable, this Court is unpersuaded. Instead, a transferee court would likely determine that the statement includes language that is ostensibly hyperbolic (of course Ching is not claiming the restaurant totally failed to prepare), and, when read in full context with the other sentences as a restaurant review posted on Yelp, an ordinary reader would understand that the sentence means Ching opined that the restaurant did not prepare enough because it did not serve enough food — which is a subjective opinion. See _Lynch, 161 N.J. at 167-68_ (finding statements to be nondefamatory if it can be construed as either fact or opinion, which is interpreted based upon the statement's fair and natural meaning from a reasonable reader).

Moreover, there is nothing alleged in the Amended Complaint to show the falsity of this statement, rendering it nondefamatory. The Amended Complaint does not claim Plaintiffs were fully prepared for the party, such that Ardiente ordered, prepared, and served each diner a full portion of short rib and Cornish hen. Further, given the passage of time between Ching's posting of the review on Yelp and Ardiente's closure to the present, Plaintiffs will likely be unable to prove the restaurant did not run out of short ribs and Cornish hen the night of the birthday dinner (and thus prove there was enough food and the restaurant prepared enough for the event). Therefore, even if sentence 6 contains statements of fact, said statements are unverifiable. See _Lynch, 161 N.J. at 167_.

the interest of justice since the claims are clearly futile. Dismissal is the only appropriate remedy for the Court's lack of personal jurisdiction over Defendant Ching.

Second, Plaintiffs ask for an opportunity to conduct jurisdictional discovery, arguing there may be a basis for jurisdiction because there may be additional information regarding Ching's attempt to target Plaintiffs.[17] However, to obtain leave to conduct jurisdictional discovery, a plaintiff must present "factual allegations that suggest 'with reasonable particularity' the possible existence of the requisite contacts between [the party] and the forum state.'" *Eurofins Pharma US Holdings v. BioAlliance Pharma SA, 623 F.3d 147, 157 (3d Cir. 2010)* (quoting *Toys "R" Us, Inc. v. Step Two, S.A., 318 F.3d 446, 455 (3d Cir. 2003)* (alteration in original)).

Here, Plaintiffs have not made this showing. Plaintiffs fail to allege Ching has any contacts with New Jersey, let alone demonstrate with particularity what limited discovery is likely to reveal. Given Ching's representations regarding his lack of New Jersey contacts and based on **[*52]** the Court's determination that Plaintiffs' tort claims regarding the Ching review are futile, any fishing expedition into jurisdictional discovery is frivolous. *Toys "R" Us, Inc., 318 F.3d at 456* (holding that although the plaintiff bears the burden to present facts to support personal jurisdiction, courts "are to assist the plaintiff by allowing jurisdictional discovery unless the plaintiff's claim is 'clearly frivolous'"). Thus, the Court will not grant Plaintiffs' request to conduct jurisdictional discovery.

## CONCLUSION

For the foregoing reasons, Defendant Ly's *Rule 12(b)(6)* motion will be granted. Defendant Ching's motion to dismiss pursuant to *Rule 12(b)(2)* will also be granted. Plaintiffs' cross motion to transfer their claims against Ching will be denied.

An appropriate Order will follow.

Date: March 30, 2022

At Camden, New Jersey

/s/ Noel L. Hillman

NOEL L. HILLMAN, U.S.D.J.

## ORDER

For the reasons expressed in the Court's Opinion filed today,

IT IS on this 30th day of March, 2022

**ORDERED** that the Motion to Dismiss by Defendant Kevin Ching [Docket Number 87] be, and the same hereby is, GRANTED. Plaintiffs' claims against Ching are dismissed; and it is further

**ORDERED** that the Motion to Dismiss by Defendant Peter Ly [Docket Number 94] be, and the same **[*53]** hereby is, GRANTED. Plaintiffs' claims against Ly are dismissed; and it is further

**ORDERED** that Plaintiffs' Cross Motion [Docket Number 98] to transfer their case against Ching is, DENIED.

---

[17] Specifically, Plaintiffs seek discovery regarding "(1) Defendant's personal contacts in New Jersey, (2) Defendant's business contact in New Jersey, (3) if Defendant had communications with anyone in [sic] about Plaintiffs, (4) Defendant's blog posts, websites, LinkedIn, or private and/or direct messaging, referring to Plaintiffs or Plaintiffs [sic] services and/or business[,] and (5) Defendant's Internet search history regarding Plaintiffs."

At Camden, New Jersey

s/ Noel L. Hillman

NOEL L. HILLMAN, U.S.D.J.

---

**End of Document**

# EXHIBIT 3

 Neutral

As of: October 21, 2025 7:07 PM Z

## *Wang v. N.J. State Police*

United States District Court for the District of New Jersey

August 19, 2019, Decided; August 19, 2019, Filed

Case No. 3:18-cv-11933-BRM-TJB

**Reporter**

2019 U.S. Dist. LEXIS 139809 *; 2019 WL 3887126

YUJIE WANG and PENG XIE, Plaintiffs, v. NEW JERSEY STATE POLICE, JOSEPH FUENTES, TROOPER BRIAN QUIRK, TROOPER J CZECH, JOHN DOES 1-10, and ABC PUBLIC ENTITY/AGENCY 1-10, Defendants.

**Notice:** NOT FOR PUBLICATION

**Subsequent History:** Motion denied by *Yujue Wang v. N.J. State Police, 2021 U.S. Dist. LEXIS 37947, 2021 WL 794535 (D.N.J., Mar. 1, 2021)*

Summary judgment granted by, in part, Summary judgment denied by, in part *Yujue Wang v. N.J. State Police, 2024 U.S. Dist. LEXIS 134090 (D.N.J., July 30, 2024)*

## Core Terms

motion to dismiss, factual allegations, supervision, arrest, intentional infliction of emotional distress, emotional distress, training, alleges, malicious prosecution, negligent hiring, conspiracy, retention, official capacity, outrageous, cause of action, probable cause, prostitution, Counts, malice, rights, video, bail, negligent infliction of emotional distress, malicious prosecution claim, racial discrimination, further order, deprivation, immune, pled

**Counsel:** [*1] For YUJIE WANG, PENG XIE, her husband, Plaintiffs: TRACEY C. HINSON, HINSON SNIPES, LLP, Princeton, NJ.

For NEW JERSEY STATE POLICE, JOSEPH FUENTES, in his official and individual capacity, TROOPER BRIAN QUIRK, in his official and individual capacity, TROOPER J CZECH, in her official and individual capacity, Defendants: FRANCIS A RASO, LEAD ATTORNEY, OFFICE OF THE ATTORNEY GENERAL OF NJ, TRENTON, NJ.

**Judges:** HON. BRIAN R. MARTINOTTI, UNITED STATES DISTRICT JUDGE.

**Opinion by:** BRIAN R. MARTINOTTI

## Opinion

MARTINOTTI, DISTRICT JUDGE

Before this Court is Defendants New Jersey State Police ("NJSP"), Brian Quirk ("Quirk"), J Czech ("Czech"), and Joseph Fuentes' ("Fuentes") (collectively, "Defendants") Motion to Dismiss the Second Amended Complaint. (ECF No. 15). Plaintiffs Yujie Wang ("Wang") and Peng Xie ("Xie") (collectively, "Plaintiffs") oppose the Motion. (ECF No. 21.) Having reviewed the submissions filed in connection with the Motion and having declined to hold oral argument pursuant to *Federal Rule of Civil Procedure 78(b)*, for the reasons set forth below and for good cause shown, Defendants' Motion is **GRANTED in part and DENIED in part**.

## I. BACKGROUND

### A. Factual Background

For the purposes of the Motion to Dismiss, the Court accepts the factual allegations **[*2]** in the Complaint as true and draws all inferences in the light most favorable to Plaintiffs. *See Phillips v. Cty. of Allegheny, 515 F.3d 224, 228 (3d Cir. 2008)*. The Court also considers any "document *integral to or explicitly relied upon* in the complaint." *In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997)*.

On July 21, 2016, Wang received a phone call from her husband, Xie, stating two New Jersey State Troopers, Quirk and Czech, were at their home looking for her. (ECF No. 6 ¶ 26.) While Xie was on the phone with Wang, Quirk took his phone to ask Wang if she knew "Lee." (*Id.* ¶ 27.) Wang did not. (*Id.*) Quirk also informed Wang she was being charged with prostitution and ordered her to report to NJSP barracks in Cranbury. (*Id.* ¶ 28.) Wang immediately left New York City, returned home, and reported to the Cranbury barracks with her husband. (*Id.* ¶¶ 28-30.)

After her arrival, Quirk repeated that Wang was being charged with prostitution and other sex related charges. (*Id.* ¶ 31.) Wang informed the officers "it was a mistake, that she was not involved in prostitution, that she was not the person they were looking for, and that she could provide proof of her innocence." (*Id.* ¶ 33.) Two other women arrested in connection with the same matter were also at the NJSP barracks and admitted they did not know **[*3]** Wang. (*Id.* ¶ 34.) Nevertheless, Wang was arrested, handcuffed, and transported to Middlesex County jail, where she was fingerprinted, booked and underwent a strip search. (*Id.* ¶¶ 35-36.) Bail was set at $25,000 and issued the night of her arrest, however, Wang spend six days and five nights in county jail before her family could post her bail. (*Id.* ¶¶ 37, 46.)

Wang was subsequently arraigned and charged with second degree conspiracy to commit racketeering, *N.J.S.A. § 2C:41-2(d)*; third degree promoting prostitution, *N.J.S.A. §§ 2C:34-1(b)*; third degree conspiracy to promote prostitution, *N.J.S.A. §§ 2C:34-1* and *2C:5-2(a)*; and fourth degree conspiracy to promote prostitution and operate a sexually oriented business within 1,000 feet of a school, *N.J.S.A. §§ 2C:34-7* and *2C:5-2(a)*. (*Id.* ¶ 44.) A few months after her arrests, Wang and her defense attorney provided Defendants with exculpatory evidence concerning her whereabouts on February 27, 2016. (*Id.* ¶¶ 56-57.) Yet, Quirk and Czech falsely claimed to have videos and photographs of Wang "soliciting an undercover [t]rooper to engage in sex acts for $100.00." (*Id.* ¶ 59.) Quirk and Czech also falsely claimed other officers had seen Wang at the Grand Health Spa. (*Id.* ¶ 61.) It was "well over a year" before Defendants "finally **[*4]** admit[ed] in court [that] they had no video, no photographs, and no evidence against [Wang]." (*Id.* ¶ 69.)

As a result of Defendants' lack of evidence, Wang filed a motion for a probable cause hearing, and a hearing was set for August 11, 2017. (*Id.* ¶ 71.) During that proceeding, the DAG assigned to the case admitted Quirk and Czech "failed to provide him with a single piece of evidence or discovery linking [] Wang to the crimes for which she was charged." (*Id.* ¶ 72.) The probable cause hearing was adjourned to September 5, 2017, wherein the judge dismissed all charges against Wang due to a lack of evidence. (*Id.* ¶ 74.) "The sole reason [Quirk and Czech] arrested [] Wang was because she was the registered owner of a car that was parked in the public parking lot of the premises where the alleged criminal activities took place." (*Id.* ¶ 76.)

As a result of the forgoing events, Wang was "publicly and privately humiliated, embarrassed, and depressed." (*Id.* ¶ 84.) She was also restricted from traveling for more than one year and was unable to attend her grandmother's funeral, lost potential business investments in China because her passport was seized, and was forced to cancel her anniversary **[*5]** plans, which had been paid for. (*Id.* ¶¶ 85-88.)

Premised on the above factual allegations, Plaintiffs filed this action on July 22, 2018. (ECF No. 1.) On August 7, 2018, they filed a Second Amended Complaint alleging: (1) *42 U.S.C. § 1983* false arrest/imprisonment; (2) *42 U.S.C. § 1983* malicious prosecution; (3) *42 U.S.C. § 1985* conspiracy; (4) *42 U.S.C. § 1983* supervisor liability; (5)

negligent hiring, training, retention, and supervision; (6) *42 U.S.C. §§ 1981*, *1983* racial discrimination; (7) *42 U.S.C. § 1985(3)* conspiracy with racial animus; (8) violation of the New Jersey Law Against Discrimination ("NJLAD"), *N.J.S.A. § 10:5-2*; (9) violation of the *New Jersey Civil Rights Act ("NJCRA"), N.J.S.A. § 10:6-1 to 2*; (10) negligent and intentional infliction of emotional distress; (11) per quod as to Xie; and (12) punitive damages. (ECF No. 6.) On December 28, 2018, Defendants filed a Motion to Dismiss the Second Amended Complaint. (ECF No. 15.) Plaintiffs oppose this Motion. (ECF No. 21.)

## II. LEGAL STANDARD

In deciding a motion to dismiss pursuant to *Federal Rule of Civil Procedure 12(b)(6)*, a district court is "required to accept as true all factual allegations in the complaint and draw all inferences in the facts alleged in the light most favorable to the [plaintiff]." *Phillips, 515 F.3d at 228*. "[A] complaint attacked by a . . . motion to dismiss does not need detailed factual allegations." **[*6]** *Bell Atl. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*. However, the plaintiff's "obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* (citing *Papasan v. Allain, 478 U.S. 265, 286, 106 S. Ct. 2932, 92 L. Ed. 2d 209 (1986))*. A court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan, 478 U.S. at 286*. Instead, assuming the factual allegations in the complaint are true, those "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly, 550 U.S. at 555*.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)* (quoting *Twombly, 550 U.S. at 570*). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for misconduct alleged." *Id.* This "plausibility standard" requires the complaint allege "more than a sheer possibility that a defendant has acted unlawfully," but it "is not akin to a 'probability requirement.'" *Id.* (quoting *Twombly, 550 U.S. at 556*). "Detailed factual allegations" are not required, but "more than an unadorned, the defendant-harmed-me accusation" must be pled; it must include "factual **[*7]** enhancements" and not just conclusory statements or a recitation of the elements of a cause of action. *Id.* (quoting *Twombly, 550 U.S. at 555, 557)*.

"Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal, 556 U.S. at 679*. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id. at 679* (quoting *Fed. R. Civ. P. 8(a)(2)*).

While as a general rule, a court may not consider anything beyond the four corners of the complaint on a motion to dismiss pursuant to 12(b)(6), the Third Circuit has held "a court may consider certain narrowly defined types of material without converting the motion to dismiss [to one for summary judgment pursuant under *Rule 56*]." *In re Rockefeller Ctr. Props. Sec. Litig., 184 F.3d 280, 287 (3d Cir. 1999)*. Specifically, courts may consider any "document *integral to or explicitly relied upon* in the complaint." *In re Burlington Coat Factory Sec. Litig., 114 F.3d at 1426*.

## III. DECISION

In their moving brief, Defendants argue this Court should dismiss: (1) all claims against NJSP and Quirk and Czech in their official capacities, as they are immune from suit pursuant to the *Eleventh Amendment*; (2) all claims against NJSP and Quirk **[*8]** and Czech in their official capacities, since they are not "persons" within *§ 1983*; (3) the *§ 1983* and *NJCRA* claims against Fuentes for failure to state a claim; (4) the *§ 1983* malicious prosecution claim for failure to state a claim; (5) the *§§ 1981* and *1983* racial discrimination claim for failure to state a claim; (6) the negligent hiring, training, retention, and supervision for also failing to state a claim; (7) the negligent infliction of

emotional distress claim; (8) the intentional infliction of emotional distress claim; and (9) the NJLAD claim as inapplicable to this matter. (*See* ECF No. 15-2.)

Plaintiffs concede certain arguments "can be immediately disposed of." (ECF No. 21 at 20.) Specifically, they "concede the *Eleventh Amendment* bars all claims brought pursuant to *42 U.S.C. § 1983*, *§ 1981*, *§ 1985* and the New Jersey Civil Rights Act, against the NJSP and against Defendants Quirk and Czech, in their official capacity, only." (*Id.*) Plaintiffs also concede Count VI, racial discrimination, and Count VIII, NJLAD[1], should be dismissed. (*Id.* at 21.) Accordingly, all claims against NJSP and Quirk and Czech in their official capacity are **DISMISSED**. Count VI and Count VIII are also **DISMISSED**.

The Court will only address the remaining claims at issue, whether Plaintiffs sufficiently **[*9]** pled: (1) *§ 1983* and *NJCRA* claims against Fuentes; (2) malicious prosecution against Quirk and Czech; (3) negligent hiring, training, retention or supervision against NJSP and Fuentes; (4) and negligent and intentional infliction of emotional distress against Quirk and Czech.

### A. Claims Against Fuentes

The Second Amended Complaint alleges six causes of actions against Fuentes: (1) *42 U.S.C. § 1985* conspiracy; (2) *42 U.S.C. § 1983* supervisor liability; (3) negligent hiring, training, retention, and supervision; (4) *42 U.S.C. § 1985(3)* conspiracy with racial animus; (5) violation of the NJCRA; and (6) negligent and intentional infliction of emotional distress. (*See* ECF No. 6.) Defendants argue the Court should dismiss all counts against him because "Fuentes is not mentioned a single time in the second of the Second Amended Complaint entitled 'Factual Allegations.'" (ECF No. 15-2 at 17.) Plaintiffs contend they have plead sufficient facts to establish all causes of action against Fuentes. (See ECF No. 21 at 21, 26, 28.)

The Court agrees with Defendants. Fuentes is not mentioned once in the crucial portion of the Second Amended Complaint, the Factual Allegations, which is thirteen pages long and consists of eighty-nine paragraphs. He is only mentioned in **[*10]** the above six Counts in a conclusory and formulaic manor, which Plaintiffs couch as factual allegations. For example, Count IV, *42 U.S.C. § 1983* Supervisor Liability, alleges:

133. Plaintiff, **YUJUE WANG**, repeats and realleges the foregoing paragraphs of the Complaint as if the same were fully set forth at length herein.

134. Defendants **JOSE FUENTES**, as Superintendent of the NJSP, is liable for creating, implementing and enforcing policies, practices and customs of the **NJSP**.

135. Defendants **FUENTES** and **JOHN DOES 1-10**, were, at all relevant times, supervisory personnel for the **NJSP**, with oversight responsibility for Defendants **QUIRK, CZECH**, and **JOHN DOES 1-10**. They were responsible for the hiring and firing, instruction, supervision, correction, discipline, and training of all officers, including the named Defendants, on all aspects of law enforcement procedures, including the use of force, arrest procedures, pursuit, conducting traffic stops, proper investigative techniques, and evaluation of what constitute a proper determination of probable cause.

136. Defendants **FUENTES** and **JOHN DOES 1-10**, a supervisory personnel in the **NJSP**, owed a duty of care to **MS. WANG** to prevent the conduct alleged, which foreseeably **[*11]** caused her injuries and violation of her civil rights.

137. Defendant **FUENTES**, as Superintendent of the **NJSP** had a duty to properly supervise officers, including Defendant Officers but failed to do so.

---

[1] In their brief, Plaintiffs inadvertently stated the NJLAD claim is Count IX instead of VIII.

138. Based on prior conduct and complaints against Defendants **QUIRK, CZECH**, and **JOHN DOES 1-10**, Defendants knew, or in the exercise of due diligence should have known that if they failed to properly supervise and discipline Defendants, the inappropriate, unlawful and tortuous conduct of Defendants against **MS. WANG** was likely to occur.

139. Defendants **FUENTES** and **JOHN DOES 1-10**'s failure to take preventive and remedial measures, including a failure to supervise and discipline **NJSP** Officers, including the named Defendants, resulted in the malicious prosecution of **MS. WANG**. Had Defendants taken the appropriate action, **MS. WANG** would not have been illegally detained, seized, searched, arrested, unlawfully imprisoned, and maliciously prosecuted.

140. Defendants' failure to supervise and discipline Defendants **QUIRK, CZECH**, and **JOHN DOES 1-10**, amounted to negligence, gross negligence, deliberate indifference, or reckless misconduct which directly caused and was the moving force behind the constitutional **[*12]** deprivations **MS WANG** suffered.

141. As a direct and proximate result of Defendants' conduct and abuse of authority detailed above, Plaintiff, **YUJUE WANG**, sustained the damages hereinbefore alleged.

(ECF No. 6 ¶¶ 133-41.) The most liberal reading of this Count, as well as all others asserted against Fuentes, fails to articulate any facts that would support a claim against Fuentes. While Plaintiffs Second Amended Complaint "does not need detailed factual allegations," it "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly, 550 U.S. at 555*. Accordingly, all claims against Fuentes are **DISMISSED**.

### B. *Section 1983* Malicious Prosecution Against Quirk and Czech

Defendants argue Plaintiffs' "Second Amended Complaint does not set forth a plausible claim that [D]efendants Quirk and Czech initiated Wang's arrest with malice." (ECF No. 15-2 at 19.) Plaintiffs contend malice can be inferred from lack of probable cause. (ECF No. 21 at 24.)

*Section 1983* provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction **[*13]** thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

*42 U.S.C. § 1983*. To state a claim under *§ 1983*, a plaintiff must establish that (1) the conduct deprived him of his rights, privileges, or immunities secured by the Constitution or laws of the United States and (2) the conduct challenged was committed by a person acting under color of state law. *Gomez v. Toledo, 446 U.S. 635, 640, 100 S. Ct. 1920, 64 L. Ed. 2d 572 (1980)*; *Shuman ex rel. Shertzer v. Penn Manor Sch. Dist., 422 F.3d 141, 146 (3d Cir. 2005)*.

To state a claim for malicious prosecution under *§ 1983* and determine whether the alleged conduct deprived plaintiff of his *Fourth Amendment* rights, a plaintiff must plead:

> (1) the defendant initiated a criminal proceeding; (2) the criminal proceeding ended in his favor; (3) the defendant initiated the proceeding without probable cause; (4) the defendant acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding.

*Johnson v. Knorr, 477 F.3d 75, 81-82 (3d Cir. 2007)* (citing *Estate of Smith v. Marasco, 318 F.3d 497, 521 (3d Cir. 2003))*. Malice is defined as "the intentional doing of a wrongful act without just cause or excuse." *Biaggi-Pacheco v. City of Plainfield, No. 16-3511, 2017 U.S. Dist. LEXIS 170746, 2017 WL 4618751, at *6 (D.N.J. Oct. 13, 2017)*

(quoting *Brunson v. Affinity Fed. Credit Union, 199 N.J. 381, 972 A.2d 1112, 1120 (N.J. 2009))*. "Malice is an independent element, **[*14]** requiring something above and beyond mere lack of probable cause, although the absence of probable cause is highly probative." *Id.* Therefore, a malicious prosecution allegation must "contain extrinsic evidence of malice." *Id.*

Furthermore, the analysis for Plaintiffs' New Jersey Constitutional malicious prosecution claim is the same as the *§ 1983* analysis. *See Estate of Martin v. U.S. Marshals Serv. Agents, 649 F. App'x 239, 245 n.4 (3d Cir. 2016)* (holding that "it appears undisputed that [p]laintiffs' claims under the New Jersey Constitution and the New Jersey Civil Rights Act trigger the same legal elements and principles as . . . [the] federal causes of action [under *Section 1983*]"); *Lucia v. Carroll, No. 12-3787, 2014 U.S. Dist. LEXIS 61134, 2014 WL 1767527, at *5 (D.N.J. May 2, 2014)* (finding that the analysis for plaintiff's *article 1, paragraph 7 of the New Jersey Constitution* malicious prosecution claim was the same as its *§ 1983* claims). Accordingly, the Court applies the same standard to all of Plaintiffs' malicious prosecution claims.

Defendants do not assert that the Second Amended Complaint should be dismissed as to the first, second, third, or fifth elements. Instead, they contend the Second Amended Complaint fails to plead Defendants' acted maliciously. The Court finds Plaintiffs' Second Amended Complaint has plead numerous allegations of malice. For example, the Complaint alleges Defendants lacked probable cause to arrest Wang; that **[*15]** Defendants "deliberately took steps to ensure [Wang's] bail could not be posted, including but not limited to failing to contact the DAG to approve her bail, in an attempt to coerce her cooperation and confession to crimes she did not commit;" "Defendant Officers ignored the exculpatory evidence and falsely claimed to have a video and photographs of [Wang] soliciting an undercover Trooper to engage in sex acts for $100.00," when no such video existed; etc. (*See* ECF No. 21-1.) Essentially, Wang has pled that her arrest, seizure, imprisonment, indictment and prosecution would not have occurred absent Quirk and Czech's continuous unlawful and fraudulent actions, which they undertook without any information or evidence other than seeing Wang's car parked in a public parking lot in proximity to the Grand Health Spa. Accordingly, Defendants' Motion to Dismiss Count II, *§ 1983* malicious prosecution, is **DENIED**.

## C. Negligent Hiring, Training, Retention or Supervision Against NJSP and Fuentes

Defendants argue Plaintiffs have failed to plead facts sufficient to support a finding of negligent hiring, training, retention or supervision against NJSP and Fuentes. (ECF No. 15-2 at 23.) Plaintiffs contend **[*16]** "the facts alleged in the Second Amended Complaint establish a plausible claim at this point that it was the policies or customs implemented by Fuentes that directly caused their harm." (ECF No. 21 at 27.)

It appears Plaintiffs agree that NJSP is immune from suit pursuant to the *Eleventh Amendment* because they do not mention NJSP in their opposition brief on this issue. However, to the extent they argue they have sufficiently pled a claim against NJSP for negligent hiring, training, retention, or supervision, the Court finds NJSP is immune from suit pursuant to the *Eleventh Amendment*.[2] "That a State may not be sued without its consent is a fundamental rule of jurisprudence." *Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 98, 104 S. Ct. 900, 79 L. Ed. 2d 67 (1984)* (quoting *In re State of New York, 256 U.S. 490, 497, 41 S. Ct. 588, 65 L. Ed. 1057 (1921))*. This protection is afforded by the *Eleventh Amendment*, which provides that "[t]he judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another state, or by citizens or subjects of any foreign state." *U.S. Const. amend. XI*. States are immune from suits in federal court brought by their own citizens, or citizens of other states, regardless of the relief sought. *Pennhurst, 465 U.S. at 100-01*; *see also Thorpe v. New Jersey, 246 F. App'x 86, 87 (3d Cir. 2007)* ("The *Eleventh Amendment of the U.S. Constitution* protects a state or state agency from a suit brought in federal court by one of its **[*17]** own citizens regardless of the relief sought . . . .").

---

[2] The Court addresses this argument because even though Plaintiffs do not mention NJSP in their opposition as to this issue, they originally only conceded NJSP was immune from claims brought pursuant to *42 U.S.C. §§ 1983*, *1981*, and *1985*. (ECF No. 21 at 20.) NJSP is, however, immune from all claims.

Courts have held that the NJSP is an arm of the state and therefore immune from federal lawsuits pursuant to the *Eleventh Amendment*. See *Lassoff v. New Jersey, 414 F. Supp. 2d 483, 489 (D.N.J. 2006)*; *Simmerman v. Corino, 804 F. Supp. 644, 650 (D.N.J. 1992)*, aff'd, 16 F.3d 405 (3d Cir. 1993). As such, Defendants Motion to Dismiss Count V as to NJSP is **GRANTED**.

With respect to Fuentes, the Court has already determined the most liberal reading of the Second Amended Complaint fails to articulate any facts that would support a claim against Fuentes. Accordingly, Defendants Motion to Dismiss Count V as to Fuentes is also **GRANTED**.

### D. Intentional and Negligent Infliction of Emotional Distress Against Quirk and Czech

### 1. Intentional Infliction of Emotional Distress

Defendants argue Plaintiffs failed to state a claim for intentional infliction of emotional distress because they did not plead Defendants intended to cause the emotional distress and the conduct was not extreme and outrageous. (ECF No. 15-2 at 27.) Plaintiffs contend their Second Amended Complaint "is replete with outrageous factual allegations of Defendants' conduct which give rise to their claim for negligent and intentional infliction of emotional distress claim." (ECF No. 21 at 28.)

Under New Jersey law, to establish a *prima facie* claim **[*18]** for intentional infliction of emotional distress, a plaintiff must show: "(1) that the defendant intended to cause emotional distress; (2) that the conduct was extreme and outrageous; (3) that the actions proximately caused emotional distress; and (4) that plaintiff's emotional distress was severe." *Witherspoon v. Rent-A-Center, Inc., 173 F. Supp. 2d 239, 242 (D.N.J. 2001)* (citing *Buckley v. Trenton Sav. Fund Soc., 111 N.J. 355, 544 A.2d 857, 863 (N.J. 1988))*. "An intentional infliction of emotional distress claim is rarely dismissed on a motion to dismiss." *Acevedo v. Monsignor Donovan High Sch., 420 F. Supp. 2d 337, 349 (D.N.J. 2006)*. However, a plaintiff will not satisfy the above elements by merely demonstrating a defendant acted "unjust, unfair and unkind." *Fregara v. Jet Aviation Bus. Jets, 764 F. Supp. 940, 956 (D.N.J. 1991)*.

In order to establish "extreme and outrageous" conduct, a plaintiff must sufficiently plead factual allegations to show the defendant's conduct was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Witherspoon, 173 F. Supp. 2d at 242* (quoting *Buckley, 544 A.2d at 863* (citation omitted)). As a threshold matter, the Court must determine whether a defendant's conduct meets this standard. *See Ali v. Jersey City Parking Auth., No. 13-2678, 2014 U.S. Dist. LEXIS 52547, 2014 WL 1494578, at *5 (D.N.J. Apr. 16, 2014)* (citing *Cox v. Keystone Carbon Co., 861 F.2d 390, 395 (3d Cir. 1988))*. In order to establish severe emotional distress, a plaintiff must show emotional distress "so severe that no reasonable [person] could be expected to endure it." *Glenside West Corp. v. Exxon Co., 761 F. Supp. 1100, 1113 (D.N.J. 1991)* (quoting *Buckley, 544 A.2d at 863*). Additionally, **[*19]** "New Jersey law . . . requires plaintiffs to assert that they sought treatment for their alleged distress." *Botts v. N.Y. Times Co., No. 03-1582, 2003 U.S. Dist. LEXIS 23785, 2003 WL 23162315, at *9 (D.N.J. Aug. 29, 2003)*.

The Court finds, contrary to Defendants argument, that Plaintiffs have pled intent to cause the emotional distress and that Defendants' conduct was extreme and outrageous. With respect to intent, the Second Amended Complaint alleges Defendants lacked probable cause to arrest Wang; that Defendants "deliberately took steps to ensure [Wang's] bail could not be posted, including but not limited to failing to contact the DAG to approve her bail, in an attempt to coerce her cooperation and confession to crimes she did not commit;" "Defendant Officers ignored the exculpatory evidence and falsely claimed to have a video and photographs of [Wang] soliciting an undercover Trooper to engage in sex acts for $100.00," when no such video existed; etc. (*See* ECF No. 21.) Regarding extreme and outrageous conduct, the Second Amended Complaint alleges Wang was unlawfully detained, seized, arrested, and imprisoned without probable cause. (*See* ECF No. 6.) She was fingerprinted, made subject to a strip search, ordered to surrender her passport, charged with several crimes, placed in a cell with an **[*20]** inmate she feared, and that her food was taken from her while she was in jail. (*See id.*) She further alleges that the events

surrounding the unlawful detention created financial and emotional strain on her, and that as a direct result she suffered severe emotional distress, embarrassment, humiliation and economic harm. (*See id.*) Moreover, she spent six days and five nights in county jail, for a crime she did not commit and was unable to attend her grandmother's funeral. Accordingly, Defendants' Motion to Dismiss Plaintiffs' intentional infliction of emotional distress claim is **DENIED**.

**2. Negligent Infliction of Emotional Distress**

Defendants argue Plaintiffs have failed to plead a claim for negligent infliction of emotional distress because they did not plead "the death or serious physical injury of any person, let alone a person with whom either plaintiff was intimately familiar." (ECF No. 15-2 at 26.) Plaintiffs content their "Second Amended Complaint is replete with outrageous factual allegations of Defendants' conduct which give rise to their claim for negligent and intentional infliction of emotional distress." (ECF No. 21 at 28.)

Under New Jersey law, there are two legal theories **[*21]** under which a plaintiff can establish a *prima facie* claim for negligent infliction of emotional distress. First, a plaintiff can show: 1) "death or serious physical injury of another caused by defendant's negligence; 2) a marital or intimate family relationship between plaintiff and the injured person; 3) observation of the death or injury at the scene of the accident; and 4) resulting severe emotional distress." *Fleming v. United Parcel Serv., Inc., 255 N.J. Super. 108, 604 A.2d 657, 686 (N.J. Super. Ct. Law. Div. 1992)*. Second, a plaintiff can show "the defendant's negligent conduct placed the plaintiff in 'reasonable fear of immediate personal injury' which gave rise to emotional distress that resulted in a substantial bodily injury or sickness." *Jablonowska v. Suther, 195 N.J. 91, 948 A.2d 610, 617 (N.J. 2008)*. Under the second standard, New Jersey law has adopted the "zone of danger" rule, where "immediate fear of personal injury could serve as the basis for recovery so long as 'substantial bodily injury or sickness' result." *Abouzaid v. Mansard Gardens Associates, LLC, 207 N.J. 67, 23 A.3d 338, 344 (N.J. 2011)*.

Here, Plaintiffs' Second Amended Complaint alleges Defendants' conduct placed Plaintiffs in a zone of danger. Specifically, she alleges "[i]nmates took her food while she remained silent and trembled with fear, unable to defend herself" and that "[o]nce, [Wang] was so hungry, she took an apple during food distribution. She was **[*22]** immediately cornered by an inmate who pushed her, used foul language and told her that apple was not for her." (ECF No. 6 ¶¶ 53-54.) Accordingly, Defendants' Motion to Dismiss Count X is **DENIED**.

**IV. CONCLUSION**

For the reasons set forth above, Defendants' Motion to Dismiss is **GRANTED in part and DENIED in part**. Specifically, all claim against the NJSP and Fuentes are **DISMISSED**. Claims against Quirk and Czech in their official capacity are also **DISMISSED**. Counts IV (Supervisor Liability),[3] V (Negligent Hiring/Training/Retention/Supervision), VI (Racial Discrimination), VII (Conspiracy with Racial Animus),[4] and VIII (NJLAD) are also **DISMISSED** in their entirety. Count II (malicious prosecution) is **GRANTED in part and DENIED in part**. It is **GRANTED** as to Quirk and Czech in their official capacities but **DENIED** as to them in their individual capacities. Defendants' Motion to Dismiss Count X is **DENIED**. Count IX (NJCRA) is **DISMISSED in part**, the NJCRA claims relating to their federal counterparts that have been dismissed are also **DISMISSED**, all others will proceed.[5] Counts I, III, X, XI and XII will proceed in their entirety.

---

[3] This Count is dismissed in its entirety because all claims against NJSP and Fuentes have been dismissed.

[4] Because Plaintiffs have voluntarily dismissed their *§ 1983* racial discrimination claim, the *§ 1983(3)* claim is also **DISMISSED. See *Barron v. New Jersey*, *No. 17-735, 2018 U.S. Dist. LEXIS 2931, 2018 WL 324725, at *4 (D.N.J. Jan. 8, 2018)*.

[5] The *NJCRA* was modeled after *§ 1983*, and "courts in New Jersey have consistently looked at claims under the NJCRA 'through the lens of *§ 1983*[,]'" thereby construing the NJCRA in terms similar to its federal counterpart. *Samoles v. Lacey Twp.,*

Date: August 19, 2019

*/s/ Brian R. Martinotti*

**HON. [\*23]  BRIAN R. MARTINOTTI**

**UNITED STATES DISTRICT JUDGE**


**ORDER**

**THIS MATTER** is opened to this Court by Defendants New Jersey State Police ("NJSP"), Brian Quirk ("Quirk"), J Czech ("Czech"), and Joseph Fuentes' ("Fuentes") (collectively, "Defendants") Motion to Dismiss the Second Amended Complaint. (ECF No. 15). Plaintiffs Yujie Wang ("Wang") and Peng Xie ("Xie") (collectively, "Plaintiffs") oppose the Motion. (ECF No. 21.) Having reviewed the submissions filed in connection with the Motion and having declined to hold oral argument pursuant to *Federal Rule of Civil Procedure 78(b)*, for the reasons set forth in the accompanying Opinion and for good cause shown,

**IT IS** on this 19th day of August 2019,

**ORDERED** that all claim against the NJSP and Fuentes are **DISMISSED**; and it is further

**ORDERED** that all claims against Quirk and Czech in their official capacity are also **DISMISSED**, and it is further

**ORDERED** that Counts IV (Supervisor Liability), V (Negligent Hiring/Training/Retention/Supervision), VI (Racial Discrimination), VII (Conspiracy with Racial Animus), and VIII (NJLAD) are also **DISMISSED** in their entirety; and it is further

**ORDERED** that Count II (malicious prosecution) is **GRANTED in part and DENIED in part**. It is **GRANTED** as to Quirk **[\*24]**  and Czech in their official capacities but **DENIED** as to them in their individual capacities; and it is further

**ORDERED** that Defendants' Motion to Dismiss Count X is **DENIED**; and it is further

**ORDERED** that Count IX (NJCRA) is **DISMISSED in part**, the NJCRA claims relating to their federal counterparts that have been dismissed are also **DISMISSED**, all others will proceed; and it is finally

**ORDERED** that Counts I, III, X, XI and XII will proceed in their entirety.

*/s/ Brian R. Martinotti*

**HON. BRIAN R. MARTINOTTI**

**UNITED STATES DISTRICT JUDGE**

---

*No. 12-3066, 2014 U.S. Dist. LEXIS 79211, 2014 WL 2602251, at \*15 (D.N.J. June 11, 2014)* (citation omitted); *see Hartfelder v. N.J. State Police, No. 165461, 2017 U.S. Dist. LEXIS 117137, 2017 WL 3184173, at \*5 (D.N.J. July 26, 2017)*; *Armstrong v. Sherman, No. 09-716, 2010 U.S. Dist. LEXIS 55616, 2010 WL 2483911, \*5 (D.N.J. June 4, 2010)*. This Court has repeatedly interpreted the NJCRA analogously to *§ 1983*. *See Chapman v. New Jersey, No. 08-4130, 2009 U.S. Dist. LEXIS 75720, 2009 WL 2634888, \*3 (D.N.J. August 25, 2009)* ("Courts have repeatedly construed the NJCRA in terms nearly identical to its federal counterpart: *Section 1983*."); *Armstrong, 2010 U.S. Dist. LEXIS 55616, 2010 WL 2483911 at \*5* ("[T]he [NJRCA] is a kind of analog to *section 1983*."). The NJCRA is therefore generally interpreted nearly identically to *§ 1983* and claims under the NJCRA are generally coterminous with and subject to the same defenses and immunities as those brought under *§ 1983*. *Trafton v. City of Woodbury, 799 F. Supp. 2d 417, 443-44 (D.N.J. 2011)*. Therefore, the Court analyzes Plaintiffs' NJCRA claims through the same lens of *§ 1983*. *Id. at 444*.

**End of Document**

# EXHIBIT 4

 Neutral

As of: October 21, 2025 7:05 PM Z

# *Herman v. Ibtihaj Muhammad*

Superior Court of New Jersey, Appellate Division

September 10, 2024, Submitted; October 15, 2024, Decided

DOCKET NO. A-1328-23

**Reporter**
2024 N.J. Super. Unpub. LEXIS 2416 *; 2024 WL 4488462

TAMAR HERMAN, Plaintiff-Respondent, v. IBTIHAJ MUHAMMAD, Defendant-Appellant, and SELAEDIN MAKSUT, COUNCIL ON AMERICAN-ISLAMIC RELATIONS, a/k/a CAIR, a/k/a CAIR FOUNDATION INC., and CAIR NEW JERSEY, a/k/a CAIR NJ, a/k/a CAIR NJ INC., Defendants.

**Notice:** NOT FOR PUBLICATION WITHOUT THE APPROVAL OF THE APPELLATE DIVISION.

PLEASE CONSULT NEW JERSEY *RULE 1:36-3* FOR CITATION OF UNPUBLISHED OPINIONS.

**Prior History:  [*1]** On appeal from an interlocutory order of the Superior Court of New Jersey, Law Division, Union County, Docket No. L-2913-22.

*Herman v. Ibtihaj Muhammad, 2024 N.J. Super. LEXIS 111 (App.Div., Oct. 15, 2024)*
*Herman v. S. Orange-Maplewood Sch. Dist. Bd. of Educ., 2023 U.S. Dist. LEXIS 44343, 2023 WL 2540428 (D.N.J., Mar. 15, 2023)*

## Core Terms

posts, hijab, allegations, defamation, actual malice, defamatory, motion to dismiss, amended complaint, media, wear, invasion, teacher, serious doubt, privacy, hair

**Counsel:** Trenk Isabel Siddiqi & Shahdanian, PC, and CAIR Legal Defense Fund, attorneys for appellant (Assad K. Siddiqi and Justin Sadowsky (CAIR Legal Defense Fund) of the District of Colombia bar, admitted pro hac vice, on the briefs).

Edward Andrew Paltzik (Bochner PLLC) and Erik Dykema (Bochner PLLC), attorneys for respondent.

**Judges:** Before Judges Sumners, Susswein and Bergman.

## Opinion

PER CURIAM

On motion for leave granted, defendant Ibtihaj Muhammad appeals the Law Division's denial of her *Rule 4:6-2(e)* motion to dismiss plaintiff Tamar Herman's amended complaint alleging defamation per se and false light invasion of privacy. We affirm.[1]

---

[1] In a separate opinion, we reversed the Law Division's denial of *Rule 4:6-2(e)*'s motion to dismiss by defendants Counsel on American Islamic Relations (CAIR) Foundation, CAIR-NJ, and CAIR-NJ's executive director Selaedin Maksut (collectively CAIR defendants). *See Tamar Herman v. Ibtihaj Muhammad*, No. A-0784-23, 2024 N.J. Super. Unpub. LEXIS 2417.

Case: 25-2553    Document: 14-2    Page: 42    Date Filed: 10/21/2025

Page 2 of 6

2024 N.J. Super. Unpub. LEXIS 2416, *1

I.

The following facts are alleged in the amended complaint. Herman is a second-grade teacher at an elementary school (school) in the South Orange-Maplewood school district. On October 6, 2021, Herman believed that one of her students, who normally wears a form-fitting hijab as part of her Muslim faith, was wearing a "hood" covering her eyes. Attempting to reengage the student in schoolwork, Herman asked the student to remove the hood from her eyesight. Unbeknownst **[*2]** that the student was wearing a loose-fitting hijab, Herman "lightly brush[ed] back" the student's hijab and "immediately and gently brushed [it] back to cover . . . the [s]tudent's hair." Herman claims that "out of respect for the religious practices of Islam and for the [s]tudent's observation of same, [she] apologized to the [s]tudent." Herman maintains the hijab "never left the [s]tudent's head," and class resumed without disruption. After the student told her mother about the incident, the mother spoke to the school's principal and assistant principal.

The next day at 4:00 p.m., Muhammad, a practicing Muslim who wore a hijab while winning a Sabre fencing medal for the United States in the Olympics, posted the following sentiments on Instagram:

> I wrote this book [The Proudest Blue: A Story of Hijab and Family] with the intention that moments like this would never happen again. When will it stop? Yesterday, Tamar Herman, a teacher at Seth Boyden Elementary School in Maplewood, NJ forcibly removed the hijab of a second[-]grade student. The young student resisted, by trying to hold onto her hijab, but the teacher pulled the hijab off, exposing her hair to the class. Herman told the student **[*3]** that her hair was beautiful and she did not have to wear [a] hijab to school anymore. Imagine being a child and stripped of your clothing in front of your classmates. Imagine the humiliation and trauma this experience has caused her.
> This is abuse. Schools should be a haven for all of our kids to feel safe, welcome and protected — no matter their faith. We cannot move toward a post-racial America until we weed out the racism and bigotry that still exist in all layers of our society. By protecting Muslim girls who wear hijab, we are protecting the rights of all of us to have a choice in the way we dress.
> Writing books and posting on social is not enough. We must stand together and vehemently denounce discrimination in all of its forms. CALL Seth Boyden Elementary (973) 378-5209 and EMAIL the principal sglander@somsd.k12.Nj.us and the superintendent Rtaylor@somsd.k12.Nj.us

About thirty minutes later, Muhammad edited and reshared the post on Instagram and Facebook.[2] The edited post omitted the first two sentences ("I wrote this book with the intention that moments like this would never happen again. When will it stop?") and included a photo of the school. Muhammad's posts garnered considerable reactions in mass media and social media, **[*4]** including by the Counsel on American Islamic Relations (CAIR) Foundation, CAIR-NJ, and CAIR-NJ's executive director Selaedin Maksut (collectively CAIR defendants), calling for Herman's immediate termination.

Prior to the incident, Herman contends she had a "[l]ongstanding [p]ersonal [r]elationship with Muhammad." They often worked out together in "small training group[s]," "shared the same personal trainer," and Herman attended Muhammad's 2018 book signing. After discussing the possibility of Muhmmad coming to speak at the school, which Muhammad also attended, the two exchanged phone numbers, "and Muhammad [gave] Herman her email address."

Just under a year after the incident, Herman filed a Law Division complaint against Muhammad and CAIR defendants, asserting claims for defamation and false light invasion of privacy. The complaint was amended after Muhammad and CAIR defendants withdrew their respective *Rule 4:6-2(e)* motions to dismiss for failure to state a claim without prejudice.

To address concerns raised by the motions to dismiss, Herman amended her complaint, adding allegations to support her claim that Muhammad's social media posts were malicious. Herman alleged Muhammad "did not

---

[2] The original post, which included a photo and statement about Muhammad's then-recently published book, has since been removed from Instagram but remains on Facebook.

Case: 25-2553    Document: 14-2    Page: 43    Date Filed: 10/21/2025

Page 3 of 6

2024 N.J. Super. Unpub. LEXIS 2416, *4

investigate **[\*5]** whether the allegations in her posts were true or false, or even make a good faith effort to determine whether the allegations were true." Herman asserted Muhammad posted an "unbelievable" version of the incident "based on the third-hand account of a dubious witness (the [s]tudent, a [seven-year-old] second-grader)." After the incident, Herman asserted the student's mother called Muhammad's mother, who then relayed the version of the incident that Muhammad posted. Herman emphasizes Muhammad's allegations "grossly distorted . . . [her] gentle and momentary light brushing back of the [s]tudent's [hijab]." Furthermore, it is alleged that Muhammad's removal of the initial Instagram post evidences her "reckless disregard for the truth of her statements."

Based on their prior relationship, Herman texted Muhammad the next evening after her postings, explaining the information in Muhammad's posts was false. However, according to Herman, "Muhammad made no effort to verify the truth." Instead, she "admitted that she was relying on the recall of a [seven]-year-old," who was coached by her mother in a now-deleted video.

As a result of Muhammad's "defamatory social media posts . . . the Essex County **[\*6]** Prosecutor's Office opened a [three-month] criminal investigation" of the incident, and though "vindicated by the outcome," Herman alleges she has endured "acute emotional distress," destruction of her "hard-earned reputation," and physical threats. Herman also alleged she was even "condemn[ed]" by the "rabbi from her childhood congregation."

II.

After Herman amended her complaint, Muhammad filed a motion seeking dismissal of the complaint without citing the relevant court rule. Yet, Muhammad's supporting brief cited both *Rules 4:6-2(e)* and *4:46-2* and included three supporting certifications--two by Muhammad and one by Garner-Muhammad. Herman responded with a counter statement of material facts and her own certification.

The motion court treated Muhammad's motion as one for summary judgment as both parties raised facts outside the pleadings through certifications and it would be "ill-placed 'and/or' [] procedurally deficient" to consider her motion under *Rules 4:6-2(e)* and *4:46-2*. The court denied the motion because, under *Rule 4:46-2*, there was a genuine issue of material fact as to whether Muhammad published the allegedly defamatory statements with actual malice. The court determined that in accordance with *Rule 4:46-3*, discovery was necessary **[\*7]** to determine whether Muhammad's state of mind in publishing her social media posts was defamatory. Citing *New York Times Co. v. Sullivan, 376 U.S. 254, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964)*, the court recognized that summary judgment was not a proper way to dispose of a defamation action. The court held Herman should not have "to prove her entire case at the pleading stage without any discovery on the disputed factual issues."

The court also viewed the motion as a *Rule 4:6-2(e)* motion to dismiss for failure to state a claim. The court determined a motion to dismiss was without merit because Herman's amended complaint pled detailed facts evincing Muhammad's actual malice in making her posts. The court found Muhammad "knew or had serious doubts about the veracity of the alleged defamatory statements" she made.

III.

Muhammad does not appeal the motion court's summary judgment ruling. Instead, she limits her appeal to the denial of her *Rule 4:6-2(e)* motion to dismiss for a failure to state a claim.

A.

Our review of a trial court's ruling on a motion to dismiss is de novo. *Watson v. N.J. Dep't of Treasury, 453 N.J. Super. 42, 47, 179 A.3d 1061 (App. Div. 2017)* (citing *Castello v. Wohler, 446 N.J. Super. 1, 14, 139 A.3d 1218 (App. Div. 2016)*). Since our "review is plenary[,] . . . we owe no deference to the trial judge's conclusions." *State v. Cherry Hill Mitsubishi, 439 N.J. Super. 462, 467, 110 A.3d 92 (App. Div. 2015)* (citation omitted). In considering a motion under *Rule 4:6-2(e)*, courts must accept the facts asserted in the complaint and should accord **[\*8]** the plaintiff all favorable inferences. *Watson, 453 N.J. Super. at 47*.

Case: 25-2553 Document: 14-2 Page: 44 Date Filed: 10/21/2025 Page 4 of 6

2024 N.J. Super. Unpub. LEXIS 2416, *8

"A complaint should be dismissed for failure to state a claim pursuant to *Rule 4:6-2(e)* only if the factual allegations are palpably insufficient to support a claim upon which relief can be granted." *Frederick v. Smith, 416 N.J. Super. 594, 597, 7 A.3d 780 (App. Div. 2010)* (internal quotations and citation omitted). "[O]ur inquiry is limited to examining the legal sufficiency of the facts alleged on the face of the complaint." *Green v. Morgan Props., 215 N.J. 431, 451, 73 A.3d 478 (2013)* (internal quotations and citation omitted). Therefore, the pleading must be "search[ed] . . . in depth and with liberality to ascertain whether the fundament of a cause of action may be gleaned even from an obscure statement of claim." *Id. at 452* (internal quotations and citation omitted).

B.

Muhammad argues the motion court erred in finding Herman's allegations were sufficient to support a defamation and false light invasion of property claim. She contends: (1) her statements were "either protected opinion or substantially true"; and (2) if not, according to *Neuwirth v. Murphy, 476 N.J. Super. 377, 391-92, 300 A.3d 274 (App. Div.)*, *certif. denied*, 255 N.J. 444, 303 A.3d 393 (2023), Herman failed to allege sufficient facts demonstrating actual malice. We address these contentions in turn.

To establish a prima facie case of defamation, there must be "(1) the assertion of a false and defamatory statement concerning another; **[\*9]** (2) the unprivileged publication of that statement to a third party; and (3) fault amounting at least to negligence by the publisher." *DeAngelis v. Hill, 180 N.J. 1, 12-13, 847 A.2d 1261 (2004)*. "A defamatory statement, generally, is one that subjects an individual to contempt or ridicule, one that harms a person's reputation by lowering the community's estimation of him or by deterring others from wanting to associate or deal with him." *Durando v. Nutley Sun, 209 N.J. 235, 248-49, 37 A.3d 449 (2012)* (quoting *G.D. v. Kenny, 205 N.J. 275, 293, 15 A.3d 300 (2011)*).

Only the first and third elements are in dispute here. Under the first element, truth may be asserted as a defense to a defamation action "even when a statement is not perfectly accurate." *G.D., 205 N.J. at 293*. "The law of defamation 'overlooks minor inaccuracies and concentrates upon substantial truth.'" *Read v. Profeta, 397 F. Supp. 3d 597, 651 (D.N.J. 2019)* (quoting *Masson v. New Yorker Mag., Inc., 501 U.S. 496, 516, 111 S. Ct. 2419, 115 L. Ed. 2d 447 (1991)*); *see also G.D., 205 N.J. at 294*. A defendant's statements of opinion about a plaintiff, rather than of fact, are not actionable defamation. "Statements of opinion, like unverifiable statements of fact, generally cannot be proved true or false," but such a statement is not protected where it implies false underlying facts. *Lynch v. N.J. Educ. Ass'n, 161 N.J. 152, 167 (1999), 735 A.2d 1129*; *see also Ward v. Zelikovsky, 136 N.J. 516, 533, 643 A.2d 972 (1994)* ("an accusation of bigotry is not actionable unless the statement suggests the existence of defamatory facts").

The third element requires a showing of "actual malice" by the defendant where **[\*10]** the statement is about a plaintiff who is a public figure or relates to an issue of public concern. *See Senna v. Florimont, 196 N.J. 469, 495, 958 A.2d 427 (2008)* (recognizing that "news stories about those subjects involve the public interest and deserve heightened protection"). There is no dispute that the actual malice standard applies here because Herman's conduct arose in the context of her teaching in a public school. *See Rocci v. Ecole Secondaire Macdonald-Cartier, 165 N.J. 149, 160, 755 A.2d 583 (2000)* (allegedly defamatory statements concerning "the welfare of [a child] entrusted to the care of a teacher," which "involved a matter of public concern.").

"To satisfy the actual-malice standard, a plaintiff must show by clear and convincing evidence that the publisher either knew that the statement was false or published with reckless disregard for the truth." *Lynch, 161 N.J. at 165*. This can be accomplished by proof that "the publisher fabricates a story, publishes one that is wholly unbelievable, or relies on an informant of dubious veracity . . . or purposely avoids the truth." *Neuwirth, 476 N.J. Super. at 392* (quoting *Lynch, 161 N.J. at 165-66*) (internal citations omitted). "Mere failure to investigate all sources [of information to be published] does not prove actual malice." *Lynch, 161 N.J. at 172* (citing *Costello v. Ocean Cnty. Observer, 136 N.J. 594. 615, 643 A.2d 1012 (1994)*). "The actual-malice standard is a subjective standard that does not involve consideration of whether a **[\*11]** reasonable person would have, or should have, known the statement was false but rather whether 'the defendant in fact entertained serious doubts as to the truth of his publication.'" *Neuwirth, 476 N.J. Super. at 392* (quoting *St. Amant v. Thompson, 390 U.S. 727, 731, 88 S. Ct. 1323, 20 L. Ed. 2d 262 (1968)*).

Case: 25-2553    Document: 14-2    Page: 45    Date Filed: 10/21/2025

Page 5 of 6

2024 N.J. Super. Unpub. LEXIS 2416, *11

A defendant commits false-light invasion of privacy by

giv[ing] publicity to a matter concerning another that places the other before the public in a false light [if]

. . . .

(a) the false light in which the other was placed would be highly offensive to a reasonable person, and

(b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

[*Romaine v. Kallinger, 109 N.J. 282, 294, 537 A.2d 284 (1988)* (quoting *Restatement, (Second) of Torts, § 652E*); *accord Durando, 209 N.J. at 249*.]

Simply put, false light invasion of privacy is "essentially [a claim] of defamation." *Swan v. Boardwalk Regency Corp., 407 N.J. Super. 108, 121, 969 A.2d 1145 (App. Div. 2009)*.

C.

We conclude plaintiff alleged a prima facie case of defamation and false-light invasion of privacy against Muhammad based on certain statements Muhammad posted on social media. This is not to say Herman's allegations can be sustained at later stages of this litigation. But, for now, considering the law governing defamation claims and affording Herman all favorable factual inferences, we agree with the motion court her amended complaint should not have been **[*12]** dismissed under *Rule 4:6-2(e)*.

Upon our de novo review of the motion, we first examine the following allegations in the amended complaint. Muhammad posted that Herman: "[F]orcibly removed the hijab of a second[-]grade student. The young student resisted, by trying to hold onto her hijab, but the teacher pulled the hijab off, exposing her hair to the class." Muhammad contends "forcibly" constitutes "protected opinion" and that the trial court and Herman conflated with term "forcefully." Muhammad maintains her assertion that Herman's removal of the student's hijab was "done with force . . . [and] against [the student's] will," constitutes her opinion. Because Herman denies its veracity, Muhammad's statement cannot be substantial truth or opinion. Moreover, the imagery of forcibly removing the hijab against the student's will portrays Herman in a bad light by suggesting she aggressively used force to remove the student's hijab despite knowing its religious significance and the student's objection.

Muhammad posted that Herman told the student "her hair was beautiful and she did not have to wear a hijab to school anymore." There is no substantial truth to this statement based on Herman's denial that she **[*13]** said this. Considering the student was practicing her Islamic faith by wearing the hijab, the statement was defamatory because it accused Herman, a public school teacher, of not respecting the student's religious beliefs. Such assertion by Herman, if true, was not a minor inaccuracy.

Muhammad posted that Herman "stripped [the student's] clothing in front of [her] classmates." Again, because Herman denies removing the hijab, there is no substantial truth supporting Muhammad's contention that this post is protected opinion.

We agree with the trial court's determination that Herman's amended complaint sufficiently alleges Muhammad's posts were done with actual malice. The court did not, as Muhammad contends, misconstrue our recent decision in *Neuwirth*. Muhammad argues that under *Neuwirth*, Herman failed to show she "in fact entertained serious doubts as to the truth of [her] publication," thereby failing to allege her posts were made with actual malice. *476 N.J. Super. at 392*. She asserts there is no factual basis supporting Herman's assertion of actual malice because she had subjective doubts about what her mother told her about the incident.

In *Neuwirth*, we reversed the trial court's order denying the defendants' *Rule 4:6-2(e)* motion to dismiss **[*14]** the plaintiff's defamation count in his fourth amended complaint. *476 N.J. Super at 381*. After the plaintiff was terminated as Assistant Commissioner for the Department of Health, he filed a multi-count complaint, including a defamation claim asserting "[t]he State, through anonymous sources, and Governor Murphy, made false and defamatory statements, knowing them not to be true, to the news media and the entire public of New Jersey during public Coronavirus Press Briefings." *Id. at 387*. He asserted Governor Murphy "made his comments about [p]laintiff

Case: 25-2553   Document: 14-2   Page: 46   Date Filed: 10/21/2025   Page 6 of 6

2024 N.J. Super. Unpub. LEXIS 2416, *14

recklessly and/or with actual knowledge of their falsity and to punish and further retaliate against [p]laintiff for engaging in whistleblowing activity concerning high ranking officials of his administration, which is further evidence of the maliciousness of his actions." *Id. at 389*. We concluded the plaintiff's "[r]epeated, conclusory allegations that Governor Murphy was 'aware' of the truth and made the statements 'recklessly and/or with actual knowledge of their falsity' are mere recitations of the applicable legal standard, not factual assertions." *Id. at 393*. We added further that "allegations regarding Governor Murphy's failure to conduct an investigation between plaintiff's . . **[*15]** . termination and the [next day's] press briefing are similarly unavailing." *Ibid.* We thus dismissed the defamation claim because the plaintiff failed to adequately plead actual malice. *Id. at 394*.

Unlike the situation in *Neuwirth*, we conclude Herman adequately plead facts which, if true, could constitute actual malice. Herman asserted that based on their prior relationship, she exchanged several text messages with Muhammad the next evening and two days after the postings, explaining the information in her posts was false. However, according to Herman, "Muhammad made no effort to verify the truth of these accusations *because she did not care whether the allegations were true or false*, because making them would generate publicity for her." Herman stresses that Muhammad "admitted that she was relying on the recall of a [seven]-year-old," who was coached by her mother in a now-deleted video. Herman also alleges that "almost one month after the initial posts -- Muhammad referred to the teacher-student interaction as the 'alleged incident,'" thereby, indicating Muhammad knew she "committed libel against Herman and was (unsuccessfully) attempting to buffer herself against" her prior statements. Herman's *allegations* **[*16]** of actual malice were not merely conclusory. Nor did she perfunctorily parrot the legal test. Rather, she detailed facts questioning whether Muhammad knew or had serious doubts about the veracity of the student's reports of the incident as relayed to the student's mother and Muhammad's mother. And while Muhammad's communications with Herman occurred after the posts, the amended complaint's allegation that Muhammad did not modify her accusations against Herman can be viewed as evidence of her subjective intent in her posts. Furthermore, the amended complaint's allegation that Muhammad later referred to the incident as "alleged" can be viewed as expressing serious doubts about her posts.

We, however, do not agree with the trial court and Herman that Muhammad had a duty to investigate the incident by speaking to the student, her mother, or Herman prior to making her posts. *See Lynch, 161 N.J. at 172*. In addition, we disagree with the court and Herman that Muhammad acted with malice because the incident is "wholly unbelievable" and she relied on a "third-hand account of a dubious witness," a seven-year-old student. There is nothing in the amended complaint suggesting the student's allegations were dubious merely **[*17]** because of her youth. We further find that allegations of antisemitism shed no light at this stage of the litigation in resolving a motion to dismiss.

In conclusion, our ruling should not be construed as an expression of our views regarding the merits of Herman's claims. Our decision affirming the denial of Muhammad's *Rule 4:6-2(e)* motion is based strictly on the pleadings and our interpretation of the law.

Affirmed.

---

**End of Document**

# EXHIBIT 5

 Neutral
As of: October 21, 2025 7:02 PM Z

# *Schachtel v. Hughes*

Superior Court of New Jersey, Appellate Division

October 8, 2024, Argued; October 25, 2024, Decided

DOCKET NOS. A-3510-21, A-3728-21

**Reporter**
2024 N.J. Super. Unpub. LEXIS 2609 *; 2024 LX 134530; 2024 WL 4579075

ALEXANDER SCHACHTEL, LAW OFFICE OF ALEXANDER SCHACHTEL, LLC, Plaintiffs, and MAGGI KHALIL MAKSOUD and LAW OFFICE OF MAGGI KHALIL MAKSOUD, LLC, Plaintiffs-Respondents, v. PING ZHANG HUGHES[1] a/k/a JOANNA ZHANG, PING ZHANG, A.J. PARK, PING LIANG, and PING ZING LIANG, Defendant-Appellant.

**Notice:** NOT FOR PUBLICATION WITHOUT THE APPROVAL OF THE APPELLATE DIVISION.

PLEASE CONSULT NEW JERSEY *RULE 1:36-3* FOR CITATION OF UNPUBLISHED OPINIONS.

**Subsequent History:** Certification denied by *Schachtel v. Hughes, 2025 N.J. LEXIS 652 (N.J., July 1, 2025)*

**Prior History:  [*1]** On appeal from the Superior Court of New Jersey, Law Division, Hudson County, Docket No. L-3590-18.

*Schachtel v. Hughes, 2022 N.J. Super. Unpub. LEXIS 5504 (June 8, 2022)*

## Core Terms

defame, online, emotional distress, default, defamatory, cause of action, award damages, reputation, compensatory, doctrine, res judicata, malicious, refund, defamation claim, collateral estoppel, entire controversy doctrine, prima facie case, nominal damages, malicious use, discovery, credible, lawsuit, proven, certificate, distressing, anonymous, ourt, outrageous, harass, stress

**Counsel:** Joel N. Kreizman argued the cause for appellant (Scarinci & Hollenbeck, LLC, attorneys; Joel N. Kreizman, of counsel and on the brief; James A. Plaisted, on the brief).

Michael Confusione argued the cause for respondents (Hegge & Confusione, LLC, attorneys; Michael Confusione, on the brief).

**Judges:** Before Judges Firko and Bishop-Thompson.

## Opinion

PER CURIAM

---

[1] We note the caption attached to defendant's notices of appeal reflect her name as "Ping Zhang Hughs," however, the caption on the final judgment order and on her brief states "Ping Zhang Hughes." Therefore, we refer to defendant as "Hughes" in our opinion.

We calendared these appeals back-to-back and consolidated them for purposes of this opinion because they arise from the same facts. In September 2015, Hughes retained plaintiff Maggi Khalil Maksoud (Maksoud) to represent her in a divorce proceeding. Shortly thereafter, Maksoud terminated the attorney-client relationship due to Hughes's refusal to take her advice. Maksoud refunded Hughes the unused portion of her retainer.

Hughes wrote a negative online review of Maksoud and her firm, the Law Office of Maggi Khalil Maksoud, LLC (the firm). Hughes also filed a lawsuit seeking return of her entire retainer in addition to other damages. Following a jury trial, the jury determined Maksoud had over-refunded Hughes. Thereafter, Hughes filed two motions for a **[*2]** new trial, which were both denied. She also filed an ethics complaint against Maksoud's trial attorney, which was ultimately dismissed.

Hughes then published more negative online reviews of Maksoud and the firm, claiming Maksoud stole her retainer for personal use, never performed work on her case, and was under ethics review. All of those statements were false.

Around the same time as making those false reviews of Maksoud, Hughes consulted co-plaintiff Alexander Schachtel. Following the consultation, Hughes posted negative online reviews of him and his firm that similarly contained false statements.

Maksoud and Schachtel jointly filed the complaint under review against Hughes alleging defamation, malicious use of process, and intentional infliction of emotional distress (IIED). Because Hughes failed to respond to discovery requests, her answer to the complaint was stricken with prejudice and default was entered against her.[2] Schachtel then settled his claims with Hughes.

Following a proof hearing, the trial court found Maksoud: (1) had proven a cause of action of defamation, for which it awarded $500.00 in nominal damages; (2) had not proven malicious use of process; and (3) had established **[*3]** IIED, and ordered a separate damages hearing to be conducted to determine the amount of the award. The court also ordered Hughes to take down all online reviews of Maksoud and the firm.

On March 22, 2022, the court conducted the proof hearing on the amount of damages to award for IIED. The court rendered an oral decision that day, and entered judgment in favor of Maksoud and against Hughes, awarding compensatory damages for IIED in the amount of $522,700.00. The court also awarded $42,393.00 in counsel fees to Maksoud. The court entered an order of disposition on March 22, 2022, and permitted Maksoud's attorney to submit a certification of services for his fees incurred subsequent to the March 1, 2021 certification of Maksoud, which addressed her damages and an itemization of her time and monies expended by her relative to this matter. Hughes filed a motion for reconsideration, which was denied.

On June 7, 2022, the civil presiding judge—who was not the court presiding over the proof hearings—entered an order for judgment, which included a calculation of pre-and post-judgment interest in accordance with *Rule 4:42-11*, and entered a total judgment against Hughes in the amount of $664,947.75, plus **[*4]** accruing daily interest.[3] In A-3510-21, Hughes appeals from the March 22, 2022 order of disposition entering default judgment in favor of Maksoud.

On appeal, Hughes argues: (1) the court erred in finding Maksoud had proven a case of IIED and awarding damages; (2) Maksoud's causes of action were barred by res judicata, collateral estoppel, and the entire controversy doctrine; (3) Maksoud's claims for IIED and defamation were barred by the First Amendment; and (4) the court erred in awarding damages based on stress Maksoud claimed to have experienced as a result of litigation. Based upon our review of the record, we conclude the March 22, 2022 order of disposition entering default

---

[2] Hughes moved to reinstate her answer. The court denied the motion.

[3] The June 7, 2022 order for judgment also states: "upon completion of punitive damages discovery, [Maksoud] may request a [p]roof [h]earing on the issue of whether to award punitive damages to [Maksoud] and against [Hughes]." The record does not reflect whether a punitive damages hearing occurred.

judgment as to the IIED claim and awarding counsel fees was based on adequate, substantial, and credible evidence, and we affirm.

As to A-3728-21, the appeal is dismissed because Hughes and Schachtel settled their claims and did not file merits briefs.

I.

A.

*Factual Background*

The record reveals the following relevant facts, allegations, and procedural history. On September 4, 2015, Maksoud met with Hughes regarding a potential divorce case against her husband. Maksoud and Hughes spoke on the phone a few times thereafter. On September **[*5]** 17, 2015, Hughes formally retained Maksoud, signed a retainer agreement, and paid a $4,000.00 retainer fee. Maksoud started to perform work for Hughes.

Shortly after representation began and prior to Maksoud's filing anything on behalf of Hughes, on September 28, 2015, Maksoud terminated the attorney-client relationship due to Hughes's refusal to take her legal advice. Maksoud refunded Hughes the unused portion of her retainer in the amount of $3,015.00, and sent Hughes an invoice, which reflected summarized, reduced charges.

Hughes did not agree with the amount she was refunded; instead, she demanded repayment of the entire retainer. Maksoud explained to Hughes that she earned her fees and would not be providing any more of a refund. Hughes then requested an itemized bill, and Maksoud obliged.

On October 26, 2015, Maksoud appeared in person at Maksoud's office, refusing to leave until she received a full refund. Ultimately, the police were called, and Hughes was removed from the office. Shortly after this incident, Hughes published a lengthy negative review of Maksoud and the firm on Avvo.com:[4]

> I went back home after 10:30 pm. I wrote her email: not do anything and I will let her know... **[*6]** However, she kept calling me and threaten she will file court appearance her own... She took $1000 from my retainer only with "courtesy" after 30 days no bill. She holds another remaining $3000 no refund, unless I accept her "5 hrs 30 minutes service". She called Police I harassing her? Stay away from this harassing Prosecutor!

B.

*The Litigation*

On July 12, 2017, Hughes filed a complaint[5] in the Law Division against Maksoud, and demanded damages of $4,000.00, in addition to court costs. On October 23, 2017, Hughes voluntarily dismissed that action by way of stipulation.

On October 30, 2017, Hughes filed another complaint[6] in the Law Division against Maksoud and demanded damages in the amount of $15,000.00. In her complaint, Hughes alleged: "Count I. Dishonest, Bully and Insult, Wanton Disregard of [Hughes's] Right"; "Count II. Improper Withdrew, Gross Retaliation on Fraudulent Excessive

---

[4] "Avvo is a comprehensive online legal marketplace connecting consumers and attorneys through its online directory, attorney profiles, question and answer forum, reviews, and other features. More than eight million consumers visit monthly to research their legal issue and find the right lawyers, which helps attorneys grow their practice." *About Us, Martindale-Avvo*, https://www.martindale-avvo.com/about/ (last visited Oct. 18, 2024).

[5] Docket No. HUD-DC-9433-17.

[6] Docket No. HUD-DC-14482-17.

Fees"; "Count III. Reckless Threat with Further Damages on Dispute, Maksoud's Attack and LIES"; "Count IV. Gross Retaliation on A Fraudulent and Abusive Written Accounting, Excessive Fees"; and "Count V. Egregious Actual Malice — Multi-Intentional [Wanton] Personal Attack."

On December **[*7]** 11, 2017, Maksoud moved to dismiss Hughes's complaint for failure to state a claim. On December 20, 2017, Hughes cross-moved for "sanctions" relative to Maksoud's "frivolous motion." On January 5, 2018, the court denied Maksoud's motion, noting that "a motion to dismiss cannot be granted if a cause of action can be gleaned even from an obscure statement." The court also denied Hughes's cross-motion.

In March 2018, Hughes's complaint against Maksoud proceeded to a jury trial. During trial, Hughes, who was self-represented, admitted to signing a retainer agreement and receiving a refund check from Maksoud, which was never deposited or cashed.

On March 19, 2018, the jury determined that Maksoud had over-refunded Hughes, and that Hughes was entitled to a refund of only $2,609.00. As previously stated, after the jury's verdict, Hughes filed two motions seeking a new trial, which were both denied.

On April 12, 2018, Maksoud filed a motion for sanctions against Hughes. On April 27, 2018, the court denied Maksoud's motion, finding that the Hughes "lawsuit was not frivolous, rather it was litigated properly to conclusion."

Also in April 2018, Hughes filed an ethics complaint against Maksoud's trial **[*8]** attorney, claiming that he had falsified documents, and specifically, documents maintained in Hughes's client file. Ultimately, the allegations against Maksoud's attorney were found to be unsubstantiated and were dismissed.

In May 2018, Hughes published another negative online review about Maksoud and her law firm on Google under the pseudonym "A.J. Park":

A solo business - "JEKYLL AND HYDE!!"
Advertise low fees on bait and switch. Pretend nice to take your money. Aggressive and Offensive on you and cheat you! Outrageously Dishonest on unearned legal fees for the days and hours she NEVER worked!!
When someone is showing tons of great reviews around same date, that's alert! More than one 1 start is the warning sign. [Maksoud] is RUDE and DISHONEST. She steals your retainer for her personal business use.
She never work on your case but FRAUDULENTLY "bill" you with "Summarized" "bill" on your waiting in her office lobby, on her missing appointment.... BACK "bill" you after she grabbed your money. She asks for multiple advertising "reviews" to cover up her bad reviews.
[Maksoud] attempted to remove her 1star AVVO review. She wasn't successful to remove the truth.

UPDATE: I had paid CONSULTATION! **[*9]** She LIED that SHE was "pushed" and she LIED she was VERBALLY "retained" to justify she charged on hourly rate for her AND her assistant, on the same very first day I met her!! She threatened NOT to cash her "refund" check if no commitment to NOT dispute!! She also LIED she called police more than 2 times to her office, because she was asked to provide itemized bill which is written on the contract!! Her issue is submitted to ethic review in 2015 and 2018. HER LAWYER is under ethic review.

Around this time, Hughes met with Schachtel, who is also an attorney, for a consultation. While the initial consultation was "free," subsequent consultations were not. At the end of Hughes's second consultation with Schachtel, which took place on May 14, 2018, she paid him $200.00 in cash.

On June 5, 2018, Hughes sent Schachtel an email demanding a refund of her $200.00 payment. Schachtel explained that he had earned his fees and would not be refunding her. Hughes, once again using the pseudonym "A.J. Park," then published a lengthy negative review about Schachtel and his law firm on Google. In a subsequent email, Hughes admitted to authoring the review and demanded that Schachtel pay her $200.00 to **[*10]** remove her posting.

Thereafter, on August 1, 2018, Maksoud and Schachtel instituted this action against Hughes. While the matter was initially filed in the Chancery Division, it was later transferred to the Law Division. Meanwhile, on October 18, 2018,

Case: 25-2553   Document: 14-2   Page: 52   Date Filed: 10/21/2025

Page 5 of 22

2024 N.J. Super. Unpub. LEXIS 2609, *10

Hughes filed another complaint in the Law Division against Maksoud and Schachtel, alleging "breach duty of confidentiality by releasing personal information for the purpose of retaliation and [a] pattern of harassment." Almost two years later, on August 28, 2020, summary judgment was granted against Hughes in that matter.

C.

*The Proof Hearing*

As to Maksoud's pending litigation, because Hughes failed to respond to discovery requests, her answer was stricken with prejudice and default was entered against her. On January 6, 2021, a one-day proof hearing was held. Schachtel did not take part in the proof hearing because sometime prior to that date he and Hughes settled.

At the proof hearing, Maksoud testified about the false allegations Hughes made in her lawsuits and how that impacted her reputation in the legal community. In particular, Maksoud testified about the time she spent on reading and answering Hughes's filings, and other work time **[*11]** and family events she missed as a result. Maksoud also testified about the negative online reviews Hughes posted, the false information included in those reviews, and how those reviews impacted her professionally and personally.

Following the proof hearing, at which only Maksoud testified, the court found she established a prima facie case of "defamation, libel." The court did not find a compensable loss to Maksoud but awarded nominal damages in the amount of $500.00. The court also found that Maksoud established a prima facie case of IIED. The court noted that it

> heard [Maksoud] recount her suffering; the never-ending onslaught and daily reminder of [Hughes], the countless hours of loss, the embarrassment of knowing the Hudson County [j]udiciary had read these comments and statements about [Maksoud], potential clients asking her about the negative reviews, anxiety and fears of losing additional business. Her incomprehensible impact here, and incomprehensible impact as a business owner and person whose personal life has suffered as well.

The court did not award damages on the IIED count at that time, but explained they would be addressed at a future proof hearing. As to malicious use **[*12]** of process, the court found that Maksoud had not established a prima facie case because no "special grievance ha[d] been established," and dismissed that count with prejudice. Finally, the court ordered all Hughes's online reviews to be removed, including libelous false internet, social media, and electronic posts or publications, either in her name, or through a pseudonym, or anonymous posts, within thirty days and provide a certification to Maksoud's counsel describing what posts were removed.

D.

*The IIED Damages Proof Hearing*

Beginning on February 23, 2022, a damages hearing spanning five days was held on the issue of IIED. At this hearing, Maksoud again testified, along with her psychologist, Dr. Mark Seglin. In light of her default status, Hughes was only permitted to conduct cross-examination and not present affirmative proofs or evidence. As to how Hughes's allegations affected Maksoud professionally, she testified:

> Professionally, I can't work. My kids are not around, and I'm not working.

> I don't feel like the strong and happy and confident woman that I used to be. I can't help people. I've been too busy reading everything she's filing. And with each filing it's broken me down just **[*13]** a little more. It's made me question who I am, what I did. You know, when—when she gave me a $4,000[.00] retainer and terminated me and she started bullying me, maybe I'm wrong. Maybe I should have given her $5,000[.00] or $6,000[.00] and just given into her demands because of how much she did to me.

Case: 25-2553   Document: 14-2   Page: 53   Date Filed: 10/21/2025

Page 6 of 22

2024 N.J. Super. Unpub. LEXIS 2609, *13

It's made me unable to help others. It's made me wonder what I could have done differently every day and what the next client might do to me because of what she was able to do to me for so long, endlessly, even until this day.

All the letters against my attorneys. An attorney friend of mine that we no longer speak because of what she did to him. Professionally, he was a colleague and a friend, and he was very much in my life, often communicating with [him], often enjoying lunches and meeting up at work events.

We don't do any of that anymore. He was traumatized by her. And you know, I don't want to speak for him, but I'm certainly traumatized, and I can say we don't talk anymore, and it's because of this.

Maksoud also testified as to how her involvement with Hughes adversely affected her health:

I wake up from my sleep thinking about all the things that have happened, thinking about what I **[*14]** could have done differently, like when she came to my office and there were a lot of clients in the waiting room, and some had to be squeezed in for emergencies, and she came in and made a scene and demanded to see me, and I just—I have nightmares about the things she did that impacted my reputation like that.

And when she called me a thief online and what people must think of me because an allegation can be believed by others without even the end result. Just the mere allegation of being called a thief had me sleepless, had me nauseous, had me—had me sick to my stomach.

I have stomach issues. I had stomach issues all morning today, which is another reason I won't really work because how many times can I get up in the middle of a meeting with someone with my stomach issues, and that's something that really has been going on for years.

And I feel stressed all the time, and I'm always reading what she sends, what she files. I'm always wondering what she's going to do next. And I can't believe how many times she's had this hearing alone adjourned and how many times she just keeps coming after me and targeting me and coming up with—with new reasons and ways to have me answer her allegations **[*15]** of sham-this and fraudulent-this and misappropriated-this when I over-refunded the retainer and even offered her the whole thing back.

I don't know what else I could have done to avoid all these years with my husband, my family. I'm often depressed. I'm with them, and I'm not with them.

And my husband's like, please get her out of your head please. And I'm like easy for you to say. I wish I could.

But you know what, she just did this, she just said this, and it's been relentless, and her actions show . . . .

Maksoud then testified about her decision to seek therapy and her sessions with Seglin.

Finally, Maksoud detailed how her personal life had been affected:

I recall several—several dates where my family was doing things that I would have normally loved to participate in, like a neighbor who had a birthday party. It was, I believe a three-hour event, and I couldn't go.

Typically[,] the mothers take the child to those events, and I asked my husband to do it instead of me because I just emotionally could not have normal conversations with other mothers, other people, and I missed that birthday party for our neighbor, my son's friend, who was his same age and the same school, and I missed **[*16]** so much more.

My husband has countless days where he took our child or children, depending on the year—right, it depends on what year it was, and he would go without me to the zoo because the day before maybe I was served with something new, and I was just a mess from all the things she was saying about me, and how she was still spinning and growing all of this, and how it was still going on.

And I just needed time alone to just—to just breathe from it and, quite frankly, to cry that this has become my life and it's continuing in this way.

I missed apple pickings with my family.

And it impacted my pregnancies. I miscarried on more than one occasion, and I remember during those pregnancies—and even the pregnancies that went to term, not feeling happy the way that a pregnant person should feel, excited about the future and her family.

Instead[,] I would just run to my computer, drop everything, and read what she is saying and what she is doing and just continue to focus on it because I had to.

I didn't want to default. I had to always make sure I had an attorney. I had to go to my husband and explain to him what we were paying and why. I had to go to my colleagues and ask for help, and I'm **[*17]** not—I'm not proud of that. It's embarrassing.

And I owe them money that I want to pay them because they deserve to be paid for their help, and I just feel like my name was dragged through the mud, not just before the [c]ourt—and I feel humiliated and my reputation, but not only do I feel completely destroyed professionally but also personally.

I can't interact with people or even my own family, my own kids. I go into a daze, and my husband—from my understanding from what he says to me, he's—I'm trying really hard to be present because I'm not present, and he's—he's clearly, from my observations, very upset about that.

. . . .

All the dinners I had with girlfriends and colleagues where I wasn't there, and when I finally talked, it was about her. It was about this, and I turned everyone into a personal therapist. I turned everyone's moment with me, where we were supposed to catch up and have a good time and colleagues, into talking about what she filed.

. . . .

I became a different person, from sad to angry to edgy to just not being able to just be normal and go out for lunch, or dinner, or drinks, or just get together.

. . . .

I stopped going to bar functions. I stopped everything. I was part **[*18]** of the Family Law Executive Committee, which is a very prestigious committee and I—I'm just not myself. There's so much loss upon loss.

As for Seglin, he testified that he met with Maksoud "periodically" to discuss her situation with Hughes. Seglin opined, "it was like treating post-traumatic stress while the attack is ongoing"; thus, "it was kind of hard to be helpful." Seglin testified that as a result of her interactions with Hughes, Maksoud suffered with "anxiety," "helplessness," and "major depression." He defined "major depression" to mean that Maksoud suffered with "dysphoria, a passivity, ruminating thoughts, guilt, helplessness, a loss of interests, and a loss of engagement with one's interests, social withdrawal."

At the conclusion of the hearing on March 22, 2022, the court rendered an oral decision. At the outset, the court found damages were proven by "well more than a preponderance of the evidence." The court specified that Hughes's conduct was "directed" at Maksoud and that "her conduct was purposeful, intentional, and outrageous." The court took "judicial notice of the entire record," which included Maksoud's "certification as to damages" and "an itemization of those **[*19]** damages." The court found Maksoud credible and that her answers "were absolute and serious." The court agreed with Maksoud that Hughes "started, continued, and perpetuated" the litigation. The court also gave great weight to Seglin's testimony, and in particular, his testimony that "[h]e had not seen anyone so vulnerable and subject to such a persistent and relentless campaign."

The court concluded:

Words do mean something, and they do have consequences; consequences that are palpable, actual, and in this case, debilitating.

The court finds that the harm here was real, that [Hughes's] conduct was real, and that it was reckless and intentional and she caused harm to [Maksoud].

The court finds that [Hughes's] actions are intentional and deliberate without any regard for any emotional distress that would follow, and the [c]ourt finds that that—the [c]ourt finds that great distress did follow.

The [court] finds that $522,700[.00] would be fair, reasonable, and adequate compensation for the harm that [Maksoud] has experienced at the hands of [Hughes].

The court's judgment shall also include $42,392[.00] in legal fees and that [Maksoud's counsel] be permitted to submit a certification of legal **[*20]** services to the court for his fee, for his time since the March 1st, 2021 certification of [Maksoud] addressing her damages[,] which included an itemized breakdown of the time and money expended by her.

Case: 25-2553    Document: 14-2    Page: 55    Date Filed: 10/21/2025    Page 8 of 22

2024 N.J. Super. Unpub. LEXIS 2609, *20

This appeal followed.

II.

A.

Hughes first contends the judgment in favor of Maksoud on the IIED claim should be vacated and dismissed by this court. Hughes asserts the IIED claim is not valid because the alleged conduct is: (1) covered by the defamation and abuse of process claims; (2) the IIED cause of action was erroneously found by the court without reliable expert medical testimony; and (3) the IIED and defamation claims were based on "court filings" and are barred by New Jersey's immunity case law.

A judgment entered after a proof hearing is subject to limited review. *Seidman v. Clifton Sav. Bank, S.L.A., 205 N.J. 150, 169, 14 A.3d 36 (2011)*. On appeal, the issue is whether there was substantial credible evidence to support the judgment. *Ibid.* In a proof hearing, "the question of what proofs are necessary is inherently within the judge's discretion." *Chakravarti v. Pegasus Consulting Grp., Inc., 393 N.J. Super. 203, 210, 923 A.2d 233 (App. Div. 2007)*.

To allege a viable claim for IIED, a plaintiff must assert facts supporting the four requisite elements of the cause of action. *Delvalle v. Trino, 474 N.J. Super. 124, 142-43, 286 A.3d 694 (App. Div. 2022)*; *Juzwiak v. Doe, 415 N.J. Super. 442, 451, 2 A.3d 428 (App. Div. 2010)*.

First, "the plaintiff must [allege] that the defendant acted intentionally or **[\*21]** recklessly. For an intentional act to result in liability, the defendant must intend both to do the act and to produce emotional distress." *Buckley v. Trenton Sav. Fund Soc'y, 111 N.J. 355, 366, 544 A.2d 857 (1988)* (citations omitted). Second, "[t]he conduct must be 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Ibid.* (citation omitted). "Third, the defendant's actions must have been the proximate cause of the plaintiff's emotional distress." *Ibid.* (citation omitted). Finally, "the emotional distress suffered by the plaintiff must be 'so severe that no reasonable man could be expected to endure it.'" *Ibid.* (citation omitted).

We have found conduct was sufficiently outrageous to support an IIED claim where a landlord "failed to provide central heating, running water and reasonable security in a rent[-]controlled building in an effort to induce the tenants to vacate," *Griffin v. Tops Appliance City, Inc., 337 N.J. Super. 15, 23, 766 A.2d 292 (App. Div. 2001)* (citing *49 Prospect St. Tenants Ass'n v. Sheva Gardens, Inc., 227 N.J. Super. 449, 455-57, 466, 471-75, 547 A.2d 1134 (App. Div. 1988)*), where a doctor intentionally told a child's parents the child was "suffering from a rare disease which may be cancerous knowing that the child has nothing more than a mildly infected appendix," *ibid.* (citing *Hume v. Bayer, 178 N.J. Super. 310, 319, 428 A.2d 966 (Law Div. 1981)*), and where an employer used a vile, **[\*22]** racial slur against an African American employee, *ibid.* (citing *Taylor v. Metzger, 152 N.J. 490, 508-21, 706 A.2d 685 (1998)*). In contrast, we have determined the alleged conduct was not sufficiently outrageous to support an IIED claim where an employee was denied promotions and terminated due to age. *Ibid.* (citing *McDonnell v. Illinois, 319 N.J. Super. 324, 332, 342, 725 A.2d 126 (App. Div. 1999)*).

Here, there was substantial credible evidence to support the court's finding that Maksoud presented a claim of IIED. Not only did Maksoud testify regarding her history with Hughes and how their interaction negatively impacted her professional and personal life, but there was also physical evidence to buttress Maksoud's claim. In particular, the record contained the multitude of filings Hughes lodged against Maksoud, along with several negative online reviews of Maksoud's regarding her and the firm, all of which were defamatory in nature.

In her merits brief, Hughes asserts "the IIED claim is not valid because the alleged conduct[] is covered by the defamation and abuse of process claims." In support of her claim, Hughes cites to two cases: *Decker v. Princeton Packet, Inc., 116 N.J. 418, 432, 561 A.2d 1122 (1989)*, and *Griffin, 337 N.J. Super. at 24*. Those cases, however, do not stand for the proposition Hughes suggests.

In *Decker*, the plaintiff, whose death was falsely reported in an obituary, brought a tort action against the defendant, **[\*23]** the publishing newspaper, seeking damages for defamation and emotional distress. *116 N.J. at*

Case: 25-2553   Document: 14-2   Page: 56   Date Filed: 10/21/2025
Page 9 of 22

2024 N.J. Super. Unpub. LEXIS 2609, *23

*420*. Because the plaintiff could not prove intention, only a claim for negligent infliction of emotional distress was considered. *Id. at 424*.

Ultimately, the Court held publication of the obituary was not defamatory per se "because the reported death of an individual when viewed from the perspective of a reasonable person of ordinary intelligence and experience does not impugn reputation." *Id. at 427-28*. As for the negligent infliction of emotional distress claim, that too was dismissed because "the injury [was] not sufficiently palpable, severe, or enduring to justify the imposition of liability and the award of compensatory damages." *Id. at 431*. Rather,

> the alleged emotional distress approximates the subjective reactions of ordinary persons who feel victimized by the false report of death, namely, annoyance, embarrassment, and irritation. Further, the distress experienced by [the plaintiff] was not occasioned by conduct that itself was egregious or purposeful. Rather it appears to have been caused only by inadvertent conduct, with respect to which there is no suggestion in the record that any serious and substantial distress on the part **[*24]** of [the plaintiff] and her family would be particularly foreseeable.
>
> [*Ibid.*]

Because defendant was a newspaper, the Court further added:

> Several federal courts have addressed the standard of conduct necessary to trigger liability for negligent infliction of emotional harm by a defendant also being sued for defamation. *They have found that the [F]irst [A]mendment requires that plaintiff establish at least the same level of intent to recover for the infliction of emotional harm as is necessary to find defamation.* If the levels of culpability were not at least as stringent, plaintiffs would be able to use the tort of negligent infliction of emotional distress to overcome defenses to defamation actions, to avoid short statutes of limitations for defamation, and to circumvent judicial barriers to punitive damages. There is, in other words, a certain symmetry or parallel between claims of emotional distress and defamation that calls for consistent results. Thus, it comports with first amendment protections to deny an emotional-distress claim based on a false publication that engenders no defamation per se. In this case, by determining that as a matter of law a false obituary does not injure reputation or **[*25]** cause compensable emotional distress, the Court preserves the libel law's [F]irst [A]mendment protections for the media.
>
> [*Id. at 432* (citations omitted) (emphasis added).]

Here, in contrast to *Decker*, Maksoud's claim of IIED was not limited to the emotional distress she suffered as a result of the publication of Hughes's online reviews; rather, Maksoud's claim included distress she suffered as a result of the totality of Hughes's conduct directed at her over the years the two were acquainted.

Moreover, Maksoud presented proof, which the court found credible, that Hughes's conduct was both egregious and purposeful, that is, intentional. And, Maksoud had presented a prima facie case of defamation, and thus, there were no concerns regarding whether Hughes's speech was protected by the First Amendment. Consequently, *Decker* is not instructive in this instance.

In *Griffin*, also cited by Hughes, the plaintiff brought suit against his former employer for, among other things, defamation based on statements made to other employees concerning the reason for plaintiff's discharge, and IIED brought on by the employer's behavior. *337 N.J. Super. at 19*. At the conclusion of trial, the jury returned a verdict in the employer's favor on the plaintiff's defamation claim. **[*26]** *Id. at 21*. However, the jury returned a verdict in plaintiff's favor on his claim for IIED. *Ibid.*

In finding that the plaintiff presented insufficient evidence to support a verdict for IIED, the court first noted that IIED is only found in "extreme cases." *Id. at 23* (citing *49 Prospect St., 227 N.J. Super. at 455-57, 466, 471-75*). The court concluded that the employer's actions were not so outrageous, and plaintiff's proofs concerning his emotional distress were weak. *Id.* at 24-27.

Further, we emphasized:

Case: 25-2553    Document: 14-2    Page: 57    Date Filed: 10/21/2025

Page 10 of 22

2024 N.J. Super. Unpub. LEXIS 2609, *26

*a plaintiff may not pursue a claim for [IIED] to circumvent the required elements of or defenses applicable to another cause of action that directly governs a particular form of conduct.* The jury in this case rejected plaintiff's defamation claim because defendants established a legitimate business purpose for the alleged defamatory statements made to other [] employees. Plaintiff cannot avoid the qualified privilege extended to such statements by relying upon them as a basis for an [IIED] claim.

Similarly, plaintiff could not rely upon the fact that the defendants had filed a criminal complaint against him as a basis for a finding of [IIED], because such conduct is the specific subject of the tort of malicious prosecution. To establish a malicious prosecution **[*27]** claim, a plaintiff must show, among other things, that the criminal complaint "terminated favorably" to him. Since the criminal complaint against plaintiff was still pending when this case was tried, plaintiff could not show that it had been "terminated favorably" to him and thus he did not yet have a viable cause of action for malicious prosecution. Consequently, plaintiff could not rely upon the criminal prosecution to support an [IIED] claim.

[*Id. at 24-25* (citations omitted) (emphasis added).]

Here, in contrast to *Griffin*, there was proof that Hughes's behavior toward Maksoud was extreme and outrageous, and that the emotional distress Maksoud suffered as a result of Hughes's behavior was severe. That proof included not only the online reviews posted by Hughes, but also Maksoud's testimony regarding her relationship with Hughes as well as the multiple court filings submitted by Hughes.

Further, in contrast to the circumstances presented in *Griffin*, Maksoud presented a prima facie case of defamation, for which she was awarded nominal damages in the amount of $500.00, and thus, her IIED claim was not being used to circumvent the elements of or defenses applicable to defamation. *Cf. LoBiondo v. Schwartz, 323 N.J. Super. 391, 417, 733 A.2d 516 (App. Div. 1999)* ("It would obviously be intolerably **[*28]** anomalous and illogical for conduct that is held not to constitute actionable defamation nevertheless to be relied on to sustain a different cause of action based solely on the consequences of that alleged defamation."). While the court did not find Maksoud presented a prima facie case of malicious use of process, it concluded her defamation claim was viable.

B.

Hughes next argues the court's legal basis for finding liability on the IIED claim was "wrong" and a "misunderst[anding] [of] the law," and therefore, the judgment should be vacated. Specifically, Hughes cites to the part of the court's decision where it discusses elements three and four of an IIED claim. Hughes argues that the court incorrectly relied upon *Clark v. Nenna, 465 N.J. Super. 505, 244 A.3d 291 (App. Div. 2020)*, and *Baglini v. Lauletta, 338 N.J. Super. 282, 768 A.2d 825 (App. Div. 2001)*.

First, as to *Clark*, the court discussed how we "reaffirmed . . . expert testimony is not required to establish the mere emotional distress under certain circumstances in which the nature of the particular harm mitigates against a reason for an enhanced standard of proof." The court's observation was correct.

In *Clark*, we recognized that, while "[o]rdinarily, medical or expert proof is required to establish emotional distress damages," there are two exceptions. *Clark, 465 N.J. Super. at 513* (citing *Tarr v. Diasulli, 181 N.J. 70, 77-78 (2004)*). The **[*29]** first "applies in cases involving intentional torts." *Ibid.* (citing *Tarr, 181 N.J. at 77-78*). The second applies "to cases in which '[t]he nature of [the] particular harm mitigates against the reason for an enhanced standard of proof in the first instance—the elimination of spurious claims.'" *Ibid.* (quoting *Innes v. Marzano-Lesnevich, 435 N.J. Super. 198, 239, 87 A.3d 775 (App. Div. 2014)*).

In the matter under review, the court properly applied both exceptions. The court found that Maksoud presented a claim of defamation, an intentional tort, and thus, the court correctly reasoned that medical or expert proof was not necessary to establish the IIED claim. Further, while the court ultimately did not find that Maksoud presented a claim of malicious use of process because she could not prove a special grievance, the court did find that Hughes acted with a malicious motive in instituting the civil suits against Maksoud and proceeded intentionally. Lastly, the

Case: 25-2553    Document: 14-2    Page: 58    Date Filed: 10/21/2025    Page 11 of 22

2024 N.J. Super. Unpub. LEXIS 2609, *29

court did not award damages on Maksoud's IIED claim following the proof hearing. Rather, the court reserved its decision on that issue following a separate hearing where Maksoud presented expert testimony by Seglin.

Next, as to *Baglini*, the court referenced one of our holdings in that case, stating: "In *Baglini*, the court held in a malicious use of **[\*30]** process case, the plaintiff may recover for harm to his reputation by any defamatory matter alleged as the basis of the proceeding, and any emotional distress that is caused by the proceedings." Hughes maintains "*Baglini* does not stand for the proposition the trial [court] cited it for but is instead an illustration of the legal principle argued above, that when there is a meritorious defamation or abuse of process claim, the IIED cause of action should be dismissed."

Contrary to Hughes's argument, however, the court's citation to *Baglini* was correct. *338 N.J. Super. at 306-07*. In *Baglini*, we emphasized, "[e]motional distress may be recovered" if it "'is of a kind normally to be expected as a result of the proceedings.'" *Id. at 307* (quoting *Restatement (Second) of Torts § 681 cmt. f (Am. L. Inst. 1976)*). "Intangible, non-pecuniary damages, such as damages to reputation where it can be proven, humiliation or anxiety, emotional distress and the like, can be recovered in addition to the pecuniary losses." *Ibid.* (quoting *Prosser & Keeton on Torts* § 120, at 896 (5th ed. 1984) (hereinafter *Prosser & Keeton*)). In this instance—as duly noted by the court—because Maksoud had proven a case of defamation, an intentional tort, emotional distress could be expected, and separately awarded. The court was correct **[\*31]** in its analysis.

Moreover, *Baglini* does not stand for the proposition Hughes suggests, which is that when there is a meritorious defamation or abuse of process claim, the IIED cause of action should be dismissed. While in *Baglini* the negligent and IIED claims were eventually dismissed, either by consent order or by order of the court, there is nothing in that case to suggest those claims were dismissed because there were meritorious defamation or abuse of process claims precluding recovery. *Baglini, 338 N.J. Super. at 293*.

C.

Hughes next argues that "[i]n addition to misunderstanding the law, [the court] also made demonstrably erroneous factual findings when ruling that [Hughes] was liable for IIED." Hughes maintains that "instead of actually reviewing and relying on the prior court decisions, [the court] relied on testimony of [Maksoud] in reaching her decision." Hughes's contention is belied by the record, which reveals the court did not make such findings.

By way of example, the court correctly identified the three lawsuits Hughes filed against Maksoud: the first, which was voluntarily withdrawn by Hughes on October 23, 2017; the second, which proceeded to trial and resulted in a jury determining that Maksoud had over-refunded **[\*32]** Hughes; and the third, in which summary judgment was granted against Hughes on all counts. Hughes claims that the court incorrectly found Maksoud prevailed at the jury trial. However, the record clearly shows that the jury determined Maksoud over-refunded Hughes, and therefore, the court was not incorrect in its recitation of the procedural history.

As for the amount of damages awarded, Hughes asserts that because no compensable damages were awarded for Maksoud's defamation claim, the court erred in its decision to award damages for IIED. But defamation and IIED were separate claims brought by Maksoud, and the court was not required to preclude a damage award for Maksoud's IIED claim just because it found a compensable award inappropriate for her defamation claim.

"Ultimately, a damages award cannot stand if it is so grossly disproportionate to the injury suffered that it shocks the judicial conscience." *Cuevas v. Wentworth Grp., 226 N.J. 480, 510, 144 A.3d 890 (2016)*. Judicial review of the correctness of a damages reward requires the record to be viewed in light most favorable to the prevailing party, with deference given to the trial court's feel of the case. *Id. at 488, 501*.

Here, the court's damages award for plaintiff's IIED claim was based on credible testimony **[\*33]** provided by Maksoud and her psychologist, Seglin. Moreover, Maksoud provided a detailed list to the court identifying the amount of professional time spent on her litigation with Hughes and personal time lost. Maksoud also provided an estimate for revenue lost from her business. Thus, we are satisfied the damages award was not so grossly disproportionate to the injury suffered that it shocks the judicial conscience.

Case: 25-2553   Document: 14-2   Page: 59   Date Filed: 10/21/2025

Page 12 of 22

2024 N.J. Super. Unpub. LEXIS 2609, *33

D.

Hughes stresses that it was error for the court to "rel[y] on statements contained in pleadings to find liability." Hughes argues that those statements were "absolutely protected by the litigation privilege."

The court found that the litigation privilege did not apply to the statements contained in Hughes's pleadings because Hughes had shared the contents of her pleadings—along with the docket numbers—online. Regardless, the court further noted that even if the litigation privilege did apply to the statements contained in Hughes's pleadings, the reviews she posted online were sufficient to support a prima facie case of defamation and IIED.

While Hughes is correct that there is an absolute privilege, known as the litigation privilege, afforded to statements made in the course **[*34]** of judicial and quasi-judicial proceedings, *Erickson v. Marsh & McLennan Co., 117 N.J. 539, 563, 569 A.2d 793 (1990)*, that privilege logically does not extend to statements made outside of judicial and quasi-judicial proceedings. Here, the record amply supports the court's finding that Hughes shared the contents of her pleadings, including docket numbers, online, bringing "the populace of the internet into her personal web of defamation." We conclude the court correctly entered judgment on Maksoud's IIED claim, which was based upon substantial credible evidence in the record.

III.

Next, Hughes contends for the first time on appeal that all of Maksoud's causes of action are barred by res judicata, collateral estoppel, and the entire controversy doctrine. Hughes argues that Maksoud's malicious use of process claim was barred by res judicata. Hughes also maintains that Maksoud's IIED claim was also barred by res judicata and "the award of attorney's fees as damages" was barred.

A.

*Res Judicata*

"The application of res judicata is a question of law[]" that is reviewed "de novo." *Walker v. Choudhary, 425 N.J. Super. 135, 151, 40 A.3d 63 (App. Div. 2012)* (first quoting *Selective Ins. Co. v. McAllister, 327 N.J. Super. 168, 173, 742 A.2d 1007 (App. Div. 2000)*; and then citing *Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378, 658 A.2d 1230 (1995)*).

Under the doctrine, a "cause of action between parties that has been finally determined on the merits by a tribunal having jurisdiction cannot be relitigated **[*35]** by those parties or their privies in a new proceeding." *Velasquez v. Franz, 123 N.J. 498, 505, 589 A.2d 143 (1991)*. For res judicata to apply, there must be "'substantially similar or identical causes of action and issues, parties, and relief sought,' as well as a final judgment." *Wadeer v. N.J. Mfrs. Ins. Co., 220 N.J. 591, 606 (2015), 110 A.3d 19* (quoting *Culver v. Ins. Co. of N. Am., 115 N.J. 451, 460, 559 A.2d 400 (1989)*).

Here, contrary to Hughes's argument, res judicata is inapplicable to the malicious use of process claim because a special grievance had not been established. And, res judicata did not bar Maksoud's IIED claim because her IIED claim was not raised in earlier proceedings, nor was a "substantially similar" cause of action raised in earlier proceedings. *Ibid.* (quoting *Culver, 115 N.J. at 460*). Moreover, res judicata did not preclude the court's award of attorney's fees, because the fees were awarded based on the court's finding that Maksoud had proven IIED and defamation, which were both claims not raised in earlier proceedings.

B.

*Collateral Estoppel*

Hughes next asserts Maksoud is "collaterally estopped from asserting that the litigation was frivolous and warranted sanctions, attorney's fees, or damages because of the rulings to the contrary." Hughes further argues Maksoud "is

Case: 25-2553   Document: 14-2   Page: 60   Date Filed: 10/21/2025   Page 13 of 22

2024 N.J. Super. Unpub. LEXIS 2609, *35

also collaterally estopped because the prima facie IIED claim was based on Maksoud's testimony that the **[*36]** prior lawsuits were frivolous and without consideration of the actual rulings in those cases."

The doctrine of collateral estoppel, or issue preclusion, "is a branch of the broader law of res judicata." *Selective Ins., 327 N.J. Super. at 173* (emphasis removed) (quoting *Figueroa v. Hartford Ins. Co., 241 N.J. Super. 578, 584, 575 A.2d 888 (App. Div. 1990)*). For collateral estoppel to apply, the party invoking the doctrine must show:

> (1) the issue to be precluded is identical to the issue decided in the prior proceeding; (2) the issue was actually litigated in the prior proceeding; (3) the court in the prior proceeding issued a final judgment on the merits; (4) the determination of the issue was essential to the prior judgment; and (5) the party against whom the doctrine is asserted was a party to or in privity with a party to the earlier proceeding.

> [*Id. at 173-74* (quoting *In re Est. of Dawson, 136 N.J. 1, 20, 641 A.2d 1026 (1994)*).]

Thus, under collateral estoppel "[w]hen an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim." *Restatement (Second) of Judgments § 27 (Am. L. Inst. 1982)*. The doctrine "is not subject to rigid application but may be applied after a careful assessment and consideration of all relevant factors both in **[*37]** support of and against its application." *Selective Ins., 327 N.J. Super. at 174*.

Here, the issues encompassing Maksoud's claims for defamation and IIED were raised for the first time in the August 1, 2018 complaint Maksoud brought against Hughes. Therefore, because these issues were not previously litigated and decided, they were not barred by collateral estoppel.

C.


*Entire Controversy Doctrine*

"The entire controversy doctrine 'embodies the principle that the adjudication of a legal controversy should occur in one litigation in only one court.'" *Dimitrakopoulos v. Borrus, Goldin, Foley, Vignuolo, Hyman & Stahl, PC, 237 N.J. 91, 108, 203 A.3d 133 (2019)* (quoting *Cogdell ex rel. Cogdell v. Hosp. Ctr. at Orange, 116 N.J. 7, 15, 560 A.2d 1169 (1989)*). "The doctrine 'seeks to impel litigants to consolidate their claims arising from a "single controversy" whenever possible.'" *Ibid.* (quoting *Thornton v. Potamkin Chevrolet, 94 N.J. 1, 5, 462 A.2d 133 (1983)*).

> Three significant concerns in the administration of justice support claim preclusion under the entire controversy doctrine: "(1) the need for complete and final disposition through the avoidance of piecemeal decisions; (2) fairness to parties to the action and those with a material interest in the action; and (3) efficiency and the avoidance of waste and the reduction of delay."

> [*Ibid.* (quoting *Wadeer, 220 N.J. at 605*).]

"The purpose of the doctrine is not to bar meritorious claims." *Olds v. Donnelly, 150 N.J. 424, 447, 696 A.2d 633 (1997)*. The Supreme Court has "always emphasized that preclusion is a remedy **[*38]** of last resort." *Id. at 446*.

"When a court decides whether multiple claims must be asserted in the same action, its initial inquiry is whether they 'arise from related facts or the same transaction or series of transactions.'" *Dimitrakopoulos, 237 N.J. at 109* (quoting *DiTrolio v. Antiles, 142 N.J. 253, 267, 662 A.2d 494 (1995)*).

"The doctrine does not mandate that successive claims share common legal issues in order for the doctrine to bar a subsequent action." *Ibid.* (citations omitted) "Instead, 'the determinative consideration is whether distinct claims are aspects of a single larger controversy because they arise from interrelated facts.'" *Ibid.* (quoting *DiTrolio, 142 N.J. at 272*). "It is the core set of facts that provides the link between distinct claims against the same parties . . . and triggers the requirement that they be determined in one proceeding." *Wadeer, 220 N.J. at 605* (omission in original) (quoting *DiTrolio, 142 N.J. at 268-69*).

Case: 25-2553    Document: 14-2    Page: 61    Date Filed: 10/21/2025    Page 14 of 22

2024 N.J. Super. Unpub. LEXIS 2609, *38

The entire controversy doctrine is "an equitable doctrine whose application is left to judicial discretion based on the factual circumstances of individual cases." *Dimitrakopoulos, 237 N.J. at 114* (quoting *Highland Lakes Country Club & Cmty. Ass'n v. Nicastro, 201 N.J. 123, 125, 988 A.2d 90 (2009)*). "The polestar of the application of the [doctrine] is judicial 'fairness.'" *Wadeer, 220 N.J. at 605* (quoting *DiTrolio, 142 N.J. at 271*). "The doctrine's equitable nature 'bar[s] its application where to do so would be unfair in the totality of the circumstances and would not promote any of **[*39]** its objectives, namely, the promotion of conclusive determinations, party fairness, and judicial economy and efficiency.'" *Dimitrakopoulos, 237 N.J. at 114* (alteration in original) (quoting *K-Land Corp. No. 28 v. Landis Sewerage Auth., 173 N.J. 59, 70, 800 A.2d 861 (2002)*).

We reject Hughes's argument that the entire controversy doctrine precludes Maksoud's action. Maksoud's claims for defamation and IIED were based on events that occurred not just before and during the litigation of the two lawsuits that Hughes filed against her, but also on the subsequent events that led to this action. Additionally, those lawsuits did not include the same parties, as Maksoud's complaint originally included Schachtel. Simply put, Maksoud's claims against Hughes had not yet accrued during the pendency of the other lawsuits, and thus, the entire controversy doctrine has no applicability here.

Importantly, we note that Hughes did not raise these issues below. These preclusive doctrines Hughes now references are affirmative defenses that may be deemed waived if not asserted. *See Rule 4:5-4* ("A responsive pleading shall set forth specifically and separately a statement of facts constituting an avoidance or affirmative defense[.]"). "It is a well-settled principle that our appellate courts will decline to consider questions or **[*40]** issues not properly presented to the trial court when an opportunity for such a presentation is available." *Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234, 300 A.2d 142 (1973)*. Notwithstanding the tenants of *Rule 4:5-4*, we have considered Hughes's res judicata, collateral estoppel, and entire controversy doctrine arguments and conclude they lack merit.

IV.

Hughes next argues "the IIED and defamation claims were defective and are barred by the [F]irst [A]mendment and should be dismissed with prejudice." Hughes maintains that her online reviews were merely "opinions," and thus, were "not actionable." Hughes relies in part on decision rendered by the Chancery Judge, who stated that Hughes's comments constituted "opinions" and "could not [be] restrain[ed]."

Generally, "[a] statement is defamatory if it is false, communicated to a third person, and tends to lower the subject's reputation in the estimation of the community or to deter third persons from associating with him." *W.J.A. v. D.A., 210 N.J. 229, 238, 43 A.3d 1148 (2012)* (citing *Lynch v. N.J. Educ. Ass'n, 161 N.J. 152, 164-65 (1999), 735 A.2d 1129*). To determine whether a statement is defamatory, "the publication as a whole" is examined and consideration is particularly given to "the context in which the statement appears." *Romaine v. Kallinger, 109 N.J. 282, 290, 537 A.2d 284 (1988)*. Further, consideration is given to the "content, verifiability, and context of the challenged statements." *Ward v. Zelikovsky, 136 N.J. 516, 529, 643 A.2d 972 (1994)*. In this regard, **[*41]** first the

> statement's content is judged by its objective meaning to a reasonable person of ordinary intelligence. Second[], only verifiable statements can be defamatory. Finally, a statement's meaning can be affected by its context. The focus is on the effect of the alleged defamatory statement on third persons, that is, whether they viewed the plaintiff in a lesser light as a result of hearing or reading the offending statement.

> [*Dello Russo v. Nagel, 358 N.J. Super. 254, 263-64, 817 A.2d 426 (App. Div. 2003)* (citations omitted).]

"[T]he law of defamation exists to achieve the proper balance between protecting reputation and protecting free speech." *DeAngelis v. Hill, 180 N.J. 1, 12, 847 A.2d 1261 (2004)* (quoting *Ward, 136 N.J. at 528*). Therefore, a claim cannot lie for one's expression of "'pure' opinion," particularly on a matter of public concern. *Kotlikoff v. Cmty. News, 89 N.J. 62, 69, 444 A.2d 1086 (1982)*.

An opinion is "pure" when "the maker of the comment states the facts on which he bases his opinion . . . and then states a view as to the plaintiff's conduct, qualifications or character." *Id. at 68-69*. Alternatively, a "mixed" opinion, that is, one "apparently based on facts about the plaintiff or his conduct that have neither been stated by defendant

Case: 25-2553   Document: 14-2   Page: 62   Date Filed: 10/21/2025   Page 15 of 22

2024 N.J. Super. Unpub. LEXIS 2609, *41

nor assumed to exist by the parties to the communication[,]" may be defamatory if it implies underlying objective facts which are false. *Id. at 69*. Finally, a statement **[\*42]** that "could be construed as either fact or opinion" cannot result in liability, because "[a]n interpretation favoring a finding of fact would tend to impose a chilling effect on speech." *Lynch, 161 N.J. at 168* (citations and internal quotation marks omitted).

Here, a review of the online reviews posted by Hughes clearly shows they are not "pure opinion" as she suggests. Instead, the online reviews are based on false facts, such as the statement that Maksoud "stole" Hughes's retainer for personal use, and thus, were properly found by the court to be defamatory.

Hughes misconstrues the decision rendered by the Chancery Judge. Indeed, the record demonstrates the Chancery Judge did not make a decision one way or the other, but instead instructed the parties to pursue their claims in the Law Division. Specifically, the Chancery Judge said:

> . . . [P]laintiffs [Maksoud and Schachtel] completely and do fail to cite to any law that supports its assertion that [they are] entitled to the drastic remedy of enjoining [libel] or, more drastically, enjoining the defense in its future speak.
>
> Instead the [c]ourt does find that . . . plaintiffs do have an adequate remedy at law in the Law Division for damages, as the only claims **[\*43]** left in the complaint are for damages because of the alleged defamation committed by [Hughes] against the [Maksoud and Schachtel] and their business.
>
> These issues are triable at law before a [j]ury and not before the Chancery Division, under *Rule 4:3-1[(a)(1)]*, . . . therefore, this complaint will be transferred [on] the [c]ourt's own motion to the Law Division under *Rule 4:3-1(b)*.
>
> . . . .
>
> As irksome as this—these—that these comments have been made both on Avvo and on Google, they are, nevertheless, constitutionally protected speech that this [c]ourt cannot enjoin.
>
> Every individual before this [c]ourt has an absolute right to state what his or her opinions are.
>
> *However, if those opinions are determined to be libelous or slanderous, and therefore impact on the business activities of [Maksoud and Schachtel], then there is an adequate redressing for that* if [Maksoud and Schachtel] are able to prove their entitlement to compensatory damages as a result of them, if they are able to show that it is proximally caused by the intentional acts of [Hughes].
>
> Additionally, [Maksoud and Schachtel] would be more than entitled to seek punitive damages if they believe and they are able to prove clearly and convincingly that these were **[\*44]** made with a malicious intent, and that [Hughes] needs to be punished as a result of that.
>
> However, that is a decision that this [c]ourt cannot make summarily, it would have to be made only in the compensatory aspects and in the compensatory atmosphere that is provided by the Law Division.
>
> [(emphasis added).]

In an effort to further support her argument that Maksoud's defamation claim was "defective," Hughes cites to *Dendrite Int'l, Inc. v. Doe, No. 3, 342 N.J. Super. 134, 775 A.2d 756 (App. Div. 2001)*. In *Dendrite*, we delineated a four-part test applicable whenever "trial courts [are] faced with an application by a plaintiff for . . . an order compelling an [Internet Service Provider (ISP)] to honor a subpoena and disclose the identity of anonymous [i]nternet posters who are sued for allegedly violating the rights of individuals, corporations or businesses." *Id. at 141*. The trial court must "first require the plaintiff to undertake efforts to notify the anonymous posters that they are the subject of a subpoena or application for an order of disclosure." *Ibid.*

Thereafter,

> *Dendrite* requires that a plaintiff . . . must: (1) identify the fictitious defendant with "sufficient specificity" to allow for a determination as to whether the defendant "is a real person or entity" who may be sued; (2) demonstrate **[\*45]** a "good-faith effort to comply with the requirements of service of process"; (3) present sufficient facts from which it may be concluded that the suit can withstand a motion to dismiss; and (4) provide

Case: 25-2553    Document: 14-2    Page: 63    Date Filed: 10/21/2025
Page 16 of 22

2024 N.J. Super. Unpub. LEXIS 2609, *45

"a request for discovery with the [c]ourt, along with a statement of reasons justifying the specific discovery requested as well as identification of a limited number of persons or entities on whom discovery process might be served and for which there is a reasonable likelihood that the discovery process will lead to identifying information about defendant that would make service of process possible."

[*Warren Hosp. v. Does 1-10, 430 N.J. Super. 225, 231, 63 A.3d 246 (App. Div. 2013)* (alteration in original) (quoting *Dendrite, 342 N.J. Super. at 151-52*).]

If the court determines that a plaintiff has "presented a prima facie cause of action, [it] must balance the defendant's First Amendment right of anonymous speech against the strength of the prima facie case presented and the necessity for the disclosure of the anonymous defendant's identity to allow the plaintiff to properly proceed." *Dendrite, 342 N.J. Super. at 142*.

Hughes claims Maksoud "did not meet . . . the second or third element of the tests required by *Dendrite*." However, the circumstances here are wholly different from the circumstances presented in *Dendrite*. Unlike *Dendrite*, there is no anonymous posting, and **[*46]** thus, this case does not involve an individual's right to speak anonymously. And, saliently, there is no question that the online reviews were authored by Hughes.

In her correspondence with Schachtel, Hughes admitted to using the pseudonym "A.J. Park." Moreover, compelling facts were produced by Maksoud to withstand dismissal, namely, copies of the online reviews Hughes published, prior court filings, and Maksoud's own testimony. Therefore, we conclude that Hughes's reliance on *Dendrite* is misplaced.

Next, Hughes claims that it was error to find that she knowingly posted a false statement because her posts were truthful based on her experience with Maksoud. As we previously noted however, while it is true that a statement of "pure opinion" cannot constitute defamation, *Kotlikoff, 89 N.J. at 68-69*, our review of the record reveals that Hughes's online postings included considerably more than her opinion.

The court highlighted the following comments Hughes made in its findings following the proof hearing:

*From AVVO*:

I went back home after 10:30 pm. I wrote her email: not do anything and I will let her know... However, she kept calling me and threaten she will file court appearance her own... She took $1000 from my retainer **[*47]** only with "courtesy" after 30 days no bill. She holds another remaining $3000 no refund, unless I accept her "5 hrs 30 minutes service". She called Police I harassing her? Stay away from this harassing Prosecutor!

*From Google*:
A solo business - "JEKYLL AND HYDE!" Advertise low fees on bait and switch. Pretend nice to take your money. Aggressive and Offensive on you and cheat you! Outrageously Dishonest on unearned legal fees for the days and hours she NEVER worked!! She asked $4000 CASH.
[Plaintiff] is RUDE and DISHONEST. She steals your retainer for her personal business use. She never work on your case but FRAUDULENTLY "bill" you with "Summarized" "bill" on your waiting in her office lobby, on her missing appointment... BACK "bill" you after she grabbed your money. She asks for multiple advertising "reviews" to cover up her bad reviews.
. . . .
Her issue is submitted to ethic review in 2015 and 2018. HER LAWYER is under ethic review.

*From Google*:
She Fraudulently "billed" $375 for her NO-SHOW appointment when she was NOT retained. She "billed" 14 "Collective" email for 4 email. She used her assistant doing Bait-and-Switch for her low rate!

[Plaintiff] Stole our Confidential Personal Financial **[*48]** Information!! Seven (7) documents!! She Deliberately gave our Personal documents to her lawyer!! Deliberately showed our Confidential documents to Jury!! Posted

Case: 25-2553    Document: 14-2    Page: 64    Date Filed: 10/21/2025

Page 17 of 22

2024 N.J. Super. Unpub. LEXIS 2609, *48

our SSN, DOB online to public view!! She Lied she was "required" to keep our Personal documents In Her Hand for Seven (7) years!!

Police advised to take her to Court! However, a once 7 year prosecutor Fabricated numerous nasty Police stories went on Personal Attack!

The court also highlighted that in more than one review, Hughes identified the docket numbers given to her filings against Maksoud and encouraged readers to look up those docket numbers. Because of these public postings, the court concluded that the litigation privilege did not apply, and thus, several of the statements made by Hughes in her pleadings were defamatory as well. The court read them into the record, relying on the following from Hughes's verified complaint:

13. However, Maksoud unlawfully stole all copies of [Hughes's] documents, stated all above, for herself, prepared to harass [Hughes] if [Hughes] disputed her charge.

. . . .

15. In Aug 2017, Defendant Christopher DeSocio started to represent Maksoud. Without [Hughes's] consent, Maksoud knowingly, willfully **[*49]** and illegally handed over all [Hughes's] documents to DeSocio who was not involved in any part of [Hughes's] divorce case.

. . . .

17. Maksoud and DeSocio knowingly, intentionally and maliciously prepared and misused "Confidential Client Questionnaire" of [Hughes] dated on Sept 4, 2015 to show to the Jury and lied that Maksoud was hired on Sept 4, 2015, instead of Sept 17, 2015 when the retainer was signed.

18. Also, Maksoud and DeSocio knowingly, deliberately and maliciously prepared and misused all Confidential Personal documents containing a large amount of [Hughes's] personal identifiers for divorce that Maksoud obtained and demanded on Sept 17, 2015, and stole all copies from [Hughes] on Sept 28, 2015, stated all above, as Maksoud's work and her exhibits to show to the Jury.

. . . .

22. Maksoud intentionally, maliciously, and deceptively allowed all Confidential Personal documents from [Hughes] that they prepared to show to the Jury.

. . . .

30. All Confidential Personal Identifier and information of [Hughes] ha[s] been in Irreparable Damages on internet to public since June 4, 2018.

. . . .

35. Clearly, it is inevitable that "Confidential Client Questionnaire" of [Hughes] has to be spread **[*50]** out further among administrative staffs, lawyer and judge in Hudson County Court and Superior Court Cler[k] office during Court process . . . .

. . . .

41. Maksoud deliberately stole [Hughes's] divorce documents containing a great amount of personal, family and financial information for harassment against her former client, [Hughes].

. . . .

43. [Maksoud and DeSocio] have knowingly, willfully and maliciously prepared and misused [Hughes's] documents to release personal information and create irreparable harm to Maksoud's former client.

44. [Maksoud and DeSocio's] repeated actions of releasing personal information of former client is Intentional, Spiteful, Willful, Unlawful and Immoral.

As evidenced above, Hughes's comments were not limited to simply "criticism" of Maksoud's performance. Not only did Hughes label Maksoud a liar and a thief, but she also supported her characterizations with false facts. In addition, Hughes claimed defendant stole her money and personal information, which was not true, and Hughes

Case: 25-2553    Document: 14-2    Page: 65    Date Filed: 10/21/2025
Page 18 of 22

2024 N.J. Super. Unpub. LEXIS 2609, *50

knew it was not true. By publicly making those assertions, Hughes ultimately sought to harm Maksoud's business reputation. Thus, we are satisfied the court properly found Hughes's **[*51]** online reviews were defamatory.

Hughes further argues that "[t]o prove defamation, a plaintiff needs more than their own testimony," and because Maksoud's "evidence was her own self-serving testimony," it was error for the court to find Maksoud had proven a claim of defamation. To support her argument, Hughes cites to *Sisler v. Gannett Co., 104 N.J. 256, 281, 516 A.2d 1083 (1986)*, and highlights the following language from that case: "Awards based on a plaintiff's testimony alone or on 'inferred' damages are unacceptable."

"Damages which may be recovered in an action for defamation are: (1) compensatory or actual, which may be either (a) general or (b) special; (2) punitive or exemplary; and (3) nominal." *W.J.A., 210 N.J. at 239* (quoting *Prosser & Keeton* § 116A, at 842). Actual damages are those "real losses flowing from the defamatory statement[,]" which are "'not limited to out-of-pocket loss,' but include[] 'impairment to reputation and standing in the community,' along with personal humiliation, mental anguish, and suffering to the extent that they flow from the reputational injury." *Ibid.* (first quoting *Prosser & Keeton* § 116A, at 843; and then quoting *Gertz v. Robert Welch, Inc., 418 U.S. 323, 350, 94 S. Ct. 2997, 41 L. Ed. 2d 789 (1974)*).

"All compensatory damages . . . depend on showings of actual harm, demonstrated through competent evidence, and **[*52]** may not include a damage award presumed by the jury." *Nuwave Inv. Corp. v. Hyman Beck & Co., 221 N.J. 495, 499, 114 A.3d 738 (2015)*; *see also Sisler, 104 N.J. at 281* ("[A] plaintiff should offer some concrete proof that his reputation has been injured."). Although "[t]estimony of third parties as to a diminished reputation will also suffice to prove 'actual injury[,]'" an "[a]ward[] based on a plaintiff's testimony alone or on 'inferred' damages [is] unacceptable." *Ibid.*

Nominal damages may be awarded in cases where damages are presumed but the plaintiff "has not proved a compensable loss." *W.J.A., 210 N.J. at 240*. "Nominal damages are 'awarded for the infraction of a legal right, where the extent of the loss is not shown, or where the right is one not dependent upon loss or damage.'" *Id. at 240-41* (quoting Charles T. McCormick, *Damages* 85 (1935)).

An award of nominal damages is a "judicial declaration that the plaintiff's right has been violated." *Id. at 241* (quoting *McCormick* at 85). They serve "the purpose of vindicating the plaintiff's character by a verdict of a jury that establishes the falsity of the defamatory statement." *Ibid.* The *Punitive Damages Act, N.J.S.A. 2A:15-5.9 to - 5.17*, defines nominal damages as "damages that are not designed to compensate a plaintiff and are less than $500.[00]" *N.J.S.A. 2A:15-5.10*. "An award of nominal damages cannot support an award of punitive damages"; punitive damages **[*53]** are only available "if compensatory damages have been awarded in the first stage of the trial." *N.J.S.A. 2A:15-5.13(c)*.

Here, Maksoud was not awarded compensatory, actual, or punitive damages for her defamation claims. She was awarded nominal damages in the amount of $500.00, which was appropriate based on the evidence presented. Contrary to Hughes's argument, Maksoud's defamation claim does not fail because she did not prove a compensatory or actual loss.

Finally, Hughes cites to two out-of-state cases for the proposition that "internet reviews of public professional practices like lawyers and doctors have been treated more protectively than if it was just a matter of private concern," and therefore, the court's "finding a prima facie case of defamation should be vacated." The two cases cited by Hughes are distinguishable from the present matter.

The first case cited by Hughes is *Creekside Endodontics, LLC v. Sullivan, 2022 COA 145, 527 P.3d 424 (Colo. App. 2022)*. In that case, the plaintiff, a licensed dentist, performed root canal therapy on his patient, the defendant. *Id. at 426-27*. The defendant was dissatisfied with the procedures as well as the plaintiff's responses to her concerns and publicly expressed her dissatisfaction by posting online reviews. *Id. at 426-28*. The plaintiff then sued the defendant "for **[*54]** libel per se and trade and product disparagement based on the allegedly defamatory posts." *Id. at 428*.

Case: 25-2553    Document: 14-2    Page: 66    Date Filed: 10/21/2025
Page 19 of 22

2024 N.J. Super. Unpub. LEXIS 2609, *54

As for the statements defendant made about the plaintiff's dental work, the court ultimately concluded that because the defendant's online reviews were posted following a "lengthy investigation" into the work that was performed on her teeth and after she "received conflicting viewpoints" from other dentists, the plaintiff could not prove actual malice, which requires proof that the author "entertained serious doubts as to the truth of the statement or acted with a high degree of awareness of its probable falsity." *Id. at 431-32* (quoting *Fry v. Lee, 2013 COA 100, 408 P.3d 843, 848 (Colo. App. 2013)*). Next, as for the statements the defendant made regarding the plaintiff's response to her complaints, the court found that those statements were "pure opinion" based on facts that were not false. *Id. at 432*. Therefore, because the defendant "provided the factual reasons for her opinion, her statements are protected by the First Amendment." *Id. at 433*.

Here, in contrast, Maksoud was able to prove actual malice, that is, Maksoud was able to show that the online reviews posted by Hughes were published with Hughes's actual knowledge that the information she was sharing was false. Additionally, we reiterate, that **[*55]** Hughes's comments were not "pure opinion" protected by the First Amendment because they were based on false facts.

Hughes relies on *DeRicco v. Maidman, 209 A.D.3d 560, 175 N.Y.S.3d 476 (N.Y. App. Div. 2022)*. In that case, the plaintiffs, an orthodontist and his professional corporation, alleged that the defendants, a former minor patient and the patient's parents, defamed them in an unfavorable review posted on Google. *Ibid.*

In dismissing the complaint, the court held that the "overall context in which the communication was made, an anonymous online review of plaintiff's services," was an important consideration. *Id. at 561*. Based on that finding, the court concluded that "a reasonable reader of [the] review would understand it to be pure opinion," and therefore, not actionable. *Ibid.*

In this instance, however, Hughes's online postings were not simply limited to commentary on Maksoud's services as an attorney. Rather, Hughes's reviews contained false allegations against Maksoud, which, to a reasonable reader, would not be understood or construed as pure opinion. Thus, Hughes's arguments are unavailing, and the court did not err in finding Maksoud proved a case of defamation.


V.

Hughes next argues that "all damages awarded for the stress [Maksoud] allegedly suffered in connection with **[*56]** litigation are not compensable," and therefore, the court erred in entering an award for IIED. Again, we disagree.

In *Picogna v. Board of Education of Township of Cherry Hill, 143 N.J. 391, 399, 671 A.2d 1035 (1996)*, the Court held that a plaintiff may not recover for the stress of conducting the litigation that the plaintiff instituted against the defendant tortfeasor. However, the Court also noted that severe emotional distress proximately caused by defendant's conduct, exclusive of the litigation, is recoverable. *Ibid.*

Here, Maksoud was not seeking recovery for severe emotional distress caused by this action—the lawsuit she filed against Hughes. Instead, Maksoud was seeking recovery for the severe emotional distress she suffered as a result of Hughes's intentional and outrageous conduct against her—conduct which included bringing two actions and filing multiple court documents premised on false facts, and forcing Maksoud to defend herself against them. The evidence adduced during the proof hearing and the damages hearing showed there were multiple stress sources, and nothing in our jurisprudence indicates that a precise quantification is required when that occurs. *See, e.g., id. at 399*; *Hill v. N.J. Dep't of Corr., 342 N.J. Super. 273, 776 A.2d 828 (App. Div. 2001)*. Consequently, we are satisfied the court did not err in taking into consideration the prior litigation **[*57]** history between the parties when determining the award for IIED damages.

Hughes further argues "the finding, that there was no 'special grievance' for the malicious abuse of process [] and the findings of 'no compensable damages' for Hughes's defamation claim [] conflicts with the finding of liability under the IIED claim." However, malicious abuse of process, defamation, and IIED are separate causes of action. The court's disinclination to find "a special grievance" to support a claim of malicious abuse of process, and its

Case: 25-2553    Document: 14-2    Page: 67    Date Filed: 10/21/2025
Page 20 of 22

2024 N.J. Super. Unpub. LEXIS 2609, *57

disinclination to find compensable damages as a result of the defamation, did not preclude the court from finding that Maksoud had separately established a claim of IIED.

Lastly, Hughes argues that it was error for the court to "rel[y] upon and specifically incorporate" Maksoud's computation of damages. "[T]o arrive at a fair and reasonable award of compensation requires a high order of human judgment." *Model Jury Charges (Civil)*, 8.11E, "Disability, Impairment and Loss of the Enjoyment of Life, Pain and Suffering" (rev. May 2017). "Determining just compensation[,] . . . particularly when the damages are not susceptible to scientific precision, as in the case of pain **[*58]** and suffering damages, necessarily requires a high degree of discretion." *Johnson v. Scaccetti, 192 N.J. 256, 279, 927 A.2d 1269 (2007)*.

The Model Jury Charge on damages provides in pertinent part:

> The law on compensation recognizes that a plaintiff may recover for any disability or impairment that he or she suffers as a result of his or her injuries. . . . The law also permits a plaintiff to recover for the loss of enjoyment of life, which means the inability to pursue one's normal pleasure and enjoyment. You must determine how the injury has deprived [p]laintiff of [his or her] customary activities as a whole person. *This measure of compensation is what a reasonable person would consider to be adequate and just under all the circumstances of the case to make [p]laintiff whole for [his or her] injury and [his or her] consequent disability, impairment, and the loss of the enjoyment of life.* The law also recognizes as proper items for recovery, the pain, physical and mental suffering, discomfort, and distress that a person may endure as a natural consequence of the injury. . . .
>
> Here are some factors you may want to take into account when fixing the amount of the verdict . . . . *You may consider [p]laintiff's age, usual activities, occupation, family* **[*59]** *responsibilities and similar relevant facts in evaluating the probable consequences of any injuries you find [he or she] has suffered. You are to consider the nature, character and seriousness of any injury, discomfort or disfigurement. You must also consider their duration* . . . .
>
> *The law does not provide you with any table, schedule or formula* by which a person's pain and suffering, disability, impairment, and loss of enjoyment of life may be measured in terms of money. *The amount is left to your sound discretion.* . . . [T]he law can provide no better yardstick for your guidance than your own impartial judgment and experience.
>
> You are to exercise sound judgment as to what is fair, just and reasonable under all the circumstances. *You should, of course, consider the testimony of [p]laintiff on the subject of [his or her] discomforts.* You should also scrutinize all the other evidence presented by both parties on the subject, including the testimony of the doctors. After considering the evidence you shall award a lump sum of money that will fairly and reasonably compensate [p]laintiff for [his or her] pain, suffering, disability, impairment, and loss of enjoyment of life proximately caused **[*60]** by defendant's negligence (or other fault).
>
> [*Model Jury Charges (Civil)*, 8.11E, (emphasis added) (italicization removed).]

As the factfinder, the court here relied on Maksoud's testimony, which it found to be credible and persuasive, as well as Maksoud's certification, which supplemented her testimony and detailed the loss of her personal and professional time proximately caused by Hughes's conduct. The court also relied on Seglin's testimony, which it further found to be credible and was not rebutted. Even though the court did not award compensatory damages for defamation, that did not preclude the court from awarding damages for IIED. And thus, it was entirely appropriate, and consistent with the Model Jury Charges, for the court to consider Maksoud's testimony, certification, and Seglin's [7] testimony in arriving at its determination.

––––––––––––––––––––––––––––

[7] In her reply brief, Hughes contends that Seglin was not a "competent" witness because he "was sufficiently impeached by his own misconduct for over-billing Medicaid patients." In the record, it was explained that there was an "administrative proceeding" with the "State fraud division" that "terminated at the end of 2016 regarding some billing issues that involved an assistant in the doctor's office and that as a condition of that resolution, with no civil penalties, [Seglin] has long since hired a company to take

Case: 25-2553    Document: 14-2    Page: 68    Date Filed: 10/21/2025

Page 21 of 22

2024 N.J. Super. Unpub. LEXIS 2609, *60

VI.

Finally, Hughes argues the verdict should be vacated for several other reasons, which we address in turn.

A.

*Default*

Hughes maintains that "rigid enforcement of a default against a pro se defendant for minor discovery violations denied the right to a jury trial." Hughes, however, never appealed from the court's entry of default judgment.

In civil actions, **[\*61]** *Rule 2:5-1(f)(2)(ii)* requires an appellant to designate, in the notice of appeal, the judgment, decision, action or rule appealed from. *See* Pressler & Verniero, *Current N.J. Court Rules*, cmt. 5.1 on *R. 2:5-1* (2025). If a matter is not designated in a party's notice of appeal, it is not subject to the appellate process and review. *See Kornbleuth v. Westover, 241 N.J. 289, 299, 227 A.3d 1209 (2020)*; *Campagna ex rel. Greco v. Am. Cyanamid Co., 337 N.J. Super. 530, 550, 767 A.2d 996 (App. Div. 2001)*; *Sikes v. Twp. of Rockaway, 269 N.J. Super. 463, 465-66, 635 A.2d 1004 (App. Div. 1994)*.

Since Hughes did not appeal from the court's default judgment, the issue as to whether default was properly entered is not before this court. Nonetheless, we address the merits of Hughes's argument.

*Rule 4:43-1* states, in pertinent part:

> If a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend as provided by these rules or court order, or if the answer has been stricken with prejudice, the clerk shall enter a default on the docket as to such party.

"As a general matter, there are various ways in which a party's failure to adequately fulfill conditions imposed by a court order in discovery or in preparation for trial may ultimately permit the dismissal of a claim or the entry of default." *N.J. Div. of Youth & Fam. Servs. v. P.W.R., 410 N.J. Super. 501, 506, 983 A.2d 598 (App. Div. 2009)*. More typical examples of such failures include "[f]ailures to file responsive pleadings or to appear when required to litigate the matter." *N.J. Div. of Youth & Fam. Servs. v. M.G., 427 N.J. Super. 154, 168, 47 A.3d 764 (App. Div. 2012)*.

Here, although Hughes was proceeding pro se, **[\*62]** the record shows she was familiar with the court system. Indeed, Hughes was given multiple opportunities to respond to Maksoud's discovery requests, but repeatedly failed to comply. Hughes's failure to appear and participate clearly constituted a failure to defend, squarely falling within the grounds for a default under *Rule 4:43-1*. Moreover, in light of Hughes's conduct, there was no basis for the court to try the case by jury.

B.

*Damages Awarded Were Arbitrary and Capricious*

Hughes avers that the court's evaluation of damages for "emotional trauma was arbitrary and capricious and should be vacated." Hughes maintains that having found no compensable damages for defamation and no special damages for abuse of process, Maksoud cannot be entitled to estimated compensatory damages under the guise of damages for extraordinary emotional distress resulting from conduct so horrendous that it is beyond the capacity of a person to bear.

---

care of his billing and has received an administrative error." Thus, contrary to Hughes's argument, we conclude this history did not render Seglin incompetent, and the court took that information into consideration when rendering its final opinion.

Case: 25-2553    Document: 14-2    Page: 69    Date Filed: 10/21/2025
Page 22 of 22

2024 N.J. Super. Unpub. LEXIS 2609, *62

As we previously stated, however, the court was not precluded from finding Maksoud proved IIED and was entitled to damages simply because it did not award compensatory damages for defamation and did not find proof of a claim of malicious use of process. Each claim was separate. **[*63]** Moreover, the court was permitted to consider all the evidence presented when awarding damages. Ultimately, the amount the court ordered, $522,700.00, does not shock the judicial conscience based on the proven facts of this case.

C.

*Mitigating Factors*

Finally, Hughes argues that she should have been allowed to present evidence in mitigation of the damages alleged by Maksoud. "It [is] strictly a discretionary matter for [the] court to determine and delineate the extent of defendant's participation" in the default proceeding. *Scott v. Scott, 190 N.J. Super. 189, 196, 462 A.2d 614 (Ch. Div. 1983)*.

Here, Hughes was permitted to challenge Maksoud's evidence by way of cross-examination. Additionally, Hughes was provided the opportunity to give a closing statement, although she was ultimately barred from doing so based on her representations to the court. Hughes was not permitted to present affirmative proofs, but that limitation was rightly imposed by the court because of her default status. *See Chakravarti, 393 N.J. Super. at 210-11* ("Even though a defendant who has defaulted has relinquished the right to present affirmative proofs in the matter, the right to challenge a plaintiff's showings in a proof hearing by way of cross-examination and argument should not ordinarily be precluded."); *Innes v. Carrascosa, 391 N.J. Super. 453, 496, 918 A.2d 686 (App. Div. 2007)* (finding **[*64]** that when faced with a defaulting defendant, trial judge acted reasonably and within his authority to restrict that party's participation in a proceeding including limiting introduction of evidence).

Thus, contrary to Hughes's arguments, in light of her default status, Hughes had no right to present evidence on her behalf at the hearings. We conclude the court acted well within its discretion in limiting Hughes's involvement to cross-examination and closing statements.

To the extent we have not addressed them, all other points raised by Hughes lack sufficient merit to warrant discussion. *R. 2:11-3(e)(1)(E)*.

Affirmed.

---

**End of Document**